# EXHIBIT "C"

Association of Ship Brokers
& Agents (U.S.A.), Inc.

**1ST ORIGINAL**

~~CODE WORD FOR THIS~~
CHARTER PARTY:

October 1977

ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

### PREAMBLE

SINGAPORE   31st August, 2010
Place                    Date

IT IS THIS DAY AGREED between *Memphis Shipping Pte Ltd,  7 Shenton Way, #1-02 Singapore Conference Hall, Singapore 068810*

~~chartered owner/owner~~ (hereinafter called the "Owner") of the          *Built in 1987,  Singapore Flag*

SS/MS      *"Memphis"*                                                                      (hereinafter called the "Vessel")

F    *International Oil Overseas Inc, Jeddah*    (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

### PART I

A.   Description and Position of Vessel:

Deadweight: *104,499.4 Metric*   tons ~~(2240 lbs.)~~ Classed: *Lloyds Register*

Loaded draft of Vessel on assigned summer freeboard *14.92 metres* ft.     in. in salt water.

Capacity for cargo: *106,093.4 cubic metres*   ~~tons~~ *excluding sloptank* ~~(of 2240 lbs. each)~~     98   % ~~more or less, Vessel's~~
*Slop Tank(s) Capacity (98%) : 2,205.4 cubic metres.*

Coated:          [ *Epoxy* ] Yes       [  ] No

Coiled:          [ *Steam* ] Yes       .[  ] No          Last ~~two~~ *3* cargoes: *Fuel Oil / Crude / Crude*

*Itinerary* ~~Now:~~ *Prompt Fujairah*          ~~Expected Ready:~~

B.   Laydays: *For 1 or 2 Voyages in Charterers' option*

Commencing:  *0001 hours 03rd September, 2010*_____  Cancelling:   *2359 hours 03rd September, 2010*

C.   Loading Port(s):    *1 SB/SP/SPM/STS Fujairah - Khor Fakkan Range, UAE*

~~Charterer's Option~~

D.   Discharging Port(s):     *1 SB/SP Karachi - Bin Qasim Range*

~~Charterer's Option~~

E.   Cargo:   *Cargo/quantity : Charterers' option upto full cargo 1/2 grades fuel oil .*
*Heat        : vessel to maintain loaded temp max 135 deg f. Max loaded temp 165 deg f*

~~Charterer's Option~~

F.   Freight Rate:
*Lumpsum : USD 265,000 basis 2 /1*

~~per ton (of 2240 lbs. each):~~

G.   Freight Payable to:



*Freight payable in USD by telegraphic transfer to Owners designated bank account as follows:*
*Here below pls find our bank details in US currency:*
*National Bank of Greece*
*Branch 196*
*2, Bouboulinas Str., & Akti Miaouli*
*Piraeus 185 35*
*Greece*
*Swift : ETHGRAA*
*Via N.Y. corresp : Bank of New York Swift IRVTUS3N or*
*JP Morgan Chase Swift CHASUS33*
*Beneficiary : EUROTANKERS INC*
*Account number : 196-931882-86*
*IBAN : GR07 0110 196 20000 196 93188286*
-at-

H.  Total Laytime in Running Hours:      *84 hours*

I.  Demurrage per day: *US$14,000 per day pro rata.*

J.  Commission ~~of~~                                          ~~% is payable by Owner to~~
*Total commission 3.75 pct of which 2.5 address commission and 1.25 pct to Island Shipbrokers Pte Ltd on all monies earned*
~~on the actual amount freight, when and as freight is paid.~~

K.  The place of General Average and arbitration proceedings to be London/~~New York (strike out one).~~

~~L.   Tovalop: Owner warrants Vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.~~

M.  Special Provisions: *International Oil Overseas Inc (additional clauses for ASBATANKVOY) dated 20.01.2009 with amendments as attached, Special Provisions to form an intergal part of this Charter Party.*


IN  WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate as of the day and year first above written.


Witness the signature of:

By:  *Owners*


Witness the Signature of:

By:  *Charterers*


This Charterparty is a computer generated copy of ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author.

## PART II

1.    WARRANTY - VOYAGE - CARGO. The Vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or as near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat), from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2.    FREIGHT. Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3.    DEADFREIGHT. Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4.    NAMING LOADING AND DISCHARGE PORTS.

    (a)    The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

On a voyage to a port or ports in:
ST. KITTS                     Carribean or U.S.  Gulf loading port(s)
PORT SAID               Eastern Mediterranean or Persian Gulf loading port(s)
                                 (from ports west of Port Said.)

    (b)    If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

Place                        On a voyage to a port or ports in:
LANDS END           United Kingdom/Continent (Bordeaux/Hamburg range)
                                 or Scandinavia (including Denmark)
SUEZ                        Mediterranean (from Persian Gulf)
GIBRALTAR          Mediterranean (from Western Hemisphere).

    (c)    Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used Laytime.

5.    LAYDAYS. Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 o'clock P.M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6.    NOTICE OF READINESS. Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice or readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7.    HOURS FOR LOADING AND DISCHARGING. The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8.    DEMURRAGE. Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9.    SAFE BERTHING - SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10.    PUMPING IN AND OUT. The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall her pumps and the necessary power for discharging in all ports, as well as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations ... ...ting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11.    HOSES: MOORING AT SEA TERMINALS. Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12.    DUES - TAXES - WHARFAGE. The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto de Comercio Maritime. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13.    (a).    CARGOES EXCLUDED VAPOR PRESSURE. Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 deg F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

        (b)    FLASH POINT. Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 deg F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14.    (a).    ICE. In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterer, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

        (b)    If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15.    TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the

following conditions:

   (a)   Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

   (b)   All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

   (c)   Time consumed shifting between the ports or terminals of the particular grouping or combination shall not count as used laytime.

   (d)   Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16.   GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17.   (a).   QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

   (b)   FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18.   CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19.   GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:- any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy or marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master or owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:- Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general, or riot or civil commotion.

20.   ISSUANCE AND TERMS OF BILLS OF LADING.

   (a)   The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

   (b)   The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

   (i)   CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

   (ii)   JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

   (iii)   GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1974 as amended 1994 ~~1950~~ and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

   (iv)   BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other to or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

   (v)   LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

   (vi)   WAR RISKS.   (a)   If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

   (b)   If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge - the Charterers shall have the right to order the cargo or such part of it as may be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

   (c)   The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

   (vii)   DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of loading any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21.   LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22.   AGENTS. The Owner shall appoint Vessel's agents at all ports.

23.   BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24.   ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25.   SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfilment of this Charter in all its terms and conditions.

26.   OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperilled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by

on board the

v     of

 

Steamship/Motorship

is Master, at the port of

 

to be delivered at the port of

or so near thereto as the Vessel can safely get, always afloat, unto

or order on payment of freight at the rate of

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London

between                                                  and                                                  , as Charterer, and

all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed                                                                    Bills of Lading

of this tenor and date, one of which being accomplished, the others will be void.

Dated at                                                                          this                    day of

 

Master

Charter Party is a computer generated copy of the ASBATANKVOY form, printed under license from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by striking out of original characters, or the insertion of new characters, such characters clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.



"Memphis" / IOOI dtd 31 Aug'10

**1ST ORIGINAL**

# "MEMPHIS" / IOOI
# CHARTER PARTY DATED 31ST AUGUST, 2010

## SPECIAL PROVISIONS

➤ **AND IN CHARTERERS' OPTION TO BE DECLARED UPON COMPLETION OF LOADING FIRST CARGO**

Cargo/quantity : Charterers' option upto full cargo 1/2 grades fuel oil .
Heat         : vessel to maintain loaded temp max 135 deg f.
               Max loaded temp 165 deg f
Loadport     : load 1/2 ports/STS Iran Intention Bandar Mahshahr
Discharging  : 1/2 safe port/STS Khor Fakkan - Fujairah range
Laycan       : 16th – 17th September, 2010(0001-2359)
Freight      : Lumpsum USD 42,5000 basis 2/1
Demurrage    : USD 14000 PDPR
Laytime      : 84 hrs

➤ Any taxes and/or dues on cargo and/or freight and/or vessel to be for Charterers account and to be settled directly by them.

➤ Worldscale terms and conditions 2009 to apply

➤ General Average / Arbitration: English Law to apply

➤ All cost/time/risk for obtaining domestic license/permit for trading coastal or domestic. If any to be for Charterers' account - (Charterers advise this is not coastal or domestic voyage so Not Applicable)

➤ OWNERS INTERIM PORT CLAUSE

➤ **CHARTERERS TO PAY FOR ADDITIONAL INTERIM LOAD/DISCH PORT AT COST AS FOLLOWS**

DEVIATION: actual additional steaming time incurred as per master's statement for deviation which exceeds direct passage from first loadport to final discharge port.

PORTTIME: time to count in full from arrival pilot station interim load/discharge port until dropping last outward pilot interim load/disch port i.e. no allowance for notice time, nor deduction for shifting even from anchorage to first berth and no deduction for time lost due to tide, sea and weather conditions.

COST: deviation and time used to be calculated at demurrage rate per day pro rata, plus cost for all additional bunkers consumed during the deviation as well as all bunkers used in port as per masters e-mail statement.



"Memphis" / 1001 dtd 31 Aug'10

PAYMENT: deviation + time used + all bunkers consumed to be paid together with freight as per Owners e-mailed invoice with supporting documents + last bunker invoice, which later to be supported by original invoice and bunker invoice.

All port costs to be for Charterers account, and to be paid directly by them.

> VOPAQ CONDITIONS AND NTM113 COMPLIANCE:

1. she does not have any projection on their hull  - yes
2. her IG systems are in good working condition - yes
3. her cots are fully inerted - yes
4. vessel is compliant with ntm 113

## OWNRS STS CLAUSE TO APPLY

Charterer's option to perform STS operation at a safe place, however always subject to Owner's/master's approval which shall not be unreasonable withheld.

Any transshipment operation to conform to standard not less than those set out in the latest edition of ICS/OCIMF STS guide - petroleum and Owner undertakes that the vessel and her crew will comply with such recommendations.

Charterers shall provide and pay for all necessary equipment, lightings including fenders and hoses. Owners shall permit supervisory personnel nominated by charts to attend on board, always at chart's risk and expense, including mooring master, to assist in the transshipment operation. All port charge incl agency fee at STS operation, if incurred, to be for Charterers' account and settled directly by Charterers.

All time from vessel arrival at STS location until vessel cast off from STS vessel to count as full laytime, or as time on demurrage if on demurrage, weather permitting or not. lighterage operations are to be at the sole discretion of the master at all times which shall not be unreasonable withheld and if the master at any time considers that the lighterage operations are, or are about to become unsafe, then he may order that they be discontinued. Whether or not operations are discontinued, all time will be considered as laytime or demurrage.

Regarding safety aspects of STS and operations, master will have the final authority. Any lightening/lighterage vessel shall have valid IMO certificate of fitness and valid ISSC certificate and be operated in compliance therewith.



**1ST ORIGINAL**

"Memphis" / IOOI dtd 31 Aug'10

## INTERNATIONAL OIL OVERSEAS, ADDITIONAL CLAUSES - (ASBATANKVOY), DATED JAN.2009 (1 - 34)

1.    DEFINITIONS: In this Charter

a.    "Place" shall mean any berth, dock, anchorage, sea terminal, submarine line, alongside vessel and/or lighter, whether at anchor or underway, and/or any other place to which Charterer is entitled to order Vessel hereunder. *All references to ship to ship transfer and lightering to be deleted in the Charterer additional terms. For STS, all reference make to Owners STS clause .*



b.    "ILL Convention" shall mean the International Load Line Convention, 1966, or any amendment thereof as may be applicable to the voyage(s) to be performed hereunder.

c.    "Full Cargo" shall mean a cargo which fills Vessel to its minimum freeboard, as permitted by the ILL Convention, or fills the cubic capacity of Vessel's available cargo spaces, whichever occurs first, after leaving appropriate space in the tanks for the expansion of cargo.

d.    "Arrival in Berth" shall mean the completion of mooring of Vessel when loading or discharging at a sea terminal, Vessel being all fast when loading from or discharging alongside a wharf/berth, or Vessel being all fast alongside a barge, lighter or other vessel when loading from or discharging to a barge, lighter or other vessel.

e.    "Owner" Or "Owners" the term shall include the Owners, Managers and Operators of the Vessel

f.    "Charter" or "Charter Party" shall mean this Charter Party

*G. All reference on telex to be changed to electronic email for the purpose of this charter party .*



2.    CONFIDENTIALITY AND PRIVACY:

a.    Owner agrees that any details of this fixture shall be absolutely private and confidential and shall not be released to any third parties. Owner agrees that all financial settlements, billings and reports rendered by Owner to Charterer, as provided for in this Charter, shall, in reasonable detail, accurately and fairly reflect the facts about all activities and transactions handled for the account of Charterer, all negotiations and every detail of this fixture are to be kept strictly private and confidential.

b.    ~~Owners warrant and undertake that all loading documents shall be strictly private and confidential and shall not be handed over to any party other than charterer or charterers agent/representative, only if instructed by Charterers. Such confidentiality shall include copies and/or quotes of such documents to any party other than charterers, Owners undertake to instruct master to strictly adhere to above and not to release any information under whatsoever circumstances neither in writing or in verbal unless agreed/instructed in writing by the charterers.~~

"Memphis" / IOOI dtd 31 Aug'10

**3.      Owners Warranties and Undertakings: Owners warrants and undertakes, from the time this Charter becomes effective and throughout Vessel's service under this Charter, the following:**

a.       A Safety Management System (SMS) in accordance with the ISM code is in operation both on shore and on board the Vessels. Owners shall have a valid document of compliance and the Vessels shall have a safety management certificate, copies of which will be supplied to charterers.

b.       Owners have a policy on Drug and Alcohol Abuse applicable to the Vessel which meets or exceeds the standards in the Oil Companies' International Marine Forum Guidelines for the Control of Drugs and Alcohol on Board Ship (OCIMF Guidelines). Owners shall exercise due diligence to ensure that such policy is complied with; seafarers to be tested shall be all Vessel officers and the drug/alcohol testing and screening shall include random testing of the officers with a frequency to ensure that each officer is tested at least once a year, a full declaration has been passed on to Exxon/Exxon affiliate, which as above states that Vessel operates under a Drug and Alcohol Policy which meets or exceeds the OCIMF Guidelines, and that the Vessel shall comply with the OCIMF Guidelines for the control of drugs and alcohol onboard ship.

c.       *To the best of Owners' knowledge,*  The Vessel is not boycotted by the Arab League and has never traded to Israel.

d.       The Master shall not allow any Vessel or craft, other than those of port authorities or pilots, to secure alongside without the express written authority of Charterers.

e.       Vessel shall be as described in Part I (A), and that the dully completed Questionnaire Form 88 and forwarded to Charterers by Owners or brokers is accurate and agree that such forms an integral part of this Charter Party.

f.       Owners and Master shall comply with Charterers voyage instructions *in accordance to charter party terms and conditions and main terms* except where safety of life, the Vessel or cargo is at risk and the master and Vessel will fully comply with Charter Party

g.       Owner shall exercise due diligence to ensure that Vessel and its hull, machinery, boilers, all tanks and all other equipment including, but not limited to pipes, pumps, valves, inert gas and crude oil wash systems, navigational equipment, heating coils and facilities, shall be fully functional and in good working order and condition and in every way seaworthy and fit to carry the cargo and perform the voyage(s) required under this Charter.

h.       The Vessel shall have a full and efficient complement of Master, officers and crew, with adequate training and experience in operating all Vessel's equipment including, but not limited to, inert gas and crude oil wash systems, and that Master and all officers shall possess valid and current certification/documents issued or approved by the country of Vessel's registry. Owner further warrants the conversational English language proficiency of Master and officer(s) in charge of cargo and bunker oil handling

"Memphis" / IOOI dtd 31 Aug'10

i.      **To the best of Owners' knowledge,** The Vessel shall be in full compliance with all international conventions, all applicable laws, regulations and/or other requirements of the country of Vessel's registry and of the countries or states of the port(s) and/or place(s) to which Vessel may be ordered hereunder and all applicable regulations and/or requirements of any terminals or facilities in such port(s) and/or place(s) where Vessel shall load or discharge. ~~Owner further warrants that Vessel shall be fully classed and have on board during the subject period, all certificates, records or other documents required by the aforementioned conventions, laws, regulations and/or requirements. The conventions, laws, regulations and requirements referred to in this Clause shall mean conventions, laws, regulations and requirements concerning ship size, ship design, safety, operation of ship's equipment (including inert gas and crude oil washing systems, where applicable), navigation, pollution and other like matters. Owner further warrants that, if required by Charterer or the Vessel's trade, the Vessel will hold a valid ITF Certificate throughout the period of this Charter~~



j.      Vessel is equipped with an Inert Gas System in working order and officers/crew experienced in its use

k.      The Vessel has not been sold at the time that this Charter is entered into and, in the event that a contract of sale is entered into during the period of this Charter, Owner will give Charterer seven (7) working days notice of the proposed date of delivery to the purchasers thereunder.

l.      That it is a member of the International Tanker Owners Pollution Federation Limited (ITOPF) and will retain such membership during the entire period of this Charter Party.

m.     Owners warrants in regards to cargo equipment that the following

i.      Vessel is able to segregate minimum two grades with double valve, line and pump segregation, and is able to load/discharge two grades simultaneously without contamination

ii.     ~~Vessel is capable of heating to and maintaining cargo at 135 degrees Fahrenheit prior to discharge as per Charterers instructions.~~ *as per main terms*

iii.    ~~Vessel is to be presented at loading port(s) fit for the carriage of cargo.~~ *(as per Q.88)*

iv.     ~~Vessel is equipped with minimum 10 ton derricks port and starboard amidships to handle bunker lines/cargo hoses.~~ *(as per Q.88)*

n.      Owners warrants in regards to the pumping capability of the Vessel the following

i.      Vessel can maintain at Vessels manifolds a pressure as is set out in the relevant clause herein and/or that a full *homogenous* cargo can be discharged within the time as is set out in the relevant clause herein hours, provided shore facilities permit.

ii.     In ship to ship transfer operations, Vessel to achieve a discharge rate of up to the rate as is set out in the relevant clause herein of metric tons per hour.

"Memphis" / IOOI dtd 31 Aug'10

iii.    ~~Vessel to have on board a sufficient range of reducers to allow connection to various hose line~~ ~~diameters and terminal cargo manifolds.~~ *(as per q.88)*

o.    Owners warrants in regards to the insurances of the Vessel the following

i.    Vessel has Protection and indemnity (P&I) insurance providing equivalent cover to that provided by a full owner's entry, without exclusions, in a member club of the International Group of P&I Clubs with a limit of liability of not less than USD 1 billion, excluding pollution risks, and hull insurance for the current market value of Vessel, and that it has in place a worldwide insurance cover for oil pollution with limits and terms of not less than the maximum on offer through the International Group of P&I Clubs and that this cover will remain in place throughout the period of this Charter, and Owners are member(s) of one of the International Group P&I Clubs

ii.    If the Vessel's hull is self - insured, full collision liability insurance shall be included in Owner's P&I insurance coverage.

iii.    Owner shall not change the P&I Club in which the Vessel is entered without the express written consent of Charterer and shall upon request provide Charterer with written evidence of such coverage in a form satisfactory to Charterer.

p.    Vessel is equipped and capable of safely carrying out all procedures as set out in the latest revised edition of the ICS/OCIMF Ship to Ship Transfer Guide

q.   That the Vessel's position at the time of fixture is ( ) and Vessel's ballast speed will be( ) knots with an expected ETA basis( ) as ( )    *Ballast/laden speed 12.0knot basis weather permitting and safe navigation.*

r.    Vessel will perform the laden voyage at( ) knots up to WF4, weather and safe navigation permitting

s.    Owners warrants in regards to communications of the Vessel the following

i.    ~~Allow Charterers supercargo the use of Vessels communication equipment for reasonable~~ ~~operation purposes without charge.~~

ii.    Transmit to charterers, on owners account, daily noon positions giving required information regarding Vessels position, distance to go, average speed, Eta next port, cargo temperature maintained and any other information requested.

iii.    Maintain twenty four hours (24 Hrs) watch on VHF Channel 16/14.

t.    Owners warrants and undertakes in regards to carriage of Heavy Grade Oil the following

i.    Owners hereby represent and warrant that the Vessel is and will at all times comply with and be permitted to trade under the provisions of the MARPOL Regulation, including but not limited to 13H,13G, and 13F of the relevant annex already into force, or coming into force on 5 April 2005, as well maintain

compliance with any other laws or regulations implementing the above regulations or similar laws or regulations imposed by the Vessel's flag state or any Governmental authority at the port(s) of loading and discharge so that the Vessel is permitted throughout the currency of this charter and related voyages to carry a cargo of heavy grade oil ("HGO") as defined in MARPOL.

ii.    ~~Owners shall also comply with and maintain the Vessel throughout the currency of this charter in compliance with all classification society regulations for the carriage of heavy grade oil.~~ *Owners shall also comply with and maintain the vessel throughout the currency of this charter in compliance with all classification society regulations as well as flag state, any government authority at the port(s) of loading and discharging for the carriage of heavy grade oil.*



iii.   ~~Owners undertake to indemnify and hold charterers free and harmless from any and all claims, costs, expenses, losses, and consequences of whatsoever nature, which charterers may incur as a result, either directly or indirectly, of the Vessel's non - compliance with the applicable MARPOL regulations, and/or flag state and/or Governmental laws and regulations or other conditions regarding the carriage of heavy fuel oil.~~ *Owners undertake to indemnify and hold Charterers free and harmless from any and all claims, costs, expenses, losses, and consequences of whatsoever nature, which Owners may incur as a result, either directly or indirectly, of the their non-compliance with the applicable marpol regulations, and/or flag state and/or governmental laws and regulations or other conditions regarding the carriage of heavy fuel oil on board M.T. Genie*



u.    If any of the warranties stipulated in this Clause are breached, any delay resulting therefrom shall not count as lay time or, if Vessel is on demurrage, as time on demurrage and any expense attributable to such delay shall be for Owner's account. *Only if solely in the case of Owners/masters fault.*

4.    NOTICE OF READINESS/ETA/TIMINGS:

a.    Unless Master is otherwise instructed in writing by Charterer, the following Estimated Time of Arrival (ETA) notifications shall be given. As soon as commencing the voyage to the nominated loading port(s) or place(s), Master shall advise Charterer and Vessel's agent, and any other entity designated by Charterer, of Vessel's estimated date and time of arrival at the nominated loading port(s) or place(s). Further, regardless of the length of the voyage and even if Vessel is in port discharging on the previous voyage, Master shall confirm or amend such advice, ninety six 96, seventy - two (72), forty - eight (48) and twenty - four (24) hours prior to Vessel's arrival at the loading port(s) or place(s). On leaving the final loading port or place, Master shall advise Charterer and Vessel's agent and any other entity designated by Charterer of Vessel's estimated date and hour of arrival at the nominated discharging port(s) or place(s). On voyages in excess of seven (7) days in duration, ETA notifications shall be sent at noon every Sunday and Thursday throughout the voyage. Further, provided the length of the voyage

"Memphis" / IOOI dtd 31 Aug'10

permits, Master shall confirm or amend such advice seventy - two (72), forty - eight (48) and twenty - four (24) hours prior to Vessel's arrival at the discharging port(s) or place(s).

b.       In addition, on leaving the final loading port or place, Master shall advise Charterer of expected maximum draft at arrival and, provided the length of the voyage permits, shall confirm or amend such advice no later than seventy - two (72) hours prior to Vessel's arrival at the discharging port(s) or place(s) *if time permits*.

c.       An alteration of more than three (3) hours in the twenty - four (24) hour notice or an alteration of more than twelve (12) hours in any other advice given pursuant to Paragraph (a) of this Clause shall be advised by Master immediately to Charterer and Vessel's agent, and any other entity designated by Charterer.

d.       If, for any reason, Vessel is unable to trim to even keel for arrival at the discharging port(s) or place(s), Master shall give notice of this to Charterer as soon as possible after receiving loading instructions but no later than sailing from the final loading port or place. Such notice shall include Vessel's estimated arrival draft forward and aft.

e.       At each loading and discharging port or place, Master or Vessel's agent shall promptly notify Charterer of the dates and times of at least the following events occurred being (i) Notice of Readiness to load/discharge tendered, and (ii) All fast, and (iii) Hoses connected, loading/discharge commenced (iv) Hoses disconnected, loading/discharge completed, and (v) Vessel cleared berth, Vessel sailed and (vi) Any unusual occurrences or incidents or delays whether caused by Vessel or cargo loading or receiving facilities, including notice(s) of protest with reason(s).

f.       All advices and notifications required by this Clause shall be made by telegraph, telex, fax or radio, (if radio, subsequently confirmed in writing).

g.       If Master fails to comply with the requirements of this of this Clause, any delay resulting therefrom at loading and/or discharging port(s) or place(s) shall not count as laytime or, if Vessel is on demurrage, as time on demurrage as all ETA notices are essential for demurrage purposes.

5.       BILLS OF LADING (B/L):

~~a.       Charterers shall have the right to ask owners to reissue new Bill of Lading, as per requirements of Charterers, upon delivery of the signed B/L's to the owner/owners agent or Master. Owners shall comply with such request.~~

~~b.       If Charterer by telex, facsimile or other form of written communication that refers to this Clause requests Owner to discharge a quantity of cargo:~~

~~i.       without presentation of original Bills of Lading and/or~~

~~ii.       in the event of a change in discharge port/place named in Bills of Lading and/or~~

~~iii.       the Bills of Lading are not available at discharge port(s) and/or~~



"Memphis" / IOOI dtd 31 Aug'10

iv.        that is different from the Bill of Lading quantity and/or

v.        to a receiver/consignee other than the receiver/consignee designated in the original Bill(s) of Lading

Then the cargo is to be released and discharged by Owners/Vessel against a Letter of Indemnity signed by an authorized signatory of Charterers without the need of any bank guarantee or bank counter signature in Owners customary P&I Club wording OR in the absence of such in following wording which shall be deemed to be given by Charterer on each and every such occasion and which is limited in value to 150% of the C.I.F. value of the cargo carried on board:

i.        Charterer shall indemnify Owner, and Owner's servants and agents in respect of any liability, loss or damage of whatsoever nature (including legal costs as between attorney or solicitor and client and associated expenses) which Owner may sustain by reason of delivering such cargo in accordance with Charterer's request.

ii.        If any proceeding is commenced against Owner or any of Owner's servants or agents in connection with Vessel having delivered cargo in accordance with such request, Charterer shall provide Owner or any of Owner's servants or agents from time to time on demand with sufficient funds to defend the said proceedings.

iii.        If Vessel or any other vessel or property belonging to Owner should be arrested or detained, or if the arrest or detention thereof should be threatened by reason of discharge in accordance with Charterer's instructions as aforesaid, Charterer shall provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such vessel or property and Charterer shall indemnify Owner in respect of any loss, damage or expenses caused by such arrest or detention whether or not the same may be justified.

iv.        Charterer shall, if called upon to do so at any time while such cargo is in Charterer's possession, custody or control, redeliver the same to Owner.

v.        As soon as all original Bills of Lading for the above cargo which name as discharge port the place where delivery actually occurred shall have arrived and/or come into Charterer's possession, to produce and deliver

vi.        the same to Owner whereupon Charterer's liability hereunder shall cease. Provided however, if Charterer has not received all such original Bills of Lading by 2400 hours on the day thirty – six (36) calendar months after the date of discharge, then this Indemnity shall terminate at that time unless before that time Charterer has received from Owner written notice that some person is making a claim in connection with Owner delivering cargo pursuant to Charterer's request, or legal proceedings have been commenced against Owner and/or carrier and/or Charterer and/or any of their respective servants or agents and/or Vessel for the same reason.



"Memphis" / IOOI dtd 31 Aug'10

~~vii.      When Charterer has received such a notice, then this indemnity shall continue in force until such claim or legal proceedings are settled. Termination of this indemnity shall not prejudice any legal rights a party may have outside this indemnity.~~

~~viii.      Owner shall promptly notify Charterer if any person (other than a person to whom Charterer ordered cargo to be delivered) claims to be entitled to such cargo and/or if Vessel or any other property belonging to Owner is arrested by reason of any such discharge of cargo.~~

*In the event of a change in discharge port named in bills of lading or the bills of lading are not available at discharge port(s), the cargo is to be released by Owners against a letter of indemnity signed by an authorized signatory of Charterers in Owners' P & I club wording without bank guarantee or counter signature .*

6.      NAMING LOAD AND DISCHARGE PORTS/PLACES; LOADING AND DISCHARGING PORT(S): ~~(Clause 4 of Asbatankvoy Charter Party is deleted and is replaced with this clause)~~ as per **ASBANTANKVOY and main terms**



~~a.      Notwithstanding anything to the contrary in this Charter Party and notwithstanding what loading and/or discharging ports/ranges may have been nominated and bills of lading issued, Charterer shall have the right to change its nomination of the loading and/or discharging ports/ranges, Charterer shall have the right to make as many changes as it deems necessary.~~

~~b.      Any extra time and expense incurred by owner in complying with charterer's orders shall be for Charterer's account. Freight is based on the voyage actually performed.~~

~~c.      Charterer shall have the option to nominate loading or discharging port(s) and/or place(s) or order Vessel to a destination for orders. If Vessel is ordered to a destination for orders, Charterer shall thereafter nominate loading or discharging port(s) and/or place(s).~~

~~d.      After nominating loading and/or discharging port(s) or place(s) pursuant to this Clause, Charterer shall have the option to nominate new port(s) or place(s), whether or not they are within the range of the previously nominated port(s) and/or place(s) and/or vary the rotation of any nominated port(s) or place(s), and Owner shall issue instructions necessary to make such change(s). If a change to, or varying the rotation of nominated port(s) or place(s) occurs or if Vessel is sent to a destination for orders, any time by which the steaming time to the port(s) or place(s) to which Vessel is finally ordered exceeds that which would have been taken if Vessel had been ordered to proceed to such port(s) or place(s) in the first instance shall be compensated at the Deviation Rate per running day and pro rata for a part thereof. All steaming times shall be computed using BP Distance Tables and Base Speed, Charterer shall pay for extra bunkers consumed during such excess time at Owner's documented actual replacement cost at the port where bunkers are next taken.~~



"Memphis" / IOOI dtd 31 Aug'10

~~e.      Discharging port(s) or place(s) shown in Bills of Lading do not constitute a declaration of discharging port(s) or place(s), but any order of Vessel to a destination for orders, all nominations and any re - nominations pursuant to this Clause shall be consistent with Part I (C) and (D).~~

7.     LOADING/DISCHARGING PORT/PLACE *as per ASBANTANKVOY and main terms*

~~a.      SHIFTING. Charterer shall have the right to shift Vessel within any port of loading and/or discharging from one loading or discharging place to another such place once or more often. In the event that Charterer exercises this right, Charterer shall pay all additional expenses properly incurred. For purposes of freight payment, the places grouped in-port and terminal combinations in WORLDSCALE are to be considered as berths within a single port, with Charterer paying shifting expenses in accordance with the foregoing.~~

~~b.      OFF-BERTH. Charterer or terminal operator shall have the right to shift Vessel from a loading and/or discharging place if Vessel fails to meet the pumping and/or heating warranties stipulated in Clauses 13 and 17 or if Vessel fails to comply with or meet any port regulations/rules, so as to avoid delay to other vessels waiting to use such place. Charterer or terminal operator shall also have the right to shift Vessel from a loading and/or discharging place due to an unsafe condition of Vessel. In such situation(s), Charterer shall not be obliged to provide an alternative loading or discharging place to the place from which Vessel was shifted. However, Charterer shall exercise due diligence to arrange prompt re-berthing and commencement of loading or discharging once Vessel has corrected such deficiency(ies). All expenses related to this shifting and any re-berthing shall be for Owner's account and all time lost by reason of the foregoing shall not count as laytime or, if Vessel is on demurrage, as time on demurrage.~~

8.     CARGO MEASUREMENT

a.     Prior to loading, Master shall measure the on board quantities of oil, water and sediment residues which are segregated in all holding tanks and slop tanks and those which remain in cargo tanks and, if requested, shall advise supplier(s) and Charterer of such quantities. After loading, Master shall determine the cargo quantities loaded, expressing these cargo quantities in barrels at standard temperature (60F/15C) calculations as specified in the Manual of Petroleum Measurement Standards issued by the American Petroleum Institute or similar standards in effect at the port of loading. A written tank - by - tank ullage report containing all measurements of oil, water and sediment residues on board prior to loading and quantities of cargo loaded shall be prepared and promptly submitted by Master to Charterer. ~~All time spent for the measurement of on-board quantities prior to loading and after loading as aforesaid shall not count as laytime or, if Vessel is on demurrage, as time on demurrage.~~ *Cargo measurement instructions to be incorporated in voyage orders by Charterers.*

b.     If Master's calculations of cargo loaded (on board quantities of oil, water, and sediment residues excluded), show a deficiency in the total cargo or any single grade or grades from the Bill of Lading figures in excess of 0.1% Master shall, if investigation and recalculation verify such deficiency, issue a Letter of Protest to supplier(s) (which should, if practicable, be acknowledged) and shall advise

"Memphis" / 1001 dtd 31 Aug'20

Charterer of such deficiency immediately by telegraph, telex, fax or radio and thereafter shall send a copy of the Letter of Protest to Charterer. *Same to be incorporated in voyage orders by Charterers.*

c.     Prior to discharging, Master shall measure the quantity of each grade of cargo on board, expressing these quantities in barrels at standard temperature (60F/15C) using the same calculation procedures specified in this Clause. Before and after discharging, Master shall cooperate with shore staff to ascertain discharged quantities. Vessel shall be obliged to discharge all free – flowing and pumpable oil *by means of vessel fixed pumps* and, if ordered by Charterer, any free – flowing and pumpable residues of oil, water and sediment *by means of vessel fixed pumps* .

d.     An inspector may be employed by Charterer at its expense *time and risk* to verify quantities and qualities of cargo and residues on board Vessel at both loading and discharging port(s) and/or place(s).

e.     Owner warrants that Vessel is equipped with an Inert Gas System in working order and has officers and crew experienced in its use. ~~Depressurization of tanks to permit ullage measurements shall be performed in accordance with the provisions of the most recent Inert Gas Systems for Oil Tankers publication issued by the International Maritime Organization (IMO).~~

9.     CARGO/DISCHARGE/RELOAD/BACKLOADING:

~~a.     Charterers have the option of loading Crude Oil, Dirty Petroleum Products, Gasoil and Marine Diesel Oil, and other products, but where Vessel loads one grade on top of another for blending and mixing purposes same to be treated as one grade.~~

b.     Charterers shall also have the right to load on top of any cargo previously loaded by them, load into a tank containing an on board quantity at bottom, comingle cargo, and blend cargo on board by inter tank cargo transfer. *Any bunkers consumed as per above operation and basis masters email statement to be paid together with freight as per Owners last bunker invoice.*

~~c.     Charterer shall further have the option of loading or back loading or discharging Vessel with a part or full cargo at any port or place within the range of ports or places between the load and discharge range being the ports or places between the Loading Ports(s) or Place(s) and Discharging Port(s) or Place(s) set out in Part I to which Vessel may have been ordered. If this option is exercised, additional time consumed awaiting berth and/or cargo and/or tank preparation and/or loading and discharging such part cargo shall count as laytime or, if Vessel is on demurrage, as time on demurrage. Any additional expenses, including port charges, incurred as a sole result of loading and discharging such shall be for Charterer's account. If the Vessel is fixed on a World Scale rate in Part 1 then freight shall always be paid for the whole voyage at the rate(s) specified in Part 1 on the largest cargo quantity carried on any ocean leg.~~

10.     FREIGHT *as per main terms*

"Memphis" / JOO! dtd 31 Aug'10

*Freight payable in USD by telegraphic transfer to Owners designated*
*bank account as follows:*
*Here below pls find our bank details in US currency:*

*National Bank of Greece*
*Branch 196*
*2, Bouboulinas Str., & Akti Miaouli*
*Piraeus 185 35*
*Greece*
*Swift : ETHGRAA*
*Via N.Y. corresp : Bank of New York Swift IRVTUS3N or*
*JP Morgan Chase Swift CHASUS33*
*Beneficiary : EUROTANKERS INC*
*Account number : 196-931882-86*
*IBAN : GR07 0110 196 20000 196 93188286*



a.      All Freight shall be paid to such account at such bank as the Seller may from time to time direct to the Owner in the Nominated Currency and in such funds in the Nominated Currency as are customary at the time for settlement of transactions in the relevant currency in the place of payment. Payment shall be deemed to have been received by the Owner on the date on which the bank directed by the Charterer to remit the Nominated Currency advises with an authenticated advice of remittance, unless that advice is sent on a day other than a Banking Day or at a time of day (whether on a Banking Day or not) when it is impossible or impracticable for the Owner to utilize the amount received for value that same day, in which event payment shall be deemed to have been received by the Owner on the Banking Day next following the date of receipt of advice by the said bank. The Nominated Currency shall mean United States Dollars unless the Charterer at its option shall elect to make payment in Euros by notice to the Owner given not more than one (1) Banking Day before Freight is payable.

b.      In the event of the Owner receiving the Hire in Euros and if the amount received is insufficient when converted into United States Dollars at the date of receipt of the Freight (as per the prevailing conversion rates form Euros' to USD at such date) to satisfy the amount of the Freight in United States Dollars, the Buyer shall, on the Owner's written demand, pay to the Owner such further amount in Euros as is sufficient to satisfy the deficit.



c.      Payment by the Charterer in Euro's shall constitute a full discharge of Charterers obligations in regards to payment of Freight

d.      Owners acknowledge Charterers payment procedures require one original signed Charter Party signed by the Owner.

11.     DEVIATION RATE

Any deviation shall be calculated at the Demurrage rate.

12.     LAYTIME/DEMURRAGE

a.      COMMENCEMENT/RESUMPTION. Charterer shall have the benefit of this six (6) hours NOR time at each load and discharge port, whether or not Vessel is on demurrage. Laytime shall not commence before ~~1200 hours~~ *0001 hours* local time on the Commencing Date specified in Part I (B) unless Charterer shall otherwise agree in writing. Should Charterer so agree in writing, laytime shall commence upon Vessel's Arrival in Berth and the total laytime agreed under Part I (H) shall be increased by the amount of time spent by the Vessel after Arrival in Berth but before ~~1200 hours~~ *0001 hours* local time on the Commencing Date specified in Part I (B).

b.      DURATION. The laytime specified in Part I (H) shall be allowed free of expense to Charterer for the purpose of loading and discharging cargo and all other Charterer's purposes. Laytime or, if Vessel is on demurrage, time on demurrage, shall continue until all cargo hoses have been disconnected upon the final termination of the loading or discharging operation. Disconnection of all cargo hoses shall be promptly effected. If Vessel is delayed in excess of three (3) hours after such disconnection of cargo hoses solely for Charterer's purposes, laytime or, if Vessel is on demurrage, time on demurrage shall resume upon the expiration of the said three (3) hour period and shall continue from that point until the termination of such delay . *Max 3 hours for waiting documents to be for Owner's account* .

c.      ~~Ballasting time and Deballasting and~~ time proceeding to berth shall not count as used laytime or time on demurrage, even if Vessel on demurrage.

d.      ~~Owners warrant Vessel shall vacate the berth after completion of ballasting or within one and a half hours following completion of loading/discharging whichever is sooner.~~ If Vessel not able to vacate berth after such time due to reasons attributed *solely for vessel purpose* to Vessel, any extra berth occupancy charges by terminal and port shall be for owners account, all time lost for such occupancy shall not count as used laytime.

e.      ~~Laytime and waiting time if any at load/discharge ports to be prorated amongst charterers/receivers according to respective cargo quantity.~~

f.      ~~Charterers shall be allowed deductions for additional pumping time as set out in the relevant~~ clause as set out herein and shall be allowed deductions for all times which are for the account of the Owners as is set out in this Charter and these terms

g.      Master shall obtain signature and stamp of receivers and agents and all other parties concerned on NOR, ullage report before discharge, Vessel ullage report after discharge, dry tank certificate, time sheet and any LOP's if any prior sailing from port. *Subject all signatures and stamps can be obtainable and available* .

h.      PAYMENT. Charterer shall pay demurrage per running day and pro rata for a part thereof for all time by which the allowed laytime specified in Part I (H) is exceeded by the time taken for loading and discharging and for all other Charterer's purposes and which, under this Charter, counts as laytime or as time on demurrage.

"Memphis" / IOOI dtd 31 Aug'10

### 13.    PUMPING IN AND OUT

a.      ~~Vessel shall be properly equipped, at Owner's expense for operations at terminal(s), including suitable anchors, ground tackle, mooring lines and equipment for handling submarine hoses. Vessel shall also be properly equipped with a sufficient number of cargo manifold reducing pieces of steel or comparable material which meet the most recent Oil Companies International Marine Forum (OCIMF) standards, to make available appropriate flanges for cargo hoses/arms at all manifold connections on one side of Vessel. If Vessel is not properly equipped as required in this Paragraph (a), any time thereafter lost shall not count as laytime or, if Vessel is on demurrage, as time on demurrage.~~

b.      If the intended cargo and or the loading/discharging Port(s)/Places/terminal requires that the cargo tanks be inerted prior loading, Owner warrants that Vessel shall arrive at the loading/discharge port(s) and/or place(s) with cargo tanks properly inerted and that such tanks shall so remain inerted throughout the loading of the cargo, the voyage and the subsequent discharging of the cargo. In case of an Inert Gas System failure during loading and/or discharging, cargo operations shall be suspended immediately until the system becomes fully operational, any deficiency in inerting is fully corrected and the terminal (or other loading and/or discharging facility) has given permission to resume operations. Time used from cessation to resumption of cargo operations shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. Master may be requested by terminal personnel or independent inspectors to breach the IGS for purposes of gauging, sampling, temperature determination and/or determining the quantity of cargo remaining on board after discharge. Master shall comply with these requests consistent with the safe operation of Vessel. Any time lost due to non - compliance with these instructions shall not count as laytime or, if Vessel is on demurrage, as time on demurrage.

c.      ~~If required by Charterer, Vessel, after discharging, shall clear shore pipelines of cargo by pumping water~~

d.      through them and the time thereby consumed shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

e.      All overtime incurred by officers and crew in loading and/or discharging shall be for the account of Owner.

f.      (i) LOADING. Vessel shall load cargo at an average rate of at least 70,000 barrels per hour **_with all manifold connections on._** If Vessel cannot load cargo at an average rate of at least 70,0**__** barrels per hour **_with all manifold connections on,_** or if loading is restricted to a lower specified rate on request of Master, then the resulting increase in loading time shall be added to allowed laytime.

(ii) DISCHARGE AT A PORT/PLACE/TERMINAL. Owner warrants that Vessel shall discharge entire cargo within twenty - four (24) hours pumping time or pro – rata on actual quantity discharged if more than one port or berth is involved, or shall maintain an average pressure **_100 PSI_** at Vessel's manifold ("Average Manifold Pressure") ~~calculated in accordance with Clause 13(f)(iii), during the entire period of discharge as specified below, provided receiving facilities permit:~~



"Memphis" / IOOI ctd 31 Aug'10

~~Vessel KDWT (per part 1 (A))       Average Manifold Pressure PSI~~

* ~~Less than 60       100~~
* ~~60 – 160        125~~
* ~~Greater than 160        150~~

~~Where the terminal requires~~ a reduced pumping rate below the warranted rate during any period or periods of discharge ~~totaling in excess of 6 hours~~, the foregoing pumping warranty shall be deemed to have been met and all pumping time shall count as laytime, or if the Vessel is on demurrage, as time on demurrage, ~~less any Crude Oil Washing time that exceeds Clause 13(g) allowances.~~



(iii) CALCULATION OF AVERAGE MANIFOLD PRESSURE. Average Manifold Pressure under the preceding clause is equal to the sum of the hourly manifold pressure readings (taken as close to the start of the hour as possible and excluding all pressure readings taken during periods of Allowed Deductions) for the entire period of discharge, divided by a number equal to the sum of the total discharge time minus total Allowed Deductions. Allowed Deductions include:

* 15 minutes for start – up of pumps.

* 3 hours for stripping.

* ~~Any slowdown or stoppage for terminal purposes totaling less than 6 hours, plus 30 minutes per~~ ~~occurrence for slowdown, stopping and bringing up or restarting pumps.~~

All time lost as a result of Vessel being unable to meet either the 24 – hour pumping warranty or the Average Manifold Pressure warranty in Clause 13(f)(ii) shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. If the discharging Port/Terminal does not allow or permit Vessel to meet the above warranty, the Vessel's Master shall forthwith issue a Letter of Protest (which should, if practicable be acknowledged) to such Port/Terminal and immediately advise Charterer by fax, telegraph or telex. If the Master fails to issue a Letter of Protest and advise Charterer as aforesaid, Owner shall be deemed to have waived any rights to contest that time was lost as a result of Vessel's failure to comply with the above pumping warranty. Any pumping time lost solely due to the discharging Port/Terminal imposing restrictions on discharging pressure below the applicable figure warranted and which is properly documented and reported as aforesaid shall count as laytime or, if the Vessel is on demurrage, as time on demurrage.

~~(iv) SHIP TO SHIP TRANSFER (LIGHTERING) OPERATIONS. Owner warrants that Vessel shall discharge~~ ~~each nominated cargo parcel within 16 hours total pumping time. All pumping time in excess of 16 hours~~ ~~shall not count as laytime or, if Vessel is on demurrage, as time on demurrage, unless such excess~~ ~~pumping time was caused solely by restrictions on the receiving vessel.~~



g.    Owner warrants that the Vessel is equipped with a Crude Oil Washing System in working order and has officers and crew experienced and certified in its use. If Vessel is required ~~by law~~ or requested by Charterer to Crude Oil Wash, the Vessel shall be allowed 6 hours or prorata part thereof (calculated based upon the number of tanks washed/stripped divided by the total number of cargo tanks loaded),

"Memphis" / IOOI dtd 31 Aug'10

which shall be counted as laytime if the Vessel is on laytime, or as demurrage if the Vessel is on demurrage. Crude Oil Washing may be done concurrently with discharge at Owner's option, but will not count as an Allowed Deduction under Clause 13(f)(ii). Nothing in this clause shall be construed to limit or otherwise affect Owner's obligations to comply with the Pumping Warranties contained in Clauses 13(f)(i), 13(f)(ii) and 13(f)(iii). If Crude Oil Washing cannot be accomplished for any reason attributable to the fault of Vessel, including improper operation of the inert gas system, any measurable cargo remaining on board as determined by an independent inspector shall be deemed liquid and pumpable *by means of vessel fixed pumps* and Charterer shall have the right to deduct from freight an amount equal to the FOB loading port value of such cargo plus freight due with respect thereto.

14.   LAYTIME/DEMURRAGE CONSEQUENCES

a.      SPECIFIED. If demurrage is incurred due to fire, explosion or strike, lockout or stoppage of labor or breakdown of machinery or equipment in or about the installation, facility, terminal or plant of Charterer, supplier, shipper or consignee of the cargo or weather and/or sea conditions (regardless of whether the Vessel was on demurrage when such cause(s) or condition(s) arose), such demurrage shall be paid at one – half (%) of the Demurrage Rate. The latter is so even if any other condition(s) hereinbefore described in this Paragraph (a) coincide with the period of such cause(s) or condition(s) and irrespective of any option given in Part I (C) and (D).

b.      EXCLUSIONS. Notwithstanding the provisions of any other Paragraph of this Clause or any other Clause of this Charter to the contrary, time shall not count as laytime or, if Vessel is on demurrage, as time on demurrage, if such time is spent or lost:

i.      As a result of labor dispute, strike, go slow, work to rule, lockout, stoppage or restraint of labor involving Master, officers or crew of Vessel or tugboats or pilots. *Such delays shall count as one half laytime or, if on demurrage, as one half demurrage rate.*

ii.      Except if Vessel is discharged at sea, on an inward passage including, but not limited to, awaiting daylight, tide, tugs or pilot, and moving from an anchorage or other waiting place, even if discharging has taken place at the anchorage or other waiting place, until Vessel's Arrival in Berth.

iii.      Due to cargo or bunker tank overflow, discharge of contaminated ballast water overboard, breakdown, inefficiency, repairs or any other conditions whatsoever attributable to inability to load or discharge the cargo within the time allowed and/or failure to meet Vessel warranties stipulated in this Charter.

iv.      Due to Owner or port authority prohibiting loading or discharging

v.      By reason of local law, regulations or intervention by local authorities, with the exception of port closure due to weather and/or sea conditions or security related delays pursuant to Clause 43(c). *Such delays shall count as one half  laytime or, if on demurrage, as one half demurrage rate.*



"Memphis" / IOOI dtd 31 Aug'10

vi.      In ballasting or deballasting (from the time loading/discharge is stopped until the time loading/discharge is resumed), lining up, cleaning of tanks, pumps, pipelines, bunkering or for any other purposes of Vessel only, unless same is carried out concurrently such that no loss of loading and/or discharging time is involved and, in the case of bunkering operations during discharge, such operations are conducted with the advance written permission of Charterer or Charterer's authorized agent.

vii.     Due to an escape or discharge of oil or pollutant or the threat of an escape or discharge of oil or pollutant from Vessel.



viii.    Time lost at any port or place due to quarantine *if solely fault of  Owners/vessel* shall not count as laytime or, if Vessel is on demurrage, as time on demurrage unless such quarantine was in force at the time when such port or place was nominated by Charterer. Vessel shall obtain free pratique prior to arrival at any port provided that same is allowed by the relevant authorities. ~~Time spent in obtaining free pratique and/or customs clearance after arrival in port shall not count as laytime or, if Vessel is on demurrage, as time on demurrage.~~ *Such delays shall count as  one half laytime or, if on demurrage, as one half demurrage rate.*

c.       UNSPECIFIED. Any delays for which laytime/demurrage consequences are not specifically allocated in this or any other Clause of this Charter and which are beyond the reasonable control of Owner or Charterer shall count as laytime or, if Vessel is on demurrage, as time on demurrage. If demurrage is incurred on account of such delays, such demurrage shall be paid at one - half (%) the Demurrage Rate.

15.      INTRANSIT LOSS & CARGO RETENTION:

a.       In addition to other warranties and guarantees herein provided with respect to the quality and quantity of the cargo, Owners shall be accountable for product losses, (all volumes corrected to 60 degrees Fahrenheit and assessed by an independent cargo inspector (*mutually agreed with Charterers and Owners* ~~selected and hired by the Shipper on behalf of Charterers and or by the cargo receiver(s) and or by the Charterers~~)), in excess of the following (Allowable Difference):



*   (~~.01~~ *0.5* percent) for non - volatile products (Fuel Oil and Crude Oil)

*   (.02 percent) for gas oil motor oil gasoline, jet fuel and naphtha

b.       If on completion of final discharge an independent cargo inspector determines that there exists any shortage of cargo in excess of the Allowable Difference either due to

*   The independent cargo inspector finds that a difference of quantity exists between that which appears on the Bill of Lading and the quantity found on the Vessel upon arrival at the discharge port (In Transit Loss); AND/OR

*   The independent cargo inspector determines on completion of discharge that the liquid *reachable* un pump - able cargo (being un pump - able by the fixed pumps of the Vessel) remaining on the Vessel (Cargo Retained)

"Memphis" / IOOI dtd 31 Aug'10

Then Charterers shall have the right to *claim from Owners* ~~deduct from Freight~~ an amount equal to the FOB loading port value (plus cargo insurance and freight thereon) of the quantity of such Transit Loss ~~PLUS~~ *or* Cargo Retained MINUS the Allowable Difference. For the purpose of calculating this deduction, the grade of such excess liquid cargo shall be deemed to be the grade of the final cargo parcel discharged by the Vessel. *Owners shall not be responsible  to any claims arising 3rd parties/ supplier/ receivers.*

c.       Any action or lack of action under this Clause shall be without prejudice to any other rights or obligations of the parties, but any exercise of the right of deduction hereunder by Charterer shall be conclusive and not merely by way of security.

d..      . Charterer shall indemnify Owner against any liability to third parties resulting from non - delivery of any such cargo in respect of which a deduction from freight is made under this Clause, provided that Charterer shall under no circumstances be liable to indemnify Owner in an amount greater than the amount of freight so deducted.

e.       Although Charterers' surveyor may be monitoring any transfer operation, this does not relieve Master or Owners of responsibility for verifying the quantity involved in each oil movement nor for liability under the terms of this Charter Party for any oil losses.

~~16.       STORAGE~~

~~a.       Charterer shall have the option to use Vessel for floating storage off load port or place and/or en route and/or off discharge port or place for up to a maximum of one hundred twenty (120) days. Such option shall be declared not less than one hundred twenty (120) hours prior to ETA first discharge port or place or storage area. Charterer shall thereinafter give Owner seventy - two (72) hours notice of termination of floating storage and Owner is under an obligation to sail upon the expiration of such period. Charterer shall pay Storage Rate specified in Part 1 or pro - rata for each day Vessel is used as floating storage. Storage hire for the first fifteen (15) days is payable upon arrival at storage area, thereafter storage hire is payable every fifteen (15) days in advance.~~

~~b.       Said Storage Rate is inclusive of all bunkers, maintenance, operating and incidental expenses incurred during or as a result of floating storage.~~

~~c.       Floating storage period shall commence upon Vessel's arrival at a floating storage area designated by Charterer and shall cease upon Vessel's sailing from same. Any deviation from most direct route to nominated discharge port or place required to commence or end storage shall be subject to the provisions of Clause 7.~~

~~d.       Vessel may be at anchor, moored or drifting during floating storage period.~~

~~i.       If Vessel goes into floating storage:~~

~~ii.       Within same range as loading port or place, no ocean freight is payable until Vessel completes discharging its cargo;~~



"Memphis" / IOOI dtd 31 Aug'10

~~iii.       Within same range as discharge port or place, seventy - five percent (75%) of the ocean freight is payable~~

~~iv.       when Vessel arrives at the storage area and the balance is payable when the Vessel completes discharging its cargo;~~

~~v.       At any place not falling within (i) or (ii), fifty percent (50%) of the ocean freight is payable when the Vessel arrives at the storage area and the balance is payable when Vessel completes discharging.~~

~~e.       Charterer has the right once Vessel is in storage to order Vessel in and out of storage area one or more times to discharge cargo. If such discharge is within same range as storage location, time from and to storage area shall be at the Storage Rate specified in Part I with Charterer paying all bunkers for steaming and all port charges, except for final discharges. Otherwise, Clause 9 shall apply to Charterer's orders, except for final discharge. Time used from connecting hoses to disconnecting hoses shall count as laytime or, if Vessel is on demurrage, as time on demurrage~~

## 17.   HEAT

a.       If Vessel is described as coiled in Part I (A), Owner warrants that Vessel is capable of heating the cargo up to and maintaining it at a maximum temperature of 135F/57C. However, unless otherwise requested by Charterer, Vessel shall be required only to maintain the cargo at the temperature loaded (up to a maximum of 135F/57C) throughout the voyage and the entire discharge. If requested by Charterer and if the length of the voyage allows, Vessel shall increase and maintain the temperature of the cargo *(18 mt of fuel oil per one deg centigrade)* from the loaded temperature to a temperature specified by Charterer, up to a maximum of 135F/57C and Charterer shall pay for extra bunkers consumed solely in increasing the temperature *as per masters email statement based on last bunker invoice price and paid together with freight* as ~~aforesaid at Owner's documented actual replacement cost for such bunkers at the port where bunkers are next taken.~~ If Vessel fails to maintain the loaded temperature or to increase and maintain the temperature of the cargo, as requested by Charterer, Charterer shall have the option to hold Vessel off berth and/or to suspend discharging, all until the cargo is properly heated, all time and expense in connection with the foregoing being for Owner's account.

## 18.   CLEANING

~~a.       If the cargo specified in Part I (F) is clean product and inspection of the tanks is required, Owner shall gas free the tanks as necessary. Any time used for tank inspection and any re - inerting of Vessel shall count as laytime or, if Vessel is on demurrage, as time on demurrage. Any time required for cleaning and gas freeing shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. Compliance with this Clause shall not be deemed compliance with Owner's obligations under Clause 3, which are in no way lessened by this Clause.~~

## 19.   MAXIMUM CARGO

"Memphis" / IOOI dtd 31 Aug'10

a.      In no event shall Charterer be required to provide, nor shall Vessel load a cargo quantity in excess of a Full Cargo as defined in Paragraph (c) of Clause 1, irrespective of whether a Full Cargo as defined is less than that provided in Part 1 (E) hereof. In addition, Charterer shall not be required to provide a cargo quantity in excess of the maximum cargo specified in Part I (A). ~~All time lost and expense incurred by reason of Vessel loading a quantity of cargo which puts Vessel, at any stage of the voyage(s) hereunder, below the marks permissible under the ILL Convention, shall be for Owner's sole account.~~ *Vessel's loadables are always subject to permissible drafts at all ends and subject to safety, trim and stress of the vessel.*

20.     SHIP TO SHIP TRANSFER OPERATIONS: *Owners STS clause to apply*

~~a.      If required by the Charterers the Vessel shall load and/or discharge full or part cargo alongside other Vessel(s) in port or at a safe anchorage. Concurrent loading or discharging from both side for cargo with flash point over 60 degrees centigrade shall be acceptable by owners, any restriction for such will not count as laytime used.~~

~~b.      Charterers are to provide suitable fenders/lines and hoses to safely effect such operations and have the option to store same on board for the duration of Charter Party. Handling of such equipment on board the Vessel shall be by owners' crew at Owners' cost. All such equipment shall be removed from the Vessel by Charterers upon completion of Charter Party without delay.~~

~~c.      Vessel's crew shall connect/disconnect cargo hoses, heave down/heave up fenders, take/throw connection lines, transfer to/transfer back cargo hoses and any other activities required for the completion and safe conduct of the ship to ship transfer operation for their account without any exclusion.~~

~~d.      All extra insurance for above ship to ship lighterage operations shall be for Owners' account and Charterers have no liability for hull or other damage, if any, that may occur during such operations.~~

~~e.      Ship to Ship Transfer may include Charterers very large crude barge (VLCB) of about 34,500 TDW chartered to perform such operations.~~

21.     DISCHARGE AT SEA

~~a.      Except when required by reason of fault attributable to Vessel, any full or partial discharge at sea or at a place outside a port including a place outside a port designated as a transshipment area at WORLDSCALE, shall be at the expense of Charterer and, notwithstanding Clause 4, Paragraph (a) of Clause 12 and Paragraph (a) of Clause 14, time used for such full or partial discharge at sea shall count as laytime or as time on demurrage subject to the bad weather provisions Paragraph (a) of Clause 14, as follows:~~

~~If Vessel is fully or partially discharged at sea or at a place outside a port, laytime or, if Vessel is on demurrage, time on demurrage shall commence upon the expiration of six (6) hours after Vessel gives Notice of Readiness at the discharge site designated by Charterer or when Vessel is all fast alongside the~~

4 4

"Memphis" / 1001 dtd 31 Aug'10

~~first cargo receiving vessel, whichever occurs first, and shall end when disconnection of the cargo hoses~~
~~from the last cargo receiving vessel has been completed.~~

~~b.      If Vessel is fully discharged at sea, or at a transshipment area, freight payment shall, in the~~
~~absence of agreement as to the appropriate freight rate, be based on the freight rate stipulated in Part I~~
~~(F) multiplied by a flat rate which is published by or obtained from the Worldscale Association (London)~~
~~Limited or the Worldscale Association (NYC) Inc. If Vessel is discharged in part at sea, or at a~~
~~transshipment area, the place at sea or the transshipment area shall not constitute a port or place~~
~~additional to those specified in Part I (D) and the freight rate for the voyage shall be the same as if the~~
~~partial discharge had not taken place. Charterer, however, shall reimburse Owner for any time by which~~
~~the steaming time to the final discharging port or place exceeds that which, at the Base Speed specified~~
~~in Part I (A), would have been taken if Vessel had not partially discharged at sea at the Deviation Rate~~
~~per day or pro - rata for a part thereof. In addition, Charterer shall pay for extra bunkers consumed by~~
~~Vessel during such excess time at Owner's documented actual replacement cost at the port where~~
~~bunkers are next taken. In calculating the payment for extra bunkers consumed, allowance shall be~~
~~given for the daily bunker consumption used in determining the Demurrage Rate for the standard vessel~~
~~in WORLDSCALE.~~

c.      If Vessel is partially or fully discharged at sea as aforesaid, Charterer shall exercise due diligence
to ensure that no damage is caused to Vessel. Such operations shall conform to standards set out in the
latest published edition of the ICS/OCIMF Ship to Ship Transfer Guide (Petroleum) and Owner
undertakes that Vessel and her crew will comply with such standards.

22.      INSPECTION

a.      OPERATIONS. Charterer's representative(s) *subject to Owners technical
management approval* shall have the right at loading and/or discharging port(s) or place(s) to
inspect Vessel and observe operations. Owner shall instruct Master to give every assistance so as to
enable said representative(s) to properly observe operations throughout Vessel. Vessel shall also
provide suitable ~~officer~~ accommodation to said representative(s) if required.

~~b.      BUNKER SAMPLING. Charterer's representative(s) shall have the right to survey and take~~
~~samples of all~~

c.      Vessel's bunker tanks and non - cargo spaces. Refusal by Master to permit such bunker
surveying and sampling shall give Charterer or terminal operator the right to order Vessel off berth. All
time lost by reason of such refusal, including any time used in shifting Vessel off and back to berth, shall
not count as laytime or, if Vessel is on demurrage, as time on demurrage. Further, all expenses related
to such refusal, including Vessel shifting expenses, shall be for Owner's account. Any delay to Vessel
caused solely by bunker surveying and sampling shall count as laytime or, if Vessel is on demurrage, as
time on demurrage.

~~23.      CLEAN SEAS~~

"Memphis" / IOOI dtd 31 Aug'10

a.    HANDLING OF TANK WASHINGS. Owner agrees to prohibit discharge overboard of oil and all oily water, oily ballast or oil in any form unless in compliance with IMO and Port, State and local regulations or under extreme circumstances whereby the safety of Vessel, cargo or life at sea would be imperiled. Owner shall ensure that Vessel's personnel comply with the following:

i.    Subsequent to the date of this Charter and in the course of the ballast passage before presenting for loading hereunder, any oily residues remaining in Vessel from its previous cargoes shall be retained on board and shall be handled according to Charterer's instructions.

ii.    During tank washing, the tank washings shall be collected into one cargo compartment and, after maximum separation of free water, such free water shall be discharged overboard to the extent permitted by applicable international regulations.

iii.    Thereafter, Charterer shall be notified promptly by telegraph, telex or radio of the estimated quantity of the segregated tank washings and the type and volume of oil and water contained in such washings and source of such washings.

b.    If Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by Owner and paid for by Charterer. Any additional Canal dues incurred on the ballast passage by reason of Vessel having tank washings on board shall be for the sole account of Owner.

c.    Owner shall ensure that Master, on Vessel's arrival at the loading port(s) or place(s), does the following:

•    arranges for the measurement of the segregated tank washings in conjunction with the cargo supplier(s)

•    records the quantity of tank washings so measured in Vessel's ullage record, issues a Slop Certificate

•    arranges that the Slop Certificate and/or Vessel's ullage record be duly signed by the cargo supplier(s) and promptly sent to Charterer.

d.    The segregated tank washings and any other oily residues on board (hereinafter called "residues") shall, at Charterer's option, be pumped ashore into slop facilities at the loading port(s) or place(s), commingled with the cargo to be loaded or segregated from the cargo to be loaded. If Charterer requires Master to discharge the residue at facilities at loading port(s) or place(s), no freight shall be payable on same but the time involved in accomplishing such discharge shall count as laytime or, if Vessel is on demurrage, as time on demurrage. Further, the cost of such facilities and the ultimate disposal of the residues shall be for Charterer's sole account.

"Memphis" / IOOI dtd 31 Aug'10

e. ~~If Charterer requires residues to be kept separate from the cargo to be loaded, same shall, at Charterer's option, be discharged at the discharging port(s) or place(s) in accordance with Charterer's instructions.~~

f. ~~If Charterer requires that the cargo be loaded on top of residues or that such residues be kept separate from the cargo to be loaded, in either case freight shall be payable in accordance with Clause 6 on the quantity of residues at the Overage Rate, if such rate exists, or otherwise at the Base Freight Rate, up to a maximum tonnage equivalent to one (1) percent of Vessel's deadweight as specified in Part I with the exception that, no freight shall be paid for the water portion of slops. In no event shall Charterer have any liability for deadfreight in connection with residues.~~

g. ~~Nothing in Charterer's instructions shall be construed as permission to contravene any applicable laws or regulations by the discharging of oily residues.~~

h. ~~DETERGENTS/CHEMICALS. The Vessel shall arrive at leading port(s) or place(s) with clean ballast and Owner guarantees that the slops and ballast on board the Vessel do not contain any detergents or chemicals. If the slops or ballast contain any detergents or chemicals, any damages incurred thereby shall be for Owner's account.~~

24. ISPS/MTSA Clause

a. ~~(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).~~

~~(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).~~

~~(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.~~

b. ~~(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA.~~

~~(ii) Loss, damages or expense (excluding consequential loss, damages or expense) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as~~

"Memphis" / IOOI dtd 31 Aug'10

~~otherwise provided in this Charter Party, and any delay caused by such failure shall count as laytime or time on demurrage.~~

~~c.        Provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS Code/MTSA, the following shall apply:~~

~~i.        Notwithstanding anything to the contrary provided in this Charter Party, the Vessel shall be entitled to tender Notice of Readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS Code/MTSA.~~

~~ii.        Any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS Code/MTSA shall count as laytime or time on demurrage, unless such measures result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers.~~

~~d.        Notwithstanding anything to the contrary provided in this Charter Party, any costs or expenses whatsoever solely arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew or the previous trading of the Vessel, the nationality of the crew or the identity of the Owners' managers. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.~~

~~e.        If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.~~

~~f.        CONFIDENTIALITY. During the period of this Charter, Owner hereby warrants that it will keep all information related to Vessel orders, Vessel movements and other Vessel activities strictly confidential and will disclose such information only to those personnel who are directly involved on behalf of Owner with the safe and timely operation of the Vessel and that it will instruct said personnel as to these confidentiality requirements.~~

~~g.        CONCLUSIVE DETERMINATION. A determination by the port facility or relevant government authority at the port where the Vessel is located that the Vessel or "the Company" is not compliant with the requirements of the ISPS Code, or that the Vessel or its agent has failed to provide the necessary reports and/or notices required for entry to or exit from the port facility, shall be deemed conclusive as between Owner and Charterer for purposes of enforcement of the provisions of this Clause.~~

### ISPS BIMCO CLS REVISED BY CHEV. FOR VOYAGE CHARTER TO APPLY REVISED BIMCO ISPS CLAUSE* (4-28-04)

*(a)  (i) from the date of coming into force of the international code for the security of ships and of port facilities and the relevant amendments to chapter xi of solas (ISPS code) in relation to the vessel, the Owners shall procure*



that both the vessel and "the company" (as defined by the ISPS code) shall comply with the requirements of the ISPS code relating to the vessel and "the company".   Upon request the Owners shall provide a copy of the relevant international ship   security certificate (or the interim international ship security certificate) to the   Charterers. the Owners shall provide the Charterers with the full style contact details of the   company security officer (CSO).

(ii) except as otherwise provided in this charter party, loss, damage,  expense or delay, excluding consequential loss, caused by failure on the part of the Owners  or "the company" to comply with the requirements of the ISPS code or this clause shall be   for the Owners' account.


(b) (i) the Charterers shall provide the CSO and the ship security officer (SSO)/master with their full style contact details and any other information the Owners   require to comply with the ISPS code.

(ii) except as otherwise provided in this charter party, loss, damage, expense, excluding consequential loss, caused by failure on the part of the Charterers to   comply with this clause shall be for the Charterers' account and any delay caused by such   failure shall be compensated at the demurrage rate.

(c) provided that the delay is not caused by the Owners' failure to comply with their obligations under the ISPS code, and that the measures imposed by the port   facility of relevant authorities applies to all vessels in that port and not solely to   the Owner's vessel, the following shall apply:

(i) notwithstanding anything to the contrary provided in this charter  party,  the vessel shall be entitled to tender notice of readiness even if not cleared due to applicable security regulations or measures imposed by a port facility or any relevant authority under the ISPS code.

(ii) any delay resulting from measures imposed by a port facility or by any relevant authority under the ISPS code shall count as half-laytime or half-time on   demurrage if the vessel is on laytime or demurrage. if the delay occurs before   laytime has started or after laytime or time on demurrage has ceased to count, it   shall be compensated by the Charterers at one half the demurrage rate and always in   accordance with a(ii).

(d) notwithstanding anything to the contrary provided in this charter party, any additional costs or expenses whatsoever solely arising out of or related   to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS code including, but not limited to, security   guards, launch services, tug escorts, port security fees or taxes

*and inspections,   unless such costs or expenses result solely from the Owners' negligence, shall be   shared equally between Owner and Charterer. All measures required by the Owners   to comply with the ship security plan shall be for the Owners' account.*

*(e) if either party makes any payment which is for the other party's   account according to this clause, the other party shall indemnify the paying party.*

### 25.   WAR RISKS:

~~a.      Owners shall pay for basic war risks insurance in respect of the hull and machinery of the Vessel and their other interests (including but not limited to, loss of earnings and detention and their protection and indemnity risks), and the basic premiums and/or calls therefore shall be for owners account. War risks insurance for hull and machinery additional premiums if any are for charterers account, net of all discounts or rebates received by owners, and provided always that charterers are given the offers received by owners for such amount of additional premium after receipt of charterers' voyage orders and before placement of policy, charterers may within 48 hours from receipt of owners notice either send its approval of such amount or provide owners with charterers insurance brokers quote (which shall offer placement with BBB or better rated European or American insurers) for such war risk insurance, the amount payable to owners shall be the lower of that presented by owners and that presented by charterers insurance brokers, if charterers do not reply with 48 hours, the amount payable by charterers shall be that stated by the owners.~~

~~b.      Any premium or increases thereto attributable to closure (i.e. blocking and trapping) insurance shall be for Owners account.~~

~~c.      The benefit of discounts or rebates on additional premium received by owners from war risks insurers, underwriters or brokers shall be credited to charterers in full. Charterers shall reimburse owners amounts due under this clause upon receipt of relevant invoices together with reasonable supporting documentation including all associated debit and credit notes (if any).~~

~~d.      For the avoidance of doubt any 'blocking and trapping', 'loss of profit', 'loss of hire', 'loss of freight' or 'loss of bunkers' insurance take-out by owners in respect of the Vessel, and any additional premium relating thereto arising from charterers trading of the Vessel shall be for owners' account, crew war bonus to be for owners account.~~

~~e.      For purposes of this Clause it shall be unreasonable for Owner to withhold consent to any voyage, route, or port or place of loading or discharging if insurance against all risks defined in here in this Clause is then available commercially or under a government program in respect of such voyage, route or port/place of loading or discharging.~~

~~f.      Charterer shall have the option to procure the additional hull war-risk insurance specified in this Clause, subject to Owner's prior approval of underwriters and the terms and conditions of the coverage,~~

"Memphis" / 100I dtd 31 Aug'10

~~which approval shall not be unreasonably withheld. Such option shall be declared at least seventy - two~~
~~(72) hours prior to Vessel's entry into the excluded zone. If such option is exercised, Charterer shall~~
~~provide verification of the insurance placement prior to Vessel's entry into the excluded zone. For that~~
~~time period during which Charterer has procured such insurance, Charterer shall be entitled to deduct~~
~~from freight an amount equal to the cost of such insurance in effect on the date of this Charter.~~

### EXXONMOBIL WAR RISK CLAUSE TO APPLY.
### EXXON WAR RISK CLAUSE (REVISED 18TH OCTOBER 2001)

*a. except as provided in paragraph (b) below, Owner shall provide and pay
for any war risk insurance(s) on the vessel's hull and machinery, loss
of earnings and detention, crew and their protection and indemnity risks.*

*b. additional war risk insurance premiums ("additional premium") and crew
bonuses ("crew bonuses") incurred as a result of the vessel entering an
excluded area for Charterer's purposes under the vessel's then current
war risk insurance(s) shall be for Charterer's account, net of all
discounts or rebates, provided always that the amount is based on the
insured vessel value provided to Charterer prior to fixing, Charterer
is given notice of the amount of such additional premium and/or crew
bonuses as soon as possible and, in any event, before such additional
premium   and crew bonuses are paid.*

*c. for the purposes of this clause, crew bonuses are defined as mandatory
payments imposed by the government to whose laws Owners are subject.
any other bonus paid by Owners to the officers and/or crew in respect of
the voyage performed pursuant to this charter shall be for Owner's account.*

*d. such additional surcharges and expenses that are for Charterer's
account are payable by Charterer together with freight against Owner's
invoice  with full supporting documents, including all associated debit and
credits notes.*

*e. the amounts of any present or future discount, or rebate, on additional
premium refunded to Owner from their war risk insurers, underwriters or
brokers shall, at Charterer's option, be credited or paid to the   Charterer  in
full.*

*f. in all cases, any premiums and increases associated with closure   insurance,
including "blocking and trapping", shall be for Owner's   account.*



51

"Memphis" / 1001 dtd 31 Aug'10

26.     YORK/ANTWERP RULES & AVERAGE/ARBITRATION:

a.      York/Antwerp Rules, 1974, as amended 1990, apply to this Charter Party.

b.      General Average and Arbitration shall take place in London and English Law applies to this Charter Party.

27.     LIEN/SETOFF/COUNTERCLAIM

a.      Owner shall have a lien on all cargoes and sub freights for all amounts due under this Charter, and Charterer shall have a lien on Vessel for all monies paid in advance and not earned, and all disbursements for Owner's account, including commissions, cost of insurance and expenses thereon and for any damages sustained by Charterer as a result of the breach of this Charter by Owner.

b.      Notwithstanding the above, Owners undertake not to place or exercise any lien cargo or delay or suspend operations arising from or due to any claims arising out of any other (past present ~~or future~~) charter parties or dealings of whatsoever nature between Owner and Charterers and/or any charterers affiliates and/or any of charterers subsidiary companies, and Owners further undertake to treat this Charter Party an independent contract and neither party shall have the right of off - setting and/or counter claim any amounts due or not due from any other (past present ~~or future~~) charter parties or dealings of whatsoever nature between Charterer and Owner, whether or not same may be due or justified.



28.     AGENCY/BUNKER SUPPLY/SUPER CARGO/ADDRESS COMMISSION/ASSIGNMENT & SUBLET:

a.      Unless otherwise agreed, Charterer shall nominate and Owner shall appoint, instruct and pay Vessel's agents at all port(s) and place(s), Owners to appoint Charterers recommended agents at load and discharge ports ***provided competitive.***

b.      ~~In the event of the Vessel has to be bunkered during the currency of the Charterparty, Owners to stem bunkers from Charterers nominated suppliers.~~



c.      Charterers have the option to place on board one supercargo ***subject to ship  management approval which not to be unreasonably withheld.***

at any time during this Charter Party. Owner is to provide such supercargo with ~~good~~ accommodation with private bath and food at Captain's table at a cost of US$***20.00*** ~~7.00~~ per day at Charterers' expense. Supercargo will be allowed access, to investigate, ullage and sample all cargo, slop, bunker, and ballast tanks, also any void spaces, and access to any other parts of Vessel that may relate to carriage of cargo as he may require. He shall also have the right to require selected valves on bunker and cargo systems to be sealed to preclude the possibility of cargo/product/bunker migration. d.      An Address Commission of one and one quarter percent (2.5%) of all freight, deadfreight and demurrage payments shall be payable by Owner to Charterer. Charterer shall have the right to deduct this Address Commission from all Freight payments before remitting same to Owner.

"Memphis" / IOOI dtd 31 Aug'10

e.      Charterer shall have the option and the right of freely assigning this Charter and or of subletting Vessel, but in either case, Charterer shall always remain responsible for the due fulfillment of the Charter

29.     INTERPRETATION

a.      The interpretation of this Charter and the rights and obligations of the parties thereto shall be governed by the laws applicable to charter parties made in the place specified in Part I (K). The headings of Clauses and Paragraphs are for convenience of reference only and shall not affect the interpretation of this Charter. No modification, waiver or discharge of any term of this Charter shall be valid unless in writing and signed by the party to be charged therewith. Notwithstanding anything in this Charter to the contrary, this Charter shall not be interpreted or applied so as to require Owner or Charterer to do, or to refrain from doing, anything which would constitute a violation of, or result in a loss of economic benefit under United States anti - boycott laws and regulations.

b.      If any terms of these additional clause are in conflict to the terms of the Asbatankvoy form, these terms shall prevail

30.     ADMINISTRATION *formal charter party to be prepared*

a.       Save for payment purposes, the preparation and signing of a formal charter party shall not be required should Owner and Charterer agree during fixture negotiations that, in lieu thereof, this Charter shall be accomplished, and thereafter this Charter is accomplished, by the following means:

b.       Within twenty – four (24) hours of the conclusion of fixture negotiations, Owner's broker shall prepare and transmit to Owner and Charterer a fixture recap:

i.       identifying the printed form of charter party;

ii.      detailing all amendments, additions and deletions to the printed form;

iii.     setting out all additional clauses to the printed form in full;



c.       Owner and Charterer shall confirm by return telex, facsimile or electronic mail that the fixture recap is accurate. Upon receipt of such confirmations, Owner's broker shall immediately forward the same to the other party. At the time Owner's broker receives the last of such confirmations, the charter party shall be deemed to have been signed by both parties.

d.       If no broker is involved in the negotiation of this Charter, Owner shall prepare the fixture recap in accordance with (a) above and the charter party shall be deemed to have been signed by both parties when Owner receives Charterer's confirmation thereof within the time prescribed.

e.       The effective date of this Charter shall be the date of the fixture recap

31.     INSURANCE



Page 28 of 30

"Memphis" / 1001 dtd 31 Aug'10

a.     The Hull and Machinery value of the Vessel insured is not less than US$ .
**USD34,000,000** .., any additional insurance payable on Vessel and/or cargo due to Vessel's age or
class shall be for ***Charterers'*** ~~Owners'~~ account, any extra insurance premiums incurred by reason of
the Vessel's age or condition, whether for cargo insurance or otherwise, shall also be for ~~Owner's~~
***Charterers'*** account ~~and Charterer shall have the right to deduct the cost of such insurance from~~
~~freight, Owners agree to allow Charterers to have the benefit of Owners' P&I Insurance to the extent the~~
~~Rules of that Association permits. Owners shall be responsible for all third party claims which fall under~~
~~Owner's responsibility.~~

32.     CANCELLATION OF CHARTER

~~a.     Should Vessel not be ready to load by 1200 hours local time on the Cancelling Date specified in~~
~~Part I (B), Charterer shall have the option of cancelling this Charter. If it appears that Vessel will be~~
~~delayed beyond the Cancelling Date specified in Part I (B), Owner may notify Charterer of the date on~~
~~which he expects Vessel to be ready to load, asking Charterer whether it will exercise its option to cancel.~~

~~b.     In the event of Owner giving such notification, Charterer shall have the option to;~~

~~•     Maintaining this Charter Party, whereby the third day after the readiness date stated in Owner's~~
~~notification, or such other day as may be mutually agreed shall be the new Cancelling Date for the~~
~~purpose of this Clause; OR~~

~~•     Cancel this Charter which on such cancellation shall be considered as null and void, in such~~
~~event Charterers shall not be liable for any losses or expense or damages (whether direct or indirect or~~
~~consequential) arising from such cancellation~~

~~c.     Cancellation or failure to cancel shall be entirely without prejudice to any claim for damages~~
~~Charterer may have for Vessel not being ready to load by the original Cancelling Date specified in Part I~~
~~(B).~~

*Should it become apparent to the Owners that the vessel will miss her*
*cancelling date, the Owners will propose a new 1 day laycan to the Charterers.*
*Charterers to confirm within two working days if they agree the new laycan or*
*cancel the charter with no liabilities to all parties.   If Charterers do not*
*respond to the proposed new laycan within two working days then the*
*proposed new laycan shall be deemed to be accepted by the Charterers.*



33.     TIME BAR:

a.     Owners agree that Charterers shall be released from all liability for payment of demurrage,
unless a ~~telex~~ ***written or email*** invoice is received within ~~30~~ **90** days upon completion of
discharge thereby followed by the claim to be submitted to Charterers in writing with fully certified
original supporting documents, such shall include but not be limited to original signed notice of
readiness submitted and accepted and duly signed time sheets and statement of facts duly counter

"Memphis" / IOOI dtd 31 Aug'10

signed by shippers and receivers respectively and original pumping logs duly counter signed by terminal representatives within 90 days of completion of discharge. ***All documents are subject being obtainable.***

b.        Notwithstanding the above, any claim for freight, deadfreight, demurrage and/or charges or expenses under this Charter shall be deemed waived, extinguished and absolutely barred if such claim is not received by Charterer or Owner, as the case may be, in writing with original supporting documentation ***if obtainable*** within ninety (90) days from the date of final discharge of the cargo on the voyage with respect to which said claim arises. This Clause shall not apply with respect to claims for damage, contamination, loss, or shortage of cargo.

34.        DUES, TAXES AND OTHER CHARGES *as per main terms*

a.        ~~Unless otherwise specified in WORLDSCALE and to the extent not prohibited by law, dues, taxes and other charges upon Vessel (including those assessed on the quantity of cargo loaded or discharged or on the freight) shall be paid by Owner and dues, taxes and other charges on the cargo shall be paid by Charterer. Vessel shall be free of charges for the use of any port(s) or place(s) arranged by Charterer solely for the purpose of loading or discharging cargo. However, Owner shall be responsible for charges for any such port(s) or place(s) when used solely for Vessel's purposes, such as, but not limited to, awaiting Owner's orders, tank cleaning, repairs, before, during or after loading and/or discharging.~~

b.        ~~Saudi Arabia Tax Clause (Nonresident Owners/Coastwise Trade): In accordance with the Income Tax Law of the Kingdom of Saudi Arabia, Charterer is required to withhold and remit to the Department of Zakah and Income Tax (DZIT) withholding tax on payments of marine freight to nonresident vessel owners who enter into voyage charter parties with Charterer for coastwise trade in Saudi Arabia. Charterer is required by law to pay this tax on behalf of such nonresident vessel owners and to collect/deduct the tax paid from marine freight due Owner under the Charter. The tax is determined by multiplying all freight, deadfreight and demurrage payments by five percent (5 %) and will be deducted from any payments due Owner under this Charter.~~