# EXHIBIT "G"

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF SIX ARBITRATIONS

BETWEEN:

ROXY INCORPORATED

(Owners of the "Nostos")

MEMPHIS SHIPPING PTE LTD

(Owners of the "Memphis")

DYNASTIC MARITIME INC

(Owners of the "Veres")

SAMANTHA SHIPMANAGEMENT GROUP

(Owners of the "Genie)

Claimants

(Owners)

- and -

INTERNATIONAL OIL OVERSEAS INC

Respondents

(Charterers)

---

FINAL ARBITRATION AWARD

---

1. By a charterparty dated 9 September 2009 Roxy Incorporated agreed
   to charter the "Nostos" to International Oil Overseas Inc. ("IOOI") for a
   voyage from Fujairah to Karachi with a cargo of fuel oil ("the first

"Nostos" fixture"). The charterparty was evidenced by a fixture recap which incorporated amended versions of the Asbatankvoy form together with IOOI's additional clauses.

2. By a charterparty dated 8 April 2010 Roxy Incorporated agreed to charter the "Nostos" to International Oil Overseas Inc. ("IOOI") for a voyage from Fujairah to Karachi with a cargo of fuel oil ("the second "Nostos" fixture"). The charterparty was evidenced by a fixture recap which incorporated amended versions of the Asbatankvoy form together with IOOI's additional clauses.

3. By a charterparty dated 31 August 2010 Memphis Shipping agreed to charter the "Memphis" to International Oil Overseas Inc. ("IOOI") for a voyage from Fujairah to Karachi with a cargo of fuel oil ("the first "Memphis" fixture"). The charterparty was evidenced by a signed charterparty which incorporated amended versions of the Asbatankvoy form together with IOOI's additional clauses.

4. By a charterparty dated 4 September 2010 Memphis Shipping agreed to charter the "Memphis" to International Oil Overseas Inc. ("IOOI") for a voyage from Fujairah or Iran (intention Bandar Mahshar) to Karachi with a cargo of fuel oil ("the second "Memphis" fixture"). The charterparty was evidenced by a fixture recap which incorporated amended versions of the Asbatankvoy form together with IOOI's additional clauses.

5. By a charterparty dated 8 July 2010 Dynastic Maritime Inc agreed to charter the "Veres" to International Oil Overseas Inc. ("IOOI") for a voyage from Fujairah to Djibouti with a cargo of fuel oil ("the "Veres" fixture"). The charterparty was evidenced by a fixture recap which incorporated amended versions of the Asbatankvoy form together with IOOI's additional clauses.

6. By a charterparty dated 16 May 2010 Memphis Shipping agreed to charter the "Genie" to International Oil Overseas Inc. ("IOOI") for a voyage from Fujairah to Karachi with a cargo of fuel oil ("the "Genie" fixture"). The charterparty was evidenced by a fixture recap which incorporated amended versions of the Asbatankvoy form together with IOOI's additional clauses. The fixture recap for the "Genie" fixture erroneously identified Roxy Incorporated, rather than Samantha Maritime Corp, as the vessel's owners; since IOOI raised no objection to this, we agreed that Samantha Maritime Corp were the true owners of the vessel.

7. Clause 26 (b) of the IOOI Additional Clauses (Asbatankvoy) provided that:

   *"Arbitration shall take place in London and English Law applies to this Charter Party"*

84

2

8. Disputes having arisen under the six charterparties, the four owning companies appointed me, Simon Everton of 14, Compton Crescent, Grove Park, London W4 3JA as their appointed arbitrator and IOOI appointed me, Edward Mocatta of Suite 4, 4th Floor, Linton House, 39-51 Highgate Road, London NW5 1RS as their appointed arbitrator.

9. We both accepted appointment on the LMAA Terms (2006) and pursuant to paragraph 5 thereof these terms apply to this reference. Further, pursuant to Section 6(B) of those terms as well as Clause 31 of the charterparty the seat of the arbitration is England.

10. The owning companies requested that we deal with the six disputes in a single Final Arbitration Award.  For convenience, we refer to them collectively and severally as "the Owners"

11. Pursuant to the first "Nostos" fixture, the Owners claimed US$144,419.18 as unpaid demurrage, together with compound interest and costs.

12. Pursuant to the second "Nostos" fixture, the Owners claimed US$31,192.06 as unpaid demurrage, together with compound interest and costs.

13. Pursuant to the first "Memphis" fixture, the Owners claimed US$8,417.50 as unpaid demurrage, together with compound interest and costs.

14. Pursuant to the second "Memphis" fixture, the Owners claimed US$208,996.76 as unpaid demurrage, together with compound interest and costs.

15. Pursuant to the "Veres" fixture, the Owners claimed US$71,649.30 as unpaid demurrage, together with compound interest and costs.

16. Pursuant to the "Genie" fixture, the Owners claimed US$53,078.81 as unpaid demurrage, together with compound interest and costs.

17. IOOI denied liability for all the claims, and counterclaimed for cargo shortages under five bills of lading issues under the charterparties.

18. Pursuant to bill of lading dated 24 September 2010 issued under the second "Memphis" charterparty IOOI counterclaimed US$147,205.35, together with compound interest and costs.

19. Pursuant to bill of lading dated 29 May 2010 issued under the "Genie" charterparty IOOI counterclaimed US$10,742.27, together with compound interest and costs.

20. Pursuant to bill of lading dated 16 July 2010 issued under the "Veres" charterparty IOOI counterclaimed US$20,522.08, together with compound interest and costs.

21. Pursuant to bill of lading dated 17 July 2010 issued under the "Veres" charterparty IOOI counterclaimed US$23,391.54, together with compound interest and costs.

22. Pursuant to bill of lading dated 17 August 2010 issued under the "Veres" charterparty IOOI counterclaimed US$10,708.92, together with compound interest and costs.

23. The total sum counterclaimed by IOOI amounted to US$212,520.16.

24. We were presented with written submissions and documentary evidence by both parties, at the conclusion of which we proceeded to our Award, neither party having requested an oral hearing. Our Reasons are attached hereto and form part of this our Final Arbitration Award.

**NOW WE** the said Edward Mocatta and Simon Everton having taken upon ourselves the burden of this reference and having carefully and conscientiously considered the documentary evidence and submissions put before us by the parties and having given due weight thereto and being in agreement each with the other **DO HEREBY MAKE ISSUE AND PUBLISH THIS OUR FINAL ARBITRATION AWARD** as follows;-

A. **WE FIND AND HOLD** that the Owners' claim for demurrage under the first "Nostos" fixture succeeds in full, and **WE THEREFORE AWARD AND DIRECT** that IOOI shall forthwith pay to the Owners the sum of US$ US$144,419.18 (One Hundred and Forty-four Thousand, four Hundred and nineteen United States Dollars and eighteen Cents) together with interest thereon at the rate of 5% per annum compounded at three-monthly rests from 19 October 2009 until payment.

B. **WE FURTHER FIND AND HOLD** that the Owners' claim for demurrage under the second "Nostos" fixture succeeds in full, and **WE THEREFORE AWARD AND DIRECT** that IOOI shall forthwith pay to the Owners the sum of US$31,192.06 (Thirty-one Thousand, one Hundred and ninety-two United States Dollars and six Cents) together with interest thereon at the rate of 5% per annum compounded at three-monthly rests from 6 May 2010 until payment.

C. **WE FURTHER FIND AND HOLD** that the Owners' claim for demurrage under the first "Memphis" fixture succeeds in full, and **WE**

4

**THEREFORE AWARD AND DIRECT** that IOOI shall forthwith pay to the Owners the sum of US$ US$8,417.50 (Eight Thousand, four Hundred and seventeen United States Dollars and fifty Cents) together with interest thereon at the rate of 5% per annum compounded at three-monthly rests from 8 October 2010 until payment.

D.   **WE FURTHER FIND AND HOLD** that the Owners' claim for demurrage under the second "Memphis" fixture succeeds in full, and **WE THEREFORE AWARD AND DIRECT** that IOOI shall forthwith pay to the Owners the sum of US$208,996.76 (Two hundred and Eight Thousand, nine Hundred and ninety-six United States Dollars and seventy-six Cents) together with interest thereon at the rate of 5% per annum compounded at three-monthly rests from 1 November 2010 until payment.

E.   **WE FURTHER FIND AND HOLD** that the Owners' claim for demurrage under the "Veres" fixture succeeds in full, and **WE THEREFORE AWARD AND DIRECT** that IOOI shall forthwith pay to the Owners the sum of US$71,649.30 (Seventy-one Thousand, six Hundred and forty-nine United States Dollars and thirty Cents) together with interest thereon at the rate of 5% per annum compounded at three-monthly rests from 17 September 2010 until payment.

F.   **WE FURTHER FIND AND HOLD** that the Owners' claim for demurrage under the "Genie" fixture succeeds in full, and **WE THEREFORE AWARD AND DIRECT** that IOOI shall forthwith pay to the Owners the sum of US$53,078.81 (Fifty-three Thousand and seventy-eight United States Dollars and eight-oney Cents) together with interest thereon at the rate of 5% per annum compounded at three-monthly rests from 29 June 2010 until payment.

G.   **WE FURTHER FIND AND HOLD** that IOOI's counter-claim succeeds only to the extent of US$3,188.55 (three thousand one hundred and eighty eight United States Dollars and fifty-five Cents) and no more, and **WE THEREFORE AWARD AND DIRECT** that the Owners shall forthwith pay to the IOOI this sum, together with interest thereon at the rate of 5% per annum compounded at three-monthly rests from 24 October 2010 until payment.

H.   **WE FURTHER AWARD AND DIRECT** that IOOI shall bear the costs of this our Final Arbitration Award which we hereby assess and determine in the sum of GB£7,200 (Seven thousand two hundred Pounds Sterling) inclusive of our fees and interlocutory charges, **ALWAYS PROVIDED** that if, in the first instance, the Owners shall have paid any amount in respect thereof, they shall be entitled to the immediate reimbursement of that amount from IOOI, together with interest thereon at the rate of 5% per annum compounded at three monthly rests from the date of such payment until that of reimbursement.

I.  **WE FURTHER AWARD AND DIRECT** that IOOI shall bear their own costs and shall pay the Owners' recoverable costs of this Final Arbitration Award which, if not agreed, to be assessed by us on the basis set out in section 63(5) of the Arbitration Act 1996.

J.  **WE HEREBY DECLARE** that this arbitration award is final as to all matters determined herein. We hereby reserve our jurisdiction to make further award(s) in respect of matters not dealt with herein.

Dated in London this 8th day of September 2011

......................................
Edward Mocatta

......................................
Witness

......................................
Simon Everton

......................................
Witness

88

6

**"NOSTOS"**
**charterparties dated 09.09.09 and 08.04.10**

**"MEMPHIS"**
**charterparties dated 31.08.10 and 04.09.10**

**"VERES"**
**charterparty dated 08.0710**

**"GENIE"**
**charterparty dated 16.05.10**


# REASONS ATTACHED TO AND FORMING PART OF OUR FINAL ARBITRATION AWARD


1. The six charterparties involved fixtures made by the owners of the four vessels with International Oil Overseas Inc. ("IOOI") for voyages from Fujairah to Karachi and other discharge ports with cargoes of fuel oil.

2. The four owning companies, to whom for convenience we refer to collectively and severally as "the Owners" requested that we make a single Final Arbitration Award covering the six disputes.

3. The charterparties all incorporated amended versions of the Asbatankvoy form together with IOOI's additional clauses.

4. Clause 26 (b) of the IOOI Additional Clauses (Asbatankvoy) provided that:

   *"Arbitration shall take place in London and English Law applies to this Charter Party"*

   We shall refer to the other relevant provisions of the charterparties when we deal with the claims in detail.

5. The Owners claimed for varying amounts of unpaid demurrage under each of the six charterparties, together with compound interest and costs.

6. IOOI denied liability, and in turn counterclaimed for a total of US$212,520.16 in respect of cargo shortage under five bills of lading issued pursuant to three of the charterparties.

**The Owners' claim for demurrage**

7. The Owners presented their calculations for demurrage arising under each of the six charterparties, supported in the usual way by statements of facts and time sheets from the load and discharge ports, and other relevant documents.

8. In essence IOOI's reply to the Owners' demurrage calculations is the same to all claims, and relies on the provisions of Clause 6 of the Asbatankvoy charterparty states:

> "*However, where delay is caused to the vessel getting into berth after giving Notice of Readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.*"

9. IOOI argued that the effect of this provision is that in each of the six charterparties, on their view, delays had occurred in getting the vessel to the berth over which they had no control, and therefore laytime should not start until the vessel was all fast at the load port, and should continue until the time that the hoses were disconnected.

10. The delays over which IOOI claimed that they had no control varied for each of the six charterparties. In the case of the first and second "Nostos" fixtures, the first "Memphis" fixture and the "Genie" fixture, the reason for the delay was tidal restrictions. In the case of the second "Memphis" fixture the reason was delay in the vessel obtaining Free Pratique. In the case of the "Veres" fixture, IOOI did not plead any specific reason for the delay, simply relying on the provisions of Clause 6.

11. Following IOOI's argument, if the provisions of Clause 6 were to be applied to the demurrage calculations as they claimed it should be applied, the time allowable for laytime in each of the six charterparties was within the time allowed for laytime, and no demurrage was due.

12. The Owners disputed IOOI's case. On their view, they were not entitled to reply on Clause 6 because IOOI themselves were in breach of the reachable arrival provision contained in the charterparties. Alternatively, to the extent that the agreed exceptions to the running of laytime and demurrage in the IOOI terms supercede the Asbatankvoy provisions, they support the Owners' calculations.

13. All six charterparties, the Owners argued, were subject to Clause 9 of the Asbatankvoy charterparty:

> "*SAFE BERTHING-SHIFTING. The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading*"

2

> *and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth.  Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15."*

14. The Owners argued that insofar as the vessels were unable to berth on arrival, the reason for this was a prima facie breach of IOOI's obligation under Clause 9 that the berth should be *"reachable on .. arrival"*.  It was, the Owners argued, for IOOI to demonstrate that the berth was reachable on arrival, but then became unreachable due to a supervening delay beyond their control, and IOOI had not adduced any evidence to this effect.

15. This being the case, the Owners argued that IOOI could not rely on Clause 6 of the Asbatankvoy charterparty, and referred us to *Voyage Charters 3rd ed. para. 57.8* and to the *"Laura Prima [1982] 1 Ll. Rep. 1.*  They also referred us (in the context of Clauses 12 and 14 of the IOOI clauses, to which we will return later) to *Schofield Laytime and Demurrage 5th Ed. para 4.456* which states:

> *"… it is suggested that it would be more logical to say that, in the same way that laytime exception in clause 6 relating to delay in getting into berth does not apply unless the charterers procure a berth "reachable on arrival", so should the demurrage exceptions in clause 8.  To hold otherwise would be to seriously limit the effect of a "reachable on arrival" provision in the circumstances specified in that clause."*

16. In the alternative, the Owners argued that Clauses 12 and 14 of the IOOI clauses (as amended in the six charterparties) provided a complete code which overrode provisions contained in the Asbatankvoy form.  Moreover, they argued that the actual cause of delay in each case was caused by congestion, for which they provided supporting evidence in the case of each of the six charterparties.

17. It is probably helpful at this stage to say that we did not agree with the Owners' secondary case, that Clauses 12 and 14 of the IOOI clauses overrode the provisions of the Asbatankvoy.  Rather, we considered that they were complementary to the provisions of the Asbatankvoy, and that IOOI's primary obligations were to comply with the provisions of Clauses 6 and 9 of the Asbatankvoy, and specifically that the berth should be *"reachable on .. arrival"* in the way contemplated in the passage cited from *Schofield*.

18. Bearing this in mind, we then turned separately to consider each of the six charterparties in detail.  Before doing so, we noted that whilst IOOI had contested the reasoning behind the Owners' demurrage claims, they did not question the calculations.  We have ourselves checked the Owners' calculations, and found them to be mathematically correct in accordance with their interpretation of the charterparty terms; we therefore agreed that, if we

3

found that the Owners were entitled to demurrage, it would be in the amount claimed.

19. For the first "Nostos" fixture, IOOI claimed that the delay was caused by tidal restrictions. The Owners claimed that the delays were caused by congestion. We agreed with the Owners that the evidence showed a prima facie case that delays were caused by congestion. Further, in any event, if the sole cause of the delay in berthing were tidal conditions, IOOI were unable to rely on Clause 14(b)(ii) of the unamended IOOI clauses as this clause was specifically deleted in the fixture recap. We therefore found that IOOI were in breach of their obligation under Clause 9 of the Asbatankvoy charterparty, that the berth should be "*reachable on .. arrival*", and the time should therefore count as laytime. We therefore found that the Owners were entitled to the demurrage claimed for the first "Nostos" fixture.

20. For the second "Nostos" fixture, the same facts applied, and for the same reasons we therefore found that the Owners were entitled to the demurrage claimed for the second "Nostos" fixture.

21. For the first "Memphis" fixture, the same facts applied, and for the same reasons we therefore found that the Owners were entitled to the demurrage claimed for the first "Memphis" fixture.

22. For the second "Memphis" fixture, IOOI claimed that the delay was caused by delays in the vessel obtaining free pratique. The Owners claimed that the delays were caused by congestion. The Owners pointed out that the charterparty had been amended to the effect that Clause 14(b)(viii) of the IOOI clauses now read:

> "*SUCH DELAYS* (i.e. delays in obtaining free pratique) *SHALL COUNT AS ONE-HALF LAYTIME OR, IF ON DEMURRAGE, AS ONE HALF DEMURRAGE RATE*".

At most therefore, IOOI would be entitled to one half of the demurrage claimed. However, having also considered the documents provided by the Owners we agreed with them that there was a prima facie case that the actual cause of the delay in berthing was congestion, and that IOOI were therefore in breach of their obligation under Clause 9 of the Asbatankvoy charterparty, that the berth should be "*reachable on .. arrival*", and the time should therefore count as laytime. We therefore found that the Owners were entitled to the full amount of demurrage claimed for the second "Memphis" fixture.

23. For the "Veres" fixture, IOOI offered no reason for the cause of the delay, whereas the Owners again claimed congestion as the cause. Having checked the Owners' documents, and in the absence of any explanation from IOOI, we agreed with the Owners that there was a prima facie case that the actual cause of the delay in berthing was congestion, and that IOOI were therefore in breach of their obligation under Clause 9 of the Asbatankvoy charterparty, that the berth should be "*reachable on .. arrival*", and the time

4

should therefore count as laytime, and we therefore found that the Owners were entitled to the full amount of demurrage claimed for the "Veres" fixture.

24. For the "Genie" fixture, as with the first and second "Nostos" fixtures referred to above as well as the first "Memphis" fixture, IOOI claimed that the delay was caused by tidal restrictions whereas the Owners claimed that the delays were caused by congestion.  We agreed with the Owners that the evidence showed a prima facie case that delays were caused by congestion. Further, in any event, if the sole cause of the delay in berthing were tidal conditions, IOOI were unable to rely on Clause 14(b)(ii) of the unamended IOOI clauses as this clause was specifically deleted in the fixture recap.  We therefore found that IOOI were in breach of their obligation under Clause 9 of the Asbatankvoy charterparty, that the berth should be "*reachable on .. arrival*", and the time should therefore count as laytime.  We therefore found that the Owners were entitled to the demurrage claimed for the "Genie" fixture.

25. As a result of our findings we have therefore awarded the Owners the demurrage claimed in respect of each of the six charterparties.

**IOOI's claim for short shipment**

26. IOOI presented a counterclaim in respect of short shipments under five separate bills of lading under three of the charterparties; the first "Memphis" fixture and the "Veres" and "Genie" fixtures.

27. In their defence to the counterclaim the Owners pointed out that the counterclaim for short shipments was governed by Clause 15 of the IOOI Clauses, which dealt with In Transit Loss and Cargo Retention.  However, in the three relevant charterparties (and indeed in all six charterparties) this clause had been amended in the fixture recaps so that it had the effect of nullifying all but 1.5% of IOOI's counterclaim.  That, in their view being the case, they invited IOOI to contest their argument, alternatively they offered simply to concede the 1.5% which remained.

28. IOOI declined to offer further submissions as invited, and we felt it reasonable to conclude that they therefore did not take issue with the Owners' argument.  In light of this we did not consider it necessary to consider the Owners' submissions on Clause 15 in detail, and simply noted their concession of 1.5% of the counterclaim.

29. The total counterclaim was US$212,520.16.  In light of the Owners concession, we have therefore awarded IOOI a total of US$3,188.55.  This is allocated as follows:

| Vessel | B/L date | Cargo claim Awarded |
|---|---|---|
| "Memphis" (C/P 04.09.10) | 24.09.10 | US$2,208.09 |
| "Genie" | 29.05.10 | US$161.13 |
| "Veres" | 16.07.10 | US$307.83 |
| "Veres" | 17.07.10 | US$350.87 |
| "Veres" | 17.08.10 | US$160.63 |

5

**Interest**

30. We agreed with the Owners that they were entitled to compound interest on the sums that we awarded and we have awarded this to run in each case from 14 days after the demurrage claim was first presented to the Charterers, as follows:

| Charterparty | Demurrage Claim Presented | Interest to run from |
|---|---|---|
| First "Nostos" fixture | 05.10.09 | 19.10.09 |
| Second "Nostos" fixture | 22.04.10 | 06.05.10 |
| First "Memphis" fixture | 24.09.10 | 08.10.10 |
| Second "Memphis" fixture | 18.10.10 | 01.11.10 |
| "Veres" fixture | 03.08.10 | 17.08.10 |
| "Genie" fixture | 15.06.10 | 29.06.10 |

31. We took as the rate of interest 5% per annum and pro rata compounded at 3-monthly rests, which we consider to be a fair average commercial rate of interest for the period in question.

32. We further agreed that IOOI were entitled to interest at the same rate of 5% per annum and pro rata compounded at 3-monthly rests on the amount in which they succeeded in their counterclaim. In view of the small amounts involved, for the sake of simplicity we agreed that this should run on the entire sum awarded to them from fourteen day from the presentation of their first cargo claim, that is 24 October 2010.

**Costs**

33. Since the Owners succeeded in full with their claim, and IOOI only to a very small extent with their counterclaim, following the normal rule that costs follow the event we decided that IOOI should bear the Owners' recoverable costs, together with the costs of our Award.

34. The Owners elected to pursue their claims together, and requested that we make a singe Award covering all claims. In the circumstances, we would therefore assume that they will allocate the costs of each claim between themselves. If that is not the case, then we would say that the costs should be equally divided between the six references.

6