# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
ROUTE HOLDING INC. and                         :
BEAM COMPANY INC.,
                                               :
        Plaintiffs,
                                               :        06 Civ. 3428
    - against -
                                               :        ECF CASE
INTERNATIONAL OIL OVERSEAS INC.,
a.k.a. IOOI, and                               :
MARINA WORLD SHIPPING CORP.,
                                               :
        Defendants.
-----------------------------------------------------------X

## DECLARATION OF HARA ANASTASATOU
## IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
## MOTION TO VACATE MARITIME ATTACHMENT

Hara Anastasatou declares under penalty of perjury of the laws of the United States of America as follows:

1.      I am a claims administrator with the company Marmaras Navigation Ltd. and I make this Declaration in Support of Plaintiffs' Opposition to Defendant, Marina World Shipping's ("MWS") Motion to Vacate the Attachment.

2.      Marmaras Navigation Ltd. was at all material times the commercial and technical manager of the M/T DELTA SAILOR on behalf of Plaintiff Route Holding Inc. ("RHI") and of the M/T PELAGOS on behalf of Plaintiff Beam Company Inc. ("BCI").

3.      I work with Mr. Martin Glibbery, manger of the legal and insurance department of Marmaras Navigation Ltd. regarding Plaintiffs' claims against IOOI and MWS. I make this declaration based upon my own personal knowledge and upon documents that I believe to be true and accurate.

4. Plaintiff RHI was at all material times the Owner of the motor tanker "DELTA SAILOR." Defendant, International Oil Overseas Inc. ("IOOI") was at all material times the charterer of the M/T DELTA SAILOR.

5. By a charter party dated April 25, 2005, Plaintiff RHI chartered the M/T DELTA SAILOR to IOOI. *See RHI Charter Party annexed hereto as Exhibit "1."*

6. IOOI was the only charterer named in the charter party contract.

7. Certain disputes arose between RHI and IOOI during the course of the charter party contract regarding IOOI's failure to pay demurrage due and owing to RHI under the charter party.

8. As a result of IOOI's breach of the charter party contract, RHI has suffered, and will continue to suffer, losses in the total principal sum of $11,395.31, as best can now be estimated, exclusive of interest, reasonable attorneys fees and arbitration costs.

9. Pursuant to clause K and clause 24 of the charter party, all disputes arising thereunder are to be submitted to arbitration in London with English law to apply.

10. Despite due demand, IOOI failed to pay the demurrage due and owing under the charter party. As a result, RHI has commenced arbitration and appointed an arbitrator.

11. Plaintiff BCI was at all material times the Owner of the motor tanker "PELAGOS."

12. By a charter party dated May 28, 2005, BCI chartered the M/T PELAGOS to IOOI. *See BCI Charter Party annexed hereto as Exhibit "2."*

13. IOOI was at all material times the only charterer of the M/T PELAGOS.

14. Certain disputes arose between the BCI and IOOI during the course of the charter party contract regarding IOOI's failure to pay demurrage, bunker costs and other expenses/damages due and owing to BCI under the charter party.

15. As a result of IOOI's breach of the charter party contract, BCI has suffered, and will continue to suffer, losses in the total principal sum of $306,531.00, as best can now be estimated, exclusive of interest, attorneys' fees, and arbitration costs.

16. Pursuant to clause K and clause 24 of the charter party, all disputes arising thereunder are to be submitted to arbitration in London with English law to apply

17. Despite due demand, IOOI failed to pay the amounts due and owing under the charter party. As a result, BCI has commenced arbitration and appointed an arbitrator.

18. In support of MWS' Motion to Vacate, Mohammed Hani Abdul Kader Al Bakri of MWS has filed with this Court his Declaration dated July 18, 2006 wherein he affirms that: MWS has no affiliation with IOOI and the two companies enjoy an arms-length business relationship. *See Declaration of Hani Bakri, ¶¶ 5-6.* For the reasons that follow, and based upon even a cursory review of the attached exhibits, it is evident that MWS and IOOI are alter egos of each other and Mr. Bakri's declaration is, at best, a gross misrepresentation of the facts.

19. In order to present the evidence in the clearest way possible this declaration is split into two parts, which have some overlapping elements. The first part of the declaration sets forth facts and evidence which demonstrate that IOOI is merely a shell corporation through which MWS conducts business. The second part of the declaration sets forth facts and evidence which demonstrate that both IOOI and MWS are two of several companies that are managed, operated and controlled as a single economic entity, known as the BAKRI GROUP, headed up by none other than Mr. Bakri himself.

## IOOI IS MERELY A SHELL CORPORATION
## THROUGH WHICH MWS CONDUCTS BUSINESS

20.     Contrary to Mr. Bakri's statements, it is not a sound commercial practice in the maritime industry to have another company habitually pay one's debts. Making such payments on a systematic basis would be especially unusual without there being some formal relationship, i.e. owner/manager, between them.

21.     On May 6, 2005, an entity named "Marina World Shipping" made a payment on behalf of IOOI in regards to the DELTA SAILOR charter party. This entity had no relationship to the underlying charter party, and IOOI was the only entity liable for the freight payment. *See Message from IOOI confirming payment and Remittance Details annexed hereto as Exhibit "3."*

22.     No one from either IOOI or MWS informed us of any "assignment."

23.     When we brought Plaintiffs' claims to Tisdale & Lennon, LLC, we became aware of another attachment case involving the same parties, IOOI and MWS. An agreement to cooperate with the plaintiff in the other case against IOOI and MWS was forged on May 4, 2006, before the instant action was initiated.

24.     From that other case, we learned that MWS had a history of making payments on behalf of IOOI. Furthermore, it was revealed that IOOI referred to and treated MWS' bank account as its own. When IOOI stated that payments would be coming from its account, the payment was always remitted under the name "Marina World Shipping." Finally, it was discovered that MWS made payments on behalf of IOOI in areas where IOOI should have exclusive control. The events summarized herein are described below.

25.     On February 22, 1998, IOOI sent a letter to a ship owner named "Garda Shipping" stating that it (IOOI) would make a payment regarding the charter of the M/V

SHIBUMI. Particularly, IOOI stated that "we have arranged remittance of USD 390,000 to Owners nominated banks account being freight through Riyad Bank Main, Branch, Jeddah with value date 24/02/98." IOOI further stated, "we instructed our bank to send direct TLX to your confirming remittance." The letter is signed "IOOI/JEDDAH." *See Letter from IOOI annexed hereto as Exhibit "4."*

26.     However, when the payment came through on February 24, 1998, the name on the remittance did not state IOOI, but instead, "Marina World Shipping." *See Bank Remittance details confirming that Marina World Shipping paid IOOI's debt to the Plaintiff annexed hereto as Exhibit "5."*

27.     MWS made freight payments on IOOI's behalf once again when it paid the freight due under another charter party of the M/T "SHIBUMI" dated November 12, 1998. *See Freight Remittance Details regarding charter party dated November 12, 1998 annexed hereto as Exhibit "6."*

28.     As with the previous charter, IOOI sent a letter confirming that it (IOOI) would have its banks pay the owners. However, when the payment came through the name on the remittance details was not IOOI, but "Marina World Shipping." *See Letter from IOOI regarding payment for November 12th charter annexed hereto as Exhibit "7."*

29.     The information provided by the other plaintiff seeking to attach IOOI and MWS revealed that MWS does not only make payments on behalf of IOOI in regards to the monies due under charter parties. On the contrary, MWS also acts and makes payments for IOOI in areas where IOOI should have exclusive control.

30.     On March 13, 2001, MWS made a series of four payments to Waterson Hicks for arbitration costs assessed against IOOI even though Marina World Shipping was not a party to

the arbitration. *See copies of Bank Remittance advices concerning payment of the "SHIBUMI"*

*Arbitration Award Costs into Waterson Hicks Account annexed hereto as Exhibit "8."*

31.     Upon information and belief, neither Waterson Hicks nor the plaintiff involved

therein were informed about any assignment between IOOI and MWS.

32.     Many other links between IOOI and MWS were exposed after the Order of

Maritime Attachment and Garnishment was issued on May 4, 2006.

33.     In addition to the four instances listed above, there are at least seven other

occasions where MWS paid IOOI's debts without apparent explanation or excuse. And, these

are only the payments I know of.

34.     IOOI was the only charterer named in the charter parties for all seven of the

payments. The payments are described below.

35.     MWS made a freight payment on IOOI's behalf in regards to the M/T PELAGOS

charter on July 12, 2005. *See Message from IOOI confirming payment and Bank Remittance*

*Details annexed hereto as Exhibits "9."*

36.     MWS also paid IOOI's debts in regards to the charter of the PRIGIPOS on

August 24, 2004. *See Bank Remittance Details annexed hereto as Exhibit "10."*

37.     Furthermore, MWS made three payments on IOOI's behalf in regards to the

NORD SEA charter on May 24, 2004, September 15, 2004 and January 18, 2005 respectively.

*See Exhibits "11," "12," and "13."*

38.     In addition, on December 21, 2005, MWS made a payment on behalf of IOOI for

the settlement of various demurrage claims in which IOOI was the only party liable in the

corresponding charter parties. As done previously, IOOI confirmed that it would pay against a

copy of the invoice. *See Message from IOOI, Invoice to IOOI and Wire Remittance details*

*annexed hereto as Exhibit "14."* However, when the payment came through, the name listed on the wire remittance was "Marina World Shipping."

39.     To our knowledge, IOOI has never made a payment on its own behalf. All payments received by the Plaintiffs in regards to their respective charters with IOOI came from MWS.

40.     MWS itself stated that it made yet another freight payment on IOOI's behalf on May 9, 2006. *See Bakri Declaration, ¶19.*

41.     It was discovered after the attachment action, that IOOI frequently withholds the payment of demurrage owed under its charters in order to negotiate a discount. This policy was revealed to us in a conversation with one of IOOI's representatives.

42.     As further evidence of the IOOI-MWS alter ego relationship is the fact that MWS and IOOI have the same address.

43.     Although Mr. Bakri claims that MWS and IOOI have separate leases, this is of no moment, as the *entire building* appears to owned and operated by a group of companies named the "BAKRI GROUP" which controls both IOOI and MWS as if they were one, single economic entity.

## IOOI AND MWS ARE DOMINATED AND CONTROLLED AS A SINGLE ECONOMIC ENTITY KNOWN AS THE BAKRI GROUP

44.     On May 15, 2006, we received a copy of the MRC investigation report on the "BAKRI GROUP" and "IOOI." This report details the companies working within the BAKRI GROUP and sets forth facts which link IOOI thereto. *See MRC Report annexed hereto as Exhibit "15."*

45. Based on the MRC report and other information available, it is evident that IOOI and MWS are two of several companies which are operated, controlled and managed as a single economic enterprise known as the "BAKRI GROUP."

46. The relationship between the BAKRI GROUP, IOOI, and MWS is made clear by an examination of the directors appointed on IOOI's and MWS' boards.

47. We had investigative search performed regarding the directors of both IOOI and the MWS.

48. The directors of MWS include Mr. Bakri and his immediate family members, who serve in many other positions within the BAKRI GROUP.

49. In addition, two of the directors of IOOI are tied to the BAKRI GROUP. The directors of IOOI are listed as Abdel Kader Mohamed El Amin, M. Othman Mahamd, and Saber Abu Ammara.

50. Abdel Kader Mohamed El Amin works as the administrative officer of Ocean Marine Services, Fujairah. Ocean Marine is believed to be a Bakri controlled ship agency to handle vessels taking bunkers from International Supply Co., Kari's Fujairah based bunker operation.

51. It should be noted that Ocean Marine's PO Box has occasionally popped up as an alternative address for IOOI. *See Exhibit "15."*

52. In addition, the director, Saber Abu Ammara, is a Jordanian who works in the legal department of Bakri Navigation.

53. We have no doubt that the third director of IOOI, M. Othman Mahamad, is also connected to Bakri Navigation and the Bakri Group as a whole.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 25,
2006.

Hara Anastasatou

## AFFIRMATION OF SERVICE

I hereby certify that on July 25, 2006, a copy of the foregoing DECLARATION OF

HARA ANASTASATOU IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO

VACATE MARITIME ATTACHMENT was filed electronically and served by mail on anyone

unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by

operation of the Court's electronic filing system or by mail to anyone unable to accept electronic

filing.  Parties may access this filing through the Court's CM/ECF system.


By: _____/s/_____
      Nancy R. Peterson

EXHIBIT 1

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

**1ST ORIGINAL**

CODE WORD FOR THIS
CHARTER PARTY:

**ASBATANKVOY**

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

*SINGAPORE*
Place

*25 APRIL 05*
Date

IT IS THIS DAY AGREED between *ROUTE HOLDING INC*

chartered owner/owner (hereinafter called the "Owner") of the *MARSHALL ISLANDS.*

*SS/MS M/T DELTA SAILOR*                                                            (hereinafter called the "Vessel")

and *INTERNATIONAL OIL OVERSEAS INC.*                                     (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble
and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

### PART I

A.  Description and Position of Vessel:

   Deadweight: *111003.6*           tons (2240 lbs.)    Classed: *LLOYD'S REGISTER*

   Loaded draft of Vessel on assigned summer freeboard *14.618 M* ft.          in. in salt water.

   Capacity for cargo: *123785.2 CUM EX SLOP TANK* tons (of 2240 lbs. each)     *98*          % more or less, Vessel's option.

   Coated:          [ *X* ] Yes       [ ] No

   Coiled:          [ *X* ] Yes       [ ] No            Last two cargoes: *NA*

   Now: *FUEL OIL/DIRTY PETROLEUM PRODUCTS EXCL VGO, CBFS AND LSWR* Expected Ready:

B.  Laydays:

           Commencing: *25.04.05*              Cancelling: *27.04.05*

C.  Loading Port(s):      *1 SP UAE NOT NORTH OF BUT INCLUDING RUWAIS*

                                                                        Charterer's Option

D.  Discharging Port(s):      *1 SP FUJAIRAH*

                                                                        Charterer's Option

E.  Cargo:   *MAXIMUM TWO(2) GRADES WITHIN VESSEL'S NATURAL SEGREGATION FUEL OIL/DIRTY PETROLEUM
   PRODUCTS EXCL VGO, CBFS AND LSWR. VESSEL TO MAINTAIN LOADED TEMPERATURE BUT MAXIMUM 135
   DEGREES FAHRENHEIT. MAXIMUM LOADED TEMPERATURE 160 DEGREES FAHRENHEIT.*

                                                                        Charterer's Option

F.  Freight Rate: *LUMPSUM USD 290,000*                                    per ton (of 2240 lbs. each).

G.  Freight Payable to:
   *HSBC BANK PLC*
   *93, AKTI MIAOULI STR., P.O.BOX 80461*
   *185 38 PIRAEUS – GREECE*

   *SWIFT : MIDLGRAA*
   *IBAN NO    : GR05 0710 0010 0000 0105 0855 071*

*ACC. NO : 001-050855-071*
*BENEFICIARY : ROUTE HOLDING INC.*

**1ST ORIGINAL**

*CORRESPONDING BANK FOR USD:*
*HSBC BANK USA – 140, BROADWAY - NEW YORK 10015*
*ABA: 021001088 - CHIPS NO: 0108*
*ACCT NO:000-04779-1 SWIFT: MRMDUS33*
ni

H. Total Laytime in Running Hours: *84 HOURS TOTAL WSTC*

I. Demurrage per day: *$27,500 PDPR*

J. Commission of *5* % is payable by Owner to *OF WHICH 2.5 ADDCOM AND 1.25 PCT TO CAPITAL LONDON AND 1.25 PCT TO RS PLATOU ASIA FRT/DEMM.*

on the actual amount freight, when and as freight is paid.

K. The place of General Average and arbitration proceedings to be London/New York (strike out one).

L. ~~Tovalop: Owner warrants Vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.~~

M. Special Provisions:

- *CONOCO WEATHER TO APPLY*

- *BIMCO ISPS CLAUSE TO APPLY*

- *MAX 3 HRS WAITING FOR CARGO DOCS FOR OWNERS ACCT.*

- *ANY/ALL TAXES A/O DUES ON CARGO A/O FREIGHT TO BE FOR CHARTERERS' ACCOUNT AND TO BE PAID DIRECTLY BY THEM*

*MASTER TO DISCHARGE ANY CARGO FROM THE VESSEL ONLY UPON RECEIVING CHARTERERS WRITTEN AUTHORIZATION AS PER FORM BELOW:*
++++ ++++ ++++

*To : Master .... And or Warehouse ....*

*"We confirm that you are hereby authorized to berth and discharge approximately....... mts of ..... us per the charter party terms and conditions and any subsequent delivery instructions dated subsequent to this message. "*

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate

as of the day and year first above written.

Witness the signature of:

Witness the Signature of:

B FOR A&U ON BEHALF OF
MARMARASTIN ............. LTD.
By:
P I R A ... S

AS NON - RESPONSIBLE AGENTS ONLY

By:

This Charterparty is a computer generated copy of ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author.

PART II  **1ST ORIGINAL**

1.  **WARRANTY - VOYAGE - CARGO.** The Vessel, as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, shall load (always afloat), from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperatures requested.

2.  **FREIGHT.** Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3.  **DEADFREIGHT.** Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4.  **NAMING LOADING AND DISCHARGE PORTS.**

(a)  The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

|  | On a voyage to a port or ports list: |
| ST. KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
|  | (from ports west of Port Said.) |

(b)  If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports list: |
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) |
|  | or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere). |

(c)  Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall count as used laytime *paid at demurrage rate.*

5.  **LAYDAYS.** Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 *12.00* o'clock P. M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6.  **NOTICE OF READINESS.** Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice or readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7.  **HOURS FOR LOADING AND DISCHARGING.** The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner or port authorities prohibit loading or discharging of the cargo at night, the time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, *unless carried out concurrently with cargo operations* will not count as used laytime.

8.  **DEMURRAGE.** Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9.  **SAFE BERTHING - SHIFTING.** The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to such berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10.  **PUMPING IN AND OUT.** The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as well as necessary herein. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11.  **HOSES: MOORING AT SEA TERMINALS.** Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. *If vessel is delayed by more than 3 hours awaiting documents, laytime or demurrage, if vessel is on demurrage, shall count until documents is onboard".* When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12.  **DUES - TAXES - WHARFAGE.** The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto do Comercio Maritimo. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13.  (a).  **CARGOES EXCLUDED VAPOR PRESSURE.** Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 deg F.) in excess of thirteen and one-half pounds (13½) as determined by the current A.S.T.M. Method (Reid) D-323.

(b)  **FLASH POINT.** Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 deg F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14.  (a).  **ICE.** In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterer, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b)  If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per

## 1ST ORIGINAL

Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo—then to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I F hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

(a) Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

(b) All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

(c) Time consumed shifting between the ports or terminals within this particular grouping or combination shall not count as used laytime.

(d) Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17. (a). QUARANTINE. Should the Charterers send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

(b) FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's an *independent* inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:- any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving of attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master nor owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss or damage or delay or failure in performing hereunder, arising or resulting from:- Act of God; act of war; perils of the sea; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING.

(a) The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

(b) The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

(i) CLAUSE PARAMOUNT. This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

(ii) JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

(iii) GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by those rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv) BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

(v) LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

(vi) WAR RISKS. (a) If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

(b) If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge - the Charterer shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other safe port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of this Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no order be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

(vii) DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in

## 1ST ORIGINAL

distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and other, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which each party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator had been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfilment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperilled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

### BILL OF LADING

Shipped in apparent good order and condition by

on board the

whereof

Steamship/Motorship

is Master, at the port of

to be delivered at the port of

or so near thereto as the Vessel can safely get, always afloat, unto

or order on payment of freight at the rate of

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London

between _____ and _____ , as Charterer, and

all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed _____ Bills of Lading of this tenor and date, one of which being accomplished, the others will be void.

Dated at _____ this _____ day of

_____ Master

This Charter Party is a computer generated copy of the ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by striking out of original characters, or the insertion of new characters, such characters clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY
Dated: 07.08.2003

M.T. "DELTA SAILOR " CP DATED:25 APR 2005

The vessel is capable ~~of heating to and~~ maintaining cargo at **CARGO LOADED TEMP BUT MAX** 135 degrees Fahrenheit prior to ~~discharge as per Charterers instructions. Due allowance in time only is to be made for cargo heating for a voyage of less than three days.~~ The vessel is to present at loading port(s) fit for the carriage of **THE AGREED** cargo.

5) PUMPING:

Owners warrant that the vessel can maintain at vessels manifolds a **AN AVERAGE** pressure of ~~140~~ 100 PSI and/or that a full cargo can be discharged within twenty four (24) hours **IN BOTH CASES EXCLUDING STRIPPING,** provided shore facilities permit. Owner warrants vessel can discharge two (2) grades simultaneously.

~~In ship to ship transfer operations, vessel warrants to achieve a discharge rate of up to 2,500 metric tons per hour. Vessel to have on board a sufficient range of reducers to allow connection to various hose line diameters and terminal cargo manifolds.~~

6) SHIP TO SHIP TRANSFER OPERATIONS:

~~If required by the Charterers the vessel shall load and/or discharge full or part cargo alongside other vessel(s) in port or at a safe anchorage.~~ **ALWAYS AS PER OCIMF RULES AND REGULATIONS** ~~Concurrent loading or discharging from both side for cargo with flash point over 60 degrees centigrade shall be acceptable by owners, any restriction for such will not count as laytime used.~~

Charterers are to provide suitable fenders/lines and hoses **ETC AS PER OCIMF RULES AND REGULATIONS** to safely effect such operations ~~and have the option to store same on board for the duration of Charter Party. Handling of such equipment on board the vessel shall be by owners' crew at Owners' cost.~~ All such equipment shall be removed from the vessel by Charterers upon completion of ~~Charter Party~~ **LOADING OR DISCHARGING** without delay.

Vessel's crew shall connect/disconnect cargo hoses, heave down/heave up fenders, take/throw connection lines, transfer to/transfer back cargo hoses and any other activities required for the completion and safe conduct of the ship to ship transfer operation for their account without any exclusion.

~~Owners warrant that the vessel is equipped with minimum 10 ton derricks port and starboard amidships to handle bunker lines/cargo hoses.~~

2

<span style="text-align:center">⌐1ST ORIGINAL ⌐</span>

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY     M.T. "DELTA SAILOR " CP DATED:25 APR 2005
Dated: 07.08.2003

**CHARTERERS HAVE NO LIABILITY FOR HULL OR OTHER DAMAGE, IF ANY, THAT MAY OCCUR DURING SUCH OPERATIONS**

All extra insurance for above ship to ship literage operations shall be for Owners' account and Charterers have no liability for hull or other damage, if any, that may occur during such operations. Owners warrant that the vessel is equipped and capable of safely carrying out all procedures as set out in the latest revised edition of the ICS/OCIMF Ship to Ship Transfer Guide.

Ship to Ship Transfer may include Charterers very large crude barge (VLCB) of about 34,500 tdw chartered to perform such operations.

7) SUPER CARGO:

Charterers have the option to place on board one supercargo at any time during **LOAD OR DISCHARGE OF** this Charter Party. Owner is to provide such supercargo with good accommodation with private bath and food at Captain's table at a cost of US$7.00 per day at Charterers' expense. Supercargo will be allowed access, to investigate, ullage and sample all cargo, slop, bunker, and ballast tanks, also any void spaces, and access to any other parts of vessel that may relate to carriage of cargo as he may require. **SUPERCARGO WILL REMAIN ON BOARD ONLY DURING LOADING AND DISCHARGING OPERATIONS.** He shall also have the right to require selected valves on bunker and cargo systems to be sealed to preclude the possibility of cargo/product/bunker migration.

8) VESSEL DESCRIPTION:

Questionnaire'88 form duly completed before placing on subjects to form an integral part of this c/p.

9) PROTECTION & INDEMNITY INSURANCE:

Owner warrants that the vessel is a member of the .. **NORTH OF ENGLAND.........** P&I Club and also a member of the ITOPF and will remain throughout the charter period. Owner warrants that vessel holds a pollution cover of US$ 500 million, and additional US$ 200 million **US$ 1 BILLION** during full time of Charter Party. Owners agreed to allow Charterers to have the benefit of Owners' P&I Insurance to the extent the Rules of that Association permits. Owners to be responsible for all third party claims which fall under Owner's responsibility.

10) INSURED VALUE:

<span style="text-align:center">3</span>

ᵔ   ¦ST ORIGINAL   ᵕ

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY
Dated: 07.08.2003

M.T. "DELTA SAILOR " CP DATED:25 APR 2005

The vessel insured value is US$ . **USD 15 MILLION TOTAL VALUE**

11) COMMUNICATIONS:
The master is to allow Charterers supercargo the use of
vessels communication equipment **EXCEPT MOBILE AND SATELLITE
PHONES.** for reasonable operational purposes without charge.

Master shall transmit to charterers, on owners account, daily
noon positions giving required information regarding vessels
position, distance to go, average speed, Eta next port, cargo
temperature maintained and any other information requested.
Vessel shall maintain twenty four hours (24 Hrs) watch on
VHF Channel 16/14.

12) TRADING HISTORY:
Owners ~~guarantee~~ **TO THE BEST OF OWNERS
KNOWLEDGE** that the vessel is not boycotted by the Arab
League and has never traded to Israel.

13) AGENCY:
Owners to appoint Charterers recommended agents at load and
discharge ports **PROVIED COMPETITIVE.**

14) ACCESS:
The Master shall not allow any vessel or craft, other than
those of port authorities or pilots, to secure alongside
without the express authority of Charterers.

15) ~~OVER AGE INSURANCE:~~
~~Any additional insurance payable on vessel and/or cargo due~~
~~to vessel's age or class shall be for Owners' account.~~

16) QUANTITATIVE RESPONSIBILITY:
Although Charterers' surveyor may be monitoring any transfer
operation, this does not relieve Master or Owners of
responsibility for verifying the quantity involved in each
oil movement nor for liability under the terms of this
charter party for any oil losses.

17) BERTH OCCUPANCY:
Owners warrant vessel shall vacate the berth after completion
of ballasting or within one and a half hours following
completion of loading/discharging whichever is sooner. If
ship not able to vacate berth after such time due to reasons
attributed to ship, any extra berth occupancy charges by

4

~~✓~~ **1ST ORIGINAL** ~~✓~~

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY          M.T. "DELTA SAILOR " CP DATED:25 APR 2005
Dated: 07.09.2003

terminal and port shall be for owners account, all time lost
for such occupancy shall not count as used laytime. **HOWEVER IF VSL IS
WAITING FOR CARGO DOCUMENTS THEN SUCH TIME AND EXTRA COSTS AS
ABOVE TO BE FOR CHARTERERS ACCOUNT.**


18) CHARTER SIGNATURE:
Owners acknowledge Charterers' payment procedures require one
original signed **BY OWNERS OR THEIR AGENTS** Charter Party.


19) INTRANSIT LOSS:
In addition to other guarantees herein provided with respect
to the quality and quantity of vessel's cargo, Owners shall
be accountable for product losses, ~~all volumes corrected to~~
~~60 degrees Fahrenheit and~~ **TOTAL CALCULATED VOLUMES** assessed by an
independent cargo
inspector, in excess of the following:

~~0.4~~ **0.3** percent for non-volatile products (Fuel Oil and crude
Oil), ~~0.2 percent for gas oil motor oil gasoline, jet fuel~~
~~and naphtha.~~

20) BLENDING:
**OWNERS NOT TO BE RESPONSIOBLE FOR THE FINAL PRODUCT
WHATSOEVER. CHRTS WILL PROVIDE OWNERS AS PER OWNERS P & I
CLUB WORDING. LOI WORDING AGAINST BLENDING AND/OR COMMINGELING
WITHOUTH BANK GUARANTEE** Charterers have the right to load on top of any
cargo
previously loaded by them, load into a tank containing an on
board quantity at bottom, comingle cargo, and blend cargo on
board by intertank cargo transfer.


21) DEMURRAGE TIME BAR:
Owners agree that Charterers shall be released from all
liability for payment of demurrage, unless a ~~telex invoice is~~
~~received within 30 days upon completion of discharge thereby~~
~~followed by the the~~ claim ~~to be~~ **IS** submitted to Charterers in
writing with ~~fully certified~~ original supporting documents,
such shall include but not be limited to original signed
notice of readiness submitted and accepted and duly signed
time sheets and statement of facts duly counter signed **IF POSSIBLE** by
shippers and receivers respectively and original pumping logs
duly counter signed by terminal representatives **IF POSSIBLE** within ~~60~~ **90**
days of completion of discharge.


22) ADHERENCE TO VOYAGE INSTRUCTIONS:
Owners / master will comply with Charterers **PROVIDED IN ACCORDANCE WITH
THIS C/P** voyage instructions except where safety of life, the vessel or cargo is at
risk.

5

## 1ST ORIGINAL

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY
Dated: 07.08.2003

M.T. "DELTA SAILOR " CP DATED:25 APR 2005

23) YORK/ANTWERP RULES:
York/Antwerp Rules, 1974, as amended 1990, apply to this
charter party.

24) AVERAGE/ARBITRATION:
General Average and Arbitration shall take place in London
and English Law applies to this charter party.

25) BILLS OF LADING:
In the event of a change in discharge port **AND/OR CONSIGNEE** named in Bills
Of Lading or if the **DULY ENDORSED ORIGINAL** Bills of Lading are not
available at
discharge port(s), the cargo is to be released by Owners
against a Letter of Indemnity signed by an authorized
signatory of Charterers in Owners' P&I Club wording without
bank guarantee or counter signature.

26) ROB'S:
In the event that any cargo remains on board upon completion
of discharge, Charterers shall have the right to ~~deduct from~~
~~freight~~ CLAIM an amount equal to the FOB port of loading value of
such cargo plus freight due with respect thereto. **PROVIDED THE VOLUME OF
CARGO REMAIANING ON BOARD IS PUMPABLE, LIQUID AND REACHABLE BY
VESSEL'S MEANS AS DETERMINED BY AND INDEPENDENT SURVEYOR.**

27) WAR RISKS:
~~Any increase of hull and machinery war risk premia over and~~
~~above those in effect on the date of this Charter Party will~~
~~be for Charterers account, except for the first seven days,~~
~~which shall be for Owners account. Any premia or increases~~
~~thereto attributable to closure (i.e. blocking and trapping)~~
~~insurance shall be for Owners account.~~
~~Surcharges which are in effect on the date of this Charter~~
~~Party are for Owners account.~~

**BP WAR RISK INSURANCE CLAUSE (AMENDED) -
OWNERS SHALL EFFECT WAR RISKS INSURANCE IN RESPECT OF THE
HULL AND MACHINERY OF THE VESSEL AND THEIR OTHER INTERESTS (INCL
BUT NOT LIMITED TO, LOSS OF EARNINGS AND DETENTION AND THEIR
PROTECTION AND INDEMNITY RISKS), AND THE BASIC PREMIUMS AND/OR
CALLS THEREFORE SHALL BE FOR OWNERS ACCOUNT. WAR RISKS
INSURANCE ADDITIONAL PREMIUMS IF ANY ARE FOR CHARTERERS ACCOUNT,
NET OF ALL DISCOUNTS OR REBATES RECEIVED BY OWNERS, AND PROVIDED
ALWAYS THAT CHARTERERS ARE GIVEN AN INDICATION OF THE EXPECTED
AMOUNT OF ADDITIONAL PREMIUM AS SOON AS POSSIBLE AFTER RECEIPT OF
CHARTERERS VOYAGE ORDERS.**

**1ST ORIGINAL**

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY            M.T. "DELTA SAILOR " CP DATED:25 APR 2005
Dated: 07.06.2003

THE BENEFIT OF DISCOUNTS OR REBATES ON ADDITIONAL PREMIUM RECEIVED
BY OWNERS FROM THEIR WAR RISKS INSURERS, UNDERWRITERS OR
BROKERS SHALL BE CREDITED TO CHARTERERS IN FULL. CHARTERERS SHALL
REIMBURSE OWNERS ANY AMOUNTS DUE UNDER THIS CLAUSE UPON RECEIPT
OF OWNERS' INVOICE TOGETHER WITH REASONABLE SUPPORTING
DOCUMENTATION INCLUDING ALL ASSOCIATED DEBIT AND CREDIT NOTES (IF
ANY). FOR THE AVOIDANCE OF DOUBT ANY 'BLOCKING AND TRAPPING', 'LOSS
OF PROFIT', 'LOSS OF HIRE', 'LOSS OF FREIGHT' OR 'LOSS OF BUNKERS'
INSURANCE TAKE OUT BY OWNERS IN RESPECT OF THE VESSEL, AND ANY
ADDITIONAL PREMIUM RELATING THERETO ARISING FROM CHARTERERS
TRADING OF THE VESSEL SHALL BE FOR OWNERS' ACCOUNT.CREW WAR
BONUS TO BE FOR OWNERS ACCOUNT.

28) ITOPF:
Owners/Operators to be a member of ITOPF and shall present
C.L.C. Certificate covering the entire Charter Party period.
This is required before payment is made by Charterers.

29) ~~PRORATION:~~
~~Laytime and waiting time if any at load/discharge ports to be~~
~~prorated amongst charterers/receivers according to respective~~
~~cargo quantity.~~

30) ~~Naming Load and Discharge ports~~
~~Clause 4 of Asbatankvoy c/p to be replaced with this clause.~~
~~Notwithstanding anything to the contrary in this charter~~
~~party and notwithstanding what loading and/or discharging~~
~~ports/ranges may have been nominated and bills of lading~~
~~issued , charterer shall have the right to change its~~
~~nomination of the loading and/or discharging ports/ranges.~~
~~Any extra time and expense incurred by owner in complying~~
~~with charterer's orders shall be for charterer's account.~~
~~Freight is based on the voyage actually performed. Charterer~~
~~shall have the right to make as many changes as it deems~~
~~necessary.~~

31) POSITION AND BALLAST SPEED:
Owners warrants that the vessel's position at the time of
fixture is ... and vessel's ballast speed will be
..... knots with an expected Eta basis 6-7 MAY AGW.... as ......

32) SPEED:
~~Vessel will perform the laden voyage at ...... knots upto~~
~~ws 5, weather and safe navigation permitting.~~
VESSEL WILL PERFORM LADEN PASSAGE AT ABT 14.0 KNOTS WSNP

33) BALLASTING/SHIFTING:
Deballasting **UNLESS CONCURRENT WITH CARGO**

7

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY
Dated: 07.08.2003

**1ST ORIGINAL** M.T. " DELTA SAILOR " CP DATED:25 APR 2005

INTERNATIONAL OIL OVERSEAS
ADDITIONAL CLAUSES - (ASBATANKVOY)
DATED 07.08.2003   (1-39)

1) PRIVACY:

    All negotiations and every detail of this fixture are to be
kept strictly private and confidential.

2) DRUG AND ALCOHOL CLAUSE:

    Owners warrant that they have a policy on Drug and Alcohol
Abuse ("Policy") applicable to the vessel which meets or
exceeds the standards in the Oil Companies' International
Marine Forum Guidelines for the Control of Drugs and Alcohol
on Board Ship ("OCIMF Guidelines"). Owners further
warrant that this Policy will remain in effect during the
term of this Charter, and that Owners shall exercise due
diligence to ensure that the Policy is complied with. For
the purposes of the Clause and the OCIMF Guidelines, alcohol
impairment shall be defined as a blood alcohol content of
40 mg/100 ml or greater; the appropriate seafarers to be
tested shall be all vessel officers and the drug/alcohol
testing and screening shall include random testing of the
officers with a frequency to ensure that each officer is
tested at least once a year.

    Owners further warrant that a full declaration has been
passed on to Exxon/Exxon affiliate, which as above states
that vessel operates under a Drug and Alcohol Policy which
meets or exceeds the OCIMF Guidelines.

3) ETA CLAUSE:

    Master to give Charterers ETA loading port immediately on
fixing and 7 days, 72/48/24/12 hours prior arrival **IF TIME ALLOWS**
at loading and discharge ports where time permits also ETA discharge
port on sailing from load port as well as any change in ETA
exceeding 6 hours in all cases. ~~All Eta notices are essential
for demurrage purposes.~~

4) CARGO:

    ~~Charterers have the option of loading Crude Oil, Dirty
Petroleum Products, Gasoil and Marine Diesel Oil, maximum ...
grades, but where vessel loads one grade on top of another
for admixing purposes same to be treated as one grade.~~

    Owners warrant vessel is able to segregate minimum two (2)
grades with double valve, line and pump segregation.
Owner warrants vessel able to load/discharge two (2)
grades simultaneously without contamination.

1

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY          M.T. "DELTA SAILOR " CP DATED:25 APR 2005
Dated: 07.08.2003

**OPERATIONS** and time proceeding to **FIRST** berth shall not count as
used laytime or time on demurrage, even if vessel on
demurrage.

34) DOCUMENTATION:
Owners warrant and undertake that all loading documents shall
be strictly private and confidential and shall not be handed
over to any party other than charterer or charterers
agent/representative **OR PORT AUTHORITIES** , only if instructed by charterers.
Such confidentiality shall include copies and/or quotes of such
documents to any party other than charterers.

Owners undertake to instruct master to strictly adhere to
above and not to release any information under whatsoever
circumstances neither in writing or in verbal unless
agreed/instructed in writing by the charterers.

35) Charterers' shall have the right to ask owners to reissue new
Bill of Lading, as per requirements of charterers, upon
delivery of the **ALL OFF** signed B/L's to the owner/owners agent
**A REPRESENTATIVE APPOINTED BY OWNERS** or
master.  Owners shall comply with such request **PROVIDED THE CONTENTS
OF NEW BILLS OF LADING ARE CORRECT .**

36)~~   In case the vessel calling port Sudan master of vessel should~~
~~obtain signature and stamp of receivers and agents/all~~
~~concerned on following documents prior sailing from port~~
~~Sudan. NOR, ullage report before discharge, ship ullage~~
~~report after discharge, dry tank certificate, time sheet and~~
~~LOP if any.~~

37) Owners warrant that, a Safety Management System (SMS) in
accordance with the ISM code is in operation both on shore
and on board the vessels. Onwers further warrant that during the
entire duration of c/p, owner (or the company as defined by the
ISM code) shall have a vaild document of compliance and the
vessels shall have a safety management certificate, copies of
which will be supplied to charterers **ON THEIR REQUEST .**

38) This charter party shall be treated as an independent
contract and neither party shall have the right of off-
setting and/or claim any amounts due or not due from any
other charter parties or dealings of whatsoever nature,
whether or not same may be due or justified.

The owner warrants that the master and vessel will fully
comply with c/p and will not lien cargo or delay or suspend
operations due to any claim arising out of **PREVIOUS** c/p's/contracts
between owner and charterers and/or any charterers affiliates

8

⌣  **1ST ORIGINAL**  ⌣

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses for ASBATANKVOY
Dated: 07.08.2003

**M.T. "DELTA SAILOR " CP DATED:25 APR 2005**

and/or any of charterers subsidiary companies.

### 39) DISCHARGE / RELOAD CLAUSE:

Charterers may order the vessel to discharge and/or back load a part or full cargo at any nominated port within the loading/~~discharging~~ ranges specified within part 1 and within the rotation of the ports previously nominated, provided that any cargo loaded is of the description specified in part 1 and the Master in his reasonable discretion determines that the cargo can be loaded, segregated and discharged without risk of contamination by, or of any other cargo. Charterers shall pay in respect of loading, carrying and discharging such cargo as follows:

a) All time used including deviation if any to be for charterers account. Deviation and other port and anchorage time used at demurrage rate plus all bunkers FO and MDO consumed irrespective of vessel being idle or steaming, plus port cost.

b) Any additional expenses, including port charges and all bunkers FO and MDO consumed, incurred.

c) If the vessel is fixed on a world scale rate in part 1 then freight shall always be paid for the whole voyage at the rate(s) specified in part 1 on the largest cargo quantity carried on any ocean leg.

9

**EXHIBIT 2**

Association of Ship Brokers
& Agents (U.S.A.), Inc.

October 1977

**1ST ORIGINAL**

CODE WORD FOR THIS
CHARTER PARTY:

ASBATANKVOY

# TANKER VOYAGE CHARTER PARTY

## PREAMBLE

| | |
|---|---|
| *SINGAPORE* | *28 TH MAY 2005* |
| Place | Date |

IT IS THIS DAY AGREED between *BEAM COMPANY INC*

chartered owner/owner (hereinafter called the "Owner") of the

*SS/MS  MT PELAGOS* (hereinafter called the "Vessel")

and  *INTERNATIONAL OIL OVERSEAS INC.* (hereinafter called the "Charterer")

that the transportation herein provided for will be performed subject to the terms and conditions of this Charter Party, which includes this Preamble and Part I and Part II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II.

### PART I

A.  Description and Position of Vessel:

Deadweight: *111,776*  tons (2240 lbs.)  Classed:  *DNV*

Loaded draft of Vessel on assigned summer freeboard  *14.618 M ft.*  ~~in~~ in salt water.

Capacity for cargo: *123785.2 CU.M EX SLOP TANK* ~~tons (of 2240 lbs. each)~~  *98*  ~~% more or less, Vessel's option.~~

Coated:  [ *X* ] Yes  [ ] No

Coiled:  [ *X* ] Yes  [ ] No  Last two cargoes:  *CRUDE*

Now:  Expected Ready: *10TH JUNE 2005*

B.  Laydays:

Commencing:  *10 TH JUNE 2005*  Cancelling:  *11TH JUNE 2005*

C.  Loading Port(s):  *1/4 SP AG EXCLUDING IRAN/IRAQ BUT INCLUDING GULF OF OMAN,KUWAIT ALWAYS TO BE FIRST LOAD PORT AND IN GEO ROTATION.*

~~Charterer's Option~~

D.  Discharging Port(s):  *1/3 SP/STS SPORE-JAPAN RANGE INCL MALAYASIA,INDO,THAILAND,PHILLIPINES BUT EXCLUDING CHINESE RIVER PORTS AND NONOC ISLAND. CHARTERERS TO DECLARE DISCHARGE RANGE PASSING COLOMBO SPORE/THAILAND OR INDO/SCHINA /PHILLIPINES*

~~Charterer's Option~~

E.  Cargo:  *MIN 80000 MT CHOPT UPTO FULL CARGO, MAXIMUM THREE(3) GRADES WITHIN VESSEL'S NATURAL SEGREGATION FUEL OIL/DIRTY PETROLEUM PRODUCTS EXCL VGO, CBFS AND LSWR. VESSEL TO MAINTAIN LOADED TEMPERATURE BUT MAXIMUM 135 DEGREES FAHRENHEIT. MAXIMUM LOADED TEMPERATURE 160 DEGREES FAHRENHEIT.*

~~Charterer's Option~~

F.  Freight Rate:  *WS 170  OVERRAGE AT 50 PCT*  ~~per ton (of 2240 lbs. each).~~

G.  Freight Payable to:
*HSBC BANK PLC*

93, AKTI MIAOULI STR., PIRAEUS - GREECE, SWIFT MIDLGRAA **1ST ORIGINAL**
FAVOUR: BEAM COMPANY INC, ACCOUNT NUMBER 001-025139-036, IBAN GR63 0710 0010 0000 0102 5139 036
CORRESPONDING BANK:
HSBC BANK USA, ABA 021001088  CHIPS 0108
ACCOUNT 000-04779-1, SWIFT MRMDUS33 et

H.  Total Laytime in Running Hours: **84 HOURS TOTAL WSTC**

I.  Demurrage per day:    **$26,000 PDPR**

J.  Commission of 3.75 % is payable by Owner to  **OF WHICH 2.5 ADDCOM AND 1.25 PCT TO RS PLATOU ASIA ON FRT/DRFT AND DEMM**

on the actual amount freight, when and as freight is paid.

K.  The place of General Average and arbitration proceedings to be London/New-York (strike out one).

L.  ~~Tovalop: Owner warrants Vessel to be a member of TOVALOP scheme and will be so maintained throughout duration of this charter.~~

M.  Special Provisions:
**BIMCO ISPS CLAUSE TO APPLY**

**CONOCO WEATHER TO APPLY**

**MAX 3 HRS WAITING FOR CARGO DOCS FOR OWNERS ACCT.**

**ANY/ALL TAXES A/O DUES ON CARGO A/O FREIGHT TO BE FOR CHARTERERS' ACCOUNT AND TO BE PAID DIRECTLY BY THEM**

**"IF LIGHTERING/LIGHTENING/STS TRANSSHIPMENT TAKES PLACE AT/OFF ANY PORT/PLACE SEA TERMINAL OR IF DISCHARGING VIA SEALINE, ANY DELAYS DUE TO WEATHER AND/OR SEA CONDITIONS (INCLUDING FOG) TO COUNT IN FULL AS LAYTIME OR DEMURRAGE IF VESSEL IS ON DEMURRAGE, AND ANY UNBERTHING /REBERTHING EXPENSES/TIME DUE TO WEATHER CONDITIONS AT THE ABOVE MENTIONED PORTS/PLACES TO BE FOR CHRTRS' ACCOUNT"**

**MASTER TO DISCHARGE ANY CARGO FROM THE VESSEL ONLY UPON RECEIVING CHARTERERS WRITTEN AUTHORIZATION AS PER FORM BELOW:**
To : Master .... And or Warehouse ....

**"We confirm that you are hereby authorized to berth and discharge approximately...... mts of ..... as per the charter party terms and conditions and any subsequent delivery instructions dated subsequent to this message. "**

**OWNERS CONFIRM VESSEL FULLY COMPLIES WITH THE FOLLOWING CONDITIONS AT KUWAIT**
**1.Maxmum loaded displacement : 100,000 MT**
**2. Maximum sailing draft : 13. 72 M**
**3.Maximum height of manifold : 16. 0 M**
**4. Maximum LOA : 260 M**
**S . Minimum parallel body length (PBL.) : 61.00 M**
**6. Inert gas system (IGS) (Operational and in use)**
**7. Maximum permitted berthing draft: 10.0 M (to apply for all berths in case of more, than one berth /port)**
**8. The vessel should not exceed 20 years of age-**
**9. Vessel should comply with International Safety Management. Code (ISM) and must have a valid Safety Management Certificate (SMC) - **
**10.Vessel exceeding 75 KT deadweight must be fitted with 8 steel mooring wires at each end forward and AFT.**
**11 .Vessel must comply fully with the provisions of the International Ship and Port Facility SECURITY (ISPS) Code, and be in possession of a valid International Ship Security Cert (ISSC) –**

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in duplicate

as of the day and year first above written.

Witness the signature of:

FOR & ON BEHALF OF
THE OWNERS

BY:   B    AUTHORITY
MARCATES NAVIGATION LTD.
        PIRAEUS

AS NON - RESPONSIBLE AGENTS ONLY

## 1ST ORIGINAL

Witness the Signature of:

By:

This Charterparty is a computer generated copy of ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited. It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted as having been made by the licensee or end user as appropriate and not by the author.

## PART II

1. **WARRANTY - VOYAGE - CARGO.** The vessel, classed as specified in Part I hereof, and to be so maintained during the currency of this Charter, shall, with all convenient dispatch, proceed as ordered to Loading Port(s) named in accordance with Clause 4 hereof, or so near thereunto as she may safely get (always afloat), and being seaworthy, and having all pipes, pumps and heater coils in good working order, and being in every respect fitted for the voyage, so far as the foregoing conditions can be attained by the exercise of due diligence, perils of the sea and any other cause of whatsoever kind beyond the Owner's and/or Master's control excepted, load (always afloat), from the factors of the Charterer a full and complete cargo of petroleum and/or its products in bulk, not exceeding what she can reasonably stow and carry over and above her bunker fuel, consumable stores, boiler feed, culinary and drinking water, and complement and their effects (sufficient space to be left in the tanks to provide for the expansion of the cargo), and being so loaded shall forthwith proceed, as ordered on signing Bills of Lading, direct to the Discharging Port(s), or so near thereunto as she may safely get (always afloat), and deliver said cargo. If heating of the cargo is requested by the Charterer, the Owner shall exercise due diligence to maintain the temperature requested.

2. **FREIGHT.** Freight shall be at the rate stipulated in Part I and shall be computed on intake quantity (except deadfreight as per Clause 3) as shown on the Inspector's Certificate of Inspection. Payment of freight shall be made by Charterer without discount upon delivery of cargo at destination, less any disbursements or advances made to the Master or Owner's agents at ports of loading and/or discharge and cost of insurance thereon. No deduction of freight shall be made for water and/or sediment contained in the cargo. The services of the Petroleum Inspector shall be arranged and paid for by the Charterer who shall furnish the Owner with a copy of the Inspector's Certificate.

3. **DEADFREIGHT.** Should the Charterer fail to supply a full cargo, the Vessel may, at the Master's option, and shall, upon request of the Charterer, proceed on her voyage, provided that the tanks in which cargo is loaded are sufficiently filled to put her in seaworthy condition. In that event, however, deadfreight shall be paid at the rate specified in Part I hereof on the difference between the intake quantity and the quantity the Vessel would have carried if loaded to her minimum permissible freeboard for the voyage.

4. **NAMING LOADING AND DISCHARGE PORTS.**

(a) The Charterer shall name the loading port or ports at least twenty-four (24) hours prior to the Vessel's readiness to sail from the last previous port of discharge, or from bunkering port for the voyage, or upon signing this Charter if the Vessel has already sailed. However, Charterer shall have the option of ordering the Vessel to the following destinations for wireless orders:

| | On a voyage to a port of ports for: |
|---|---|
| ST. KITTS | Caribbean or U.S. Gulf loading port(s) |
| PORT SAID | Eastern Mediterranean or Persian Gulf loading port(s) |
| | (from ports west of Port Said.) |

(b) If lawful and consistent with Part I and with the Bills of Lading, the Charterer shall have the option of nominating a discharging port or ports by radio to the Master on or before the Vessel's arrival at or off the following places:

| Place | On a voyage to a port or ports in: |
|---|---|
| LAND'S END | United Kingdom/Continent (Bordeaux/Hamburg range) |
| | or Scandinavia (including Denmark) |
| SUEZ | Mediterranean (from Persian Gulf) |
| GIBRALTAR | Mediterranean (from Western Hemisphere). |

(c) Any extra expense incurred in connection with any change in loading or discharging ports (so named) shall be paid for by the Charterer and any time thereby lost to the Vessel shall ~~count as used laytime~~ *paid at demmurrage rate.*

5. **LAYDAYS.** Laytime shall not commence before the date stipulated in Part I, except with the Charterer's sanction. Should the Vessel not be ready to load by 4:00 *12:00* o'clock P. M. (local time) on the cancelling date stipulated in Part I, the Charterer shall have the option of cancelling this Charter by giving Owner notice of such cancellation within twenty-four (24) hours after such cancellation date; otherwise this Charter to remain in full force and effect.

6. **NOTICE OF READINESS.** Upon arrival at customary anchorage at each port of loading or discharge, the Master or his agent shall give the Charterer or his agent notice by letter, telegraph, wireless or telephone that the Vessel is ready to load or discharge cargo, berth or no berth, and laytime, as hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of such notice, or upon the Vessel's arrival in berth (i.e., finished mooring when at a sealoading or discharging terminal and all fast when loading or discharging alongside a wharf), whichever first occurs. However, where delay is caused to Vessel getting into berth after giving notice of readiness for any reason over which Charterer has no control, such delay shall not count as used laytime.

7. **HOURS FOR LOADING AND DISCHARGING.** The number of running hours specified as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging cargo; but any delay due to the Vessel's condition or breakdown or inability of the Vessel's facilities to load or discharge cargo within the time allowed shall not count as used laytime. If regulations of the Owner ~~or port authorities~~ prohibit loading or discharging of the cargo at night, time so lost shall not count as used laytime; if the Charterer, shipper or consignee prohibits loading or discharging at night, time so lost shall count as used laytime. Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops *unless carried out concurrently with cargo operations*, will not count as used laytime.

8. **DEMURRAGE.** Charterer shall pay demurrage per running hour and pro rata for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein specified. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labor or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred. The Charterer shall not be liable for any demurrage for delay caused by strike, lockout, stoppage or restraint of labor for Master, officers and crew of the Vessel or tugboat or pilots.

9. **SAFE BERTHING - SHIFTING.** The vessel shall load and discharge at any safe place or wharf, or alongside vessels or lighters reachable on her arrival, which shall be designated and procured by the Charterer, provided the Vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any lighterage being at the expense, risk and peril of the Charterer. The Charterer shall have the right of shifting the Vessel at ports of loading and/or discharge from one safe berth to another on payment of all towage and pilotage shifting to next berth, charges for running lines on arrival at and leaving that berth, additional agency charges and expense, customs overtime and fees, and any other extra port charges or port expenses incurred by reason of using more than one berth. Time consumed on account of shifting shall count as used laytime except as otherwise provided in Clause 15.

10. **PUMPING IN AND OUT.** The cargo shall be pumped into the Vessel at the expense, risk and peril of the Charterer, and shall be pumped out of the Vessel at the expense of the Vessel, but at the risk and peril of the Vessel only so far as the Vessel's permanent hose connections, where delivery of the cargo shall be taken by the Charterer or its consignee. If required by Charterer, Vessel after discharging is to clear shore pipe lines of cargo by pumping water through them and time consumed for this purpose shall apply against allowed laytime. The Vessel shall supply her pumps and the necessary power for discharging in all ports, as vessel as necessary hands. However, should the Vessel be prevented from supplying such power by reason of regulations prohibiting fires on board, the Charterer or consignee shall supply, at its expense, all power necessary for discharging as well as loading, but the Owner shall pay for power supplied to the Vessel for other purposes. If cargo is loaded from lighters, the Vessel shall furnish steam at Charterer's expense for pumping cargo into its Vessel, if requested by the Charterer, providing the Vessel has facilities for generating steam and is permitted to have fires on board. All overtime of officers and crew incurred in loading and/or discharging shall be for account of the Vessel.

11. **HOSES: MOORING AT SEA TERMINALS.** Hoses for loading and discharging shall be furnished by the Charterer and shall be connected and disconnected by the Charterer, or, at the option of the Owner, by the Owner at the Charterer's risk and expense. Laytime shall continue until the hoses have been disconnected. *If vessel is delayed by more than 3 hours awaiting documents, laytime or demurrage, if vessel is on demurrage, shall count until documents are onboard* When Vessel loads or discharges at a sea terminal, the Vessel shall be properly equipped at Owner's expense for loading or discharging at such place, including suitable ground tackle, mooring lines and equipment for handling submarine hoses.

12. **DUES - TAXES - WHARFAGE.** The Charterer shall pay all taxes, dues and other charges on the cargo, including but not limited to Customs overtime on the cargo, Venezuelan Habilitation Tax, C.I.M. Taxes at Le Havre and Portuguese Imposto do Consorcio Maritimo. The Charterer shall also pay all taxes on freight at loading or discharging ports and any unusual taxes, assessments and governmental charges which are not presently in effect but which may be imposed in the future on the Vessel or freight. The Owner shall pay all dues and other charges on the Vessel (whether or not such dues or charges are assessed on the basis of quantity of cargo), including but not limited to French droits de quai and Spanish derramas taxes. The Vessel shall be free of charges for the use of any wharf, dock, place or mooring facility arranged by the Charterer for the purpose of loading or discharging cargo; however, the Owner shall be responsible for charges for such berth when used solely for Vessel's purposes, such as awaiting Owner's orders, tank cleaning, repairs, etc. before, during or after loading or discharging.

13. (a) **CARGOES EXCLUDED VAPOR PRESSURE.** Cargo shall not be shipped which has a vapor pressure at one hundred degrees Fahrenheit (100 deg F.) in excess of thirteen and one-half pounds (13.5 lbs.) as determined by the current A.S.T.M. Method (Reid) D-323.

(b) **FLASH POINT.** Cargo having a flash point under one hundred and fifteen degrees Fahrenheit (115 deg F.) (closed cup) A.S.T.M. Method D-56 shall not be loaded from lighters but this clause shall not restrict the Charterer from loading or topping off Crude Oil from vessels or barges inside or outside the bar at any port or place where bar conditions exist.

14. (a) **ICE.** In case port of loading or discharge should be inaccessible owing to ice, the Vessel shall direct her course according to Master's judgment, notifying by telegraph or radio, if available, the Charterers, shipper or consignee, who is bound to telegraph or radio orders for another port, which is free from ice and where there are facilities for the loading or reception of the cargo in bulk. The whole of the time occupied from the time the Vessel is diverted by reason of the ice until her arrival at an ice-free port of loading or discharge, as the case may be, shall be paid for by the Charterer at the demurrage rate stipulated in Part I.

(b) If on account of ice the Master considers it dangerous to enter or remain at any loading or discharging place for fear of the Vessel being frozen in or damaged, the Master shall communicate by telegraph or radio, if available, with the Charterer, shipper or consignee of the cargo, who shall telegraph or radio him in reply, giving orders to proceed to another port as per

# 1ST ORIGINAL

Clause 14 (a) where there is no danger of ice and where there are the necessary facilities for the loading or reception of the cargo in bulk, or to remain at the original port at their risk, and in either case Charterer to pay for the time that the Vessel may be delayed, at the demurrage rate stipulated in Part I.

15. TWO OR MORE PORTS COUNTING AS ONE. To the extent that the freight rate standard of reference specified in Part I hereof provides for special groupings or combinations of ports or terminals, any two or more ports or terminals within each such grouping or combination shall count as one port for purposes of calculating freight and demurrage only, subject to the following conditions:

    (a)   Charterer shall pay freight at the highest rate payable under Part I F hereof for a voyage between the loading and discharge ports used by Charterer.

    (b)   All charges normally incurred by reason of using more than one berth shall be for Charterer's account as provided in Clause 9 hereof.

    (c)   Time consumed shifting between the ports or terminals within the particular grouping or combination shall not count as used laytime.

    (d)   Time consumed shifting between berths within one of the ports or terminals of the particular grouping or combination shall count as used laytime.

16. GENERAL CARGO. The Charterer shall not be permitted to ship any packaged goods or non-liquid bulk cargo of any description; the cargo the Vessel is to load under this Charter is to consist only of liquid bulk cargo as specified in Clause I.

17. (a) QUARANTINE. Should the Charterer send the Vessel to any port or place where a quarantine exists, any delay thereby caused to the Vessel shall count as used laytime; but should the quarantine not be declared until the Vessel is on passage to such port, the Charterer shall not be liable for any resulting delay.

    (b)   FUMIGATION. If the Vessel, prior to or after entering upon this Charter, has docked or docks at any wharf which is not rat-free or stegomyia-free, she shall, before proceeding to a rat-free or stegomyia-free wharf, be fumigated by the Owner at his expense, except that if the Charterer ordered the Vessel to an infected wharf the Charterer shall bear the expense of fumigation.

18. CLEANING. The Owner shall clean the tanks, pipes and pumps of the Vessel to the satisfaction of the Charterer's *an independent* Inspector. The Vessel shall not be responsible for any admixture if more than one quality of oil is shipped, nor for leakage, contamination or deterioration in quality of the cargo unless the admixture, leakage, contamination or deterioration results from (a) unseaworthiness existing at the time of loading or at the inception of the voyage which was discoverable by the exercise of due diligence, or (b) error or fault of the servants of the Owner in the loading, care or discharge of the cargo.

19. GENERAL EXCEPTIONS CLAUSE. The Vessel, her Master and Owner shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or damage, or delay or failure in performing hereunder, arising or resulting from:- any act, neglect, default or barratry of the Master, pilots, mariners or other servants of the Owner in the navigation or management of the Vessel; fire, unless caused by the personal design or neglect of the Owner; collision, stranding or peril, danger or accident of the sea or other navigable waters; saving or attempting to save life or property; wastage in weight or bulk, or any other loss or damage arising from inherent defect, quality or vice of the cargo; any act or omission of the Charterer or Owner, shipper or consignee of the cargo, their agents or representatives; insufficiency of packing; insufficiency or inadequacy of marks; explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or machinery; unseaworthiness of the Vessel unless caused by want of due diligence on the part of the Owner to make the Vessel seaworthy or to have her properly manned, equipped and supplied; or from any other cause of whatsoever kind arising without the actual fault of privity of the Owner. And neither the Vessel nor Master or owner, nor the Charterer, shall, unless otherwise in this Charter expressly provided, be responsible for any loss of damage or delay or failure in performing hereunder, arising or resulting from:- Act of God; act of war; perils of the seas; act of public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people; or seizure under legal process provided bond is promptly furnished to release the Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or general; or riot or civil commotion.

20. ISSUANCE AND TERMS OF BILLS OF LADING.

    (a)   The Master shall, upon request, sign Bills of Lading in the form appearing below for all cargo shipped but without prejudice to the rights of the Owner and Charterer under the terms of this Charter. The Master also shall not be required to sign Bills of Lading for any port which, the Vessel cannot enter, remain at and leave in safety and always afloat nor for any blockaded port.

    (b)   The carriage of cargo under this Charter Party and under all Bills of Lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause and such terms shall be incorporated verbatim or be deemed incorporated by the reference in any such Bill of Lading. In such sub-paragraphs and in any Act referred to therein, the word "carrier" shall include the Owner and the Chartered Owner of the Vessel.

    (i)   CLAUSE PARAMOUNT. This Bill of Lading shall, have effect subject to the provisions of the Carriage of Goods by Sea Acts of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or legislation gives statutory effect to the International Convention for the Unification of Certain Rules relating to Bills of Lading at Brussels, August 1924, then this Bill of Lading shall have effect, subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called the "Act") shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Owner of any of its rights or immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act to any extent, such term shall be void to the extent but no further.

    (ii)   JASON CLAUSE. In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owner is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Owner in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Owner, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Owner or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery.

    (iii)   GENERAL AVERAGE. General Average shall be adjusted, stated and settled according to York/Antwerp Rules 1950 and, as to matters not provided for by these rules, according to the laws and usages at the port of New York or at the port of London, whichever place is specified in Part I of this Charter. If a General Average statement is required, it shall be prepared at such port or place in the United States or United Kingdom, whichever country is specified in Part I of this Charter, as may be selected by the Owner, unless otherwise mutually agreed, by an Adjuster appointed by the Owner and approved by the Charterer. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Owner and/or Charterer, and/or Owner and/or Consignees of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by him at his risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

    (iv)   BOTH TO BLAME. If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Owner in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder shall indemnify the Owner against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or Owner. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or object are at fault in respect of a collision or contact.

    (v)   LIMITATION OF LIABILITY. Any provision of this Charter to the contrary notwithstanding, the Owner shall have the benefit of all limitations of, and exemptions from, liability accorded to the owner or chartered owner of vessels by any statute or rule of law for the time being in force.

    (vi)   WAR RISKS.  (a)  If any port of loading or of discharge named in this Charter Party or to which the Vessel may properly be ordered pursuant to the terms of the Bills of Lading be blockaded, or

    (b)   If owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions or the operation of international law (a) entry to any such port of loading or of discharge or the loading or discharge of cargo at any such port be considered by the Master or Owners in his or their discretion dangerous or prohibited or (b) it be considered by the Master or Owners in his or their discretion dangerous or impossible for the Vessel to reach any such port of loading or discharge - the Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or discharged at any other such port of loading or of discharge within the range of loading or discharging ports respectively established under the provisions of the Charter Party (provided such other port is not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Owner's discretion dangerous or prohibited). If in respect of a port of discharge no orders be received from the Charterers within 48 hours after they or their agents have received from the Owners a request for the nomination of a substitute port, the Owners shall then be at liberty to discharge the cargo at any safe port which they or the Master may in their or his discretion decide on (whether within the range of discharging ports established under the provisions of the Charter Party or not) and such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment so far as cargo so discharged is concerned. In the event of the cargo being loaded or discharged at any such other port within the respective range of loading or discharging ports established under the provisions of the Charter Party, the Charter Party shall be read in respect of freight and all other conditions whatsoever as if the voyage performed were that originally designated. In the event, however, that the Vessel discharges the cargo at a port outside the range of discharging ports established under the provisions of the Charter Party, freight shall be paid as for the voyage originally designated and all extra expenses involved in reaching the actual port of discharge and or discharging the cargo thereat shall be paid by the Charterers or Cargo Owners. In the latter event the Owners shall have a lien on the cargo for all such extra expenses.

    (c)   The Vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any otherwise whatsoever given by the government of the nations under whose flag the Vessel sails or any other government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations, anything is done or is not done such shall not be deemed a deviation.

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to the port or ports of discharge originally designated or to which she may have been ordered pursuant to the terms of the Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfillment of the contract or contracts of affreightment and the Owners shall be entitled to freight as if discharge has been effected at the port or ports originally designated or to which the vessel may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching and discharging the cargo at any such other port of discharge shall be paid by the Charterers and/or Cargo Owners and the Owners shall have a lien on the cargo for freight and all such expenses.

    (vii)   DEVIATION CLAUSE. The Vessel shall have liberty to call at any ports in any order, to sail with or without pilots, to tow or to be towed, to go to the assistance of vessels in

distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage. Any salvage shall be for the sole benefit of the Owner.

21. LIEN. The Owner shall have an absolute lien on the cargo for all freight, deadfreight, demurrage and costs, including attorney fees, of recovering the same, which lien shall continue after delivery of the cargo into the possession of the Charterer, or of the holders of any Bills of Lading covering the same or of any storageman.

22. AGENTS. The Owner shall appoint Vessel's agents at all ports.

23. BREACH. Damages for breach of this Charter shall include all provable damages, and all costs of suit and attorney fees incurred in any action hereunder.

24. ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York or in the City of London whichever place is specified in Part I of this charter pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Either party hereto may call for such arbitration by service upon any officer of the other, wherever he may be found, of a written notice specifying the name and address of the arbitrator chosen by the first moving party and a brief description of the disputes or differences which such party desires to put to arbitration. If the other party shall not, by notice served upon an officer of the first moving party within twenty days of the service of such first notice, appoint its arbitrator to arbitrate the dispute or differences specified, then the first moving party shall have the right without further notice to appoint a second arbitrator, who shall be a disinterested person with precisely the same force and effect as if said second arbitrator has been appointed by the other party. In the event that the two arbitrators fail to appoint a third arbitrator within twenty days of the appointment of the second arbitrator, either arbitrator may apply to a Judge of any court of maritime jurisdiction in the city abovementioned for the appointment of a third arbitrator, and the appointment of such arbitrator by such Judge on such application shall have precisely the same force and effect as if such arbitrator had been appointed by the two arbitrators. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on an officer of the other party to specify further disputes or differences under this Charter for hearing and determination. Awards made in pursuance to this clause may include costs, including a reasonable allowance for attorney's fees, and judgement may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

25. SUBLET. Charterer shall have the right to sublet the Vessel. However, Charterer shall always remain responsible for the fulfillment of this Charter in all its terms and conditions.

26. OIL POLLUTION CLAUSE. Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such program prohibits discharge overboard of all oily water, oily ballast or oil in any form of a persistent nature, except under extreme circumstances whereby the safety of the vessel, cargo or life at sea would be imperiled.

Upon notice being given to the Owner that Oil Pollution Avoidance controls are required, the Owner will instruct the Master to retain on board the vessel all oily residues from consolidated tank washings, dirty ballast, etc., in one compartment, after separation of all possible water has taken place. All water separated to be discharged overboard.

If the Charterer requires that deemulsifiers shall be used for the separation of oil/water, such deemulsifiers shall be obtained by the Owner and paid for by Charterer.

The oil residues will be pumped ashore at the loading or discharging terminal, either as segregated oil, dirty ballast or co-mingled with cargo as it is possible for Charterers to arrange. If it is necessary to retain the residue on board co-mingled with or segregated from the cargo to be loaded, Charterers shall pay for any deadfreight so incurred.

The Charterer agrees to pay freight as per the terms of the Charter Party on any consolidated tank washings, dirty ballast, etc., retained on board under Charterer's instructions during the loaded portion of the voyage up to a maximum of 1% of the total deadweight of the vessel that could be legally carried for such voyage. Any extra expenses incurred by the vessel at loading or discharging port in pumping ashore oil residues shall be for Charterer's account, and extra time, if any, consumed for this operation shall count as used laytime.

## BILL OF LADING

Shipped in apparent good order and condition by

on board the                                                                                    Steamship/Motorship

whereof                                                                                    is Master, at the port of

to be delivered at the port of

or so near thereto as the Vessel can safely get, always afloat, unto

or order on payment of freight at the rate of

This shipment is carried under and pursuant to the terms of the contract/charter dated New York/London

between                                                        and                                                        , as Charterer, and

all the terms whatsoever of the said contract/charter except the rate and payment of freight specified therein apply to and govern the rights of the parties concerned in this shipment.

In witness whereof the Master has signed                                                                      Bills of Lading

of this tenor and date, one of which being accomplished, the others will be void.

Dated at                                                        this                    day of

                                                                                                                           Master

This Charter Party is a computer generated copy of the ASBATANKVOY form, printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by striking out of original characters, or the insertion of new characters, such characters clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

**1ST ORIGINAL**

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses – (ASBATANKVOY)
Dated: 07.08.2003 (1 – 39)

M.T. "PELAGOS " CP DATED: 28 MAY 2005

**1) PRIVACY:**
All negotiations and every detail of this fixture are to be kept strictly private and confidential.

**2) DRUG AND ALCOHOL CLAUSE:**
Owners warrant that they have a policy on Drug and Alcohol Abuse ("Policy") applicable to the Vessel which meets or exceeds the standards in the Oil Companies' International Marine Forum Guidelines for the Control of Drugs and Alcohol on Board Ship ("OCIMF Guidelines"). Owners further warrant that this Policy will remain in effect during the term of this Charter, and that Owners shall exercise due diligence to ensure that the Policy is complied with. For the purposes of the Clause and the OCIMF Guidelines, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all vessel officers and the drug/alcohol testing and screening shall include random testing of the officers with a frequency to ensure that each officer is tested at least once a year.

Owners further warrant that a full declaration has been passed on to Exxon/Exxon affiliate, which as above states that vessel operates under a Drug and Alcohol Policy which meets or exceeds the OCIMF Guidelines.

**3) ETA CLAUSE:**
Master to give Charterers ETA loading port immediately on fixing and 7 days, 72/48/24/12 hours prior arrival **IF TIME ALLOWS** at loading and discharge ports where time permits also ETA discharge port on sailing from load port as well as any change in ETA exceeding 6 hours in all cases. All Eta notices are essential for demurrage purposes.

**4) CARGO:**
Charterers have the option of loading Crude Oil, Dirty Petroleum Products, Gasoil and Marine Diesel Oil, maximum ... grades, but where vessel loads one grade on top of another for admixing purposes same to be treated as one grade.

Owners warrant vessel is able to segregate minimum two (2) grades with double valve, line and pump segregation. Owner warrants vessel able to load/discharge two (2) grades simultaneously without contamination.

The vessel is capable of heating to and maintaining cargo at **CARGO LOADED TEMP BUT MAX** 135 degrees Fahrenheit prior to discharge as per Charterers instructions. Due allowance in time only is to be made for cargo heating for a voyage of less than three days. The vessel is to present at loading port(s) fit for the carriage of **THE AGREED** cargo.

**5) PUMPING:**
Owners warrant that the vessel can maintain at vessels manifolds a **AN AVERAGE** pressure of 110 100 PSI and/or that a full cargo can be discharged within twenty four (24) hours **IN BOTH CASE EXCLUDING STRIPPING**, provided

1

**1ST ORIGINAL**

shore facilities permit. Owner warrants vessel can discharge two (2) grades simultaneously.

~~In ship-to-ship transfer operations, vessel warrants to achieve a discharge rate of up to 2,500 metric tons per hour. Vessel to have on board a sufficient range of reducers to allow connection to various hose line diameters and terminal cargo manifolds.~~

6)  SHIP TO SHIP TRANSFER OPERATIONS:

~~If required by the Charterers the vessel shall load and/or discharge full or part cargo alongside other vessel(s) in port or at a safe anchorage.~~ ALWAYS AS PER OCIMF RULES AND REGULATIONS. ~~Concurrent loading or discharging from both side for cargo with flash point over 60 degrees centigrade shall be acceptable by owners, any restriction for such will not count as laytime used.~~

Charterers are to provide suitable fenders/lines and hoses ETC AS PER OCIMF RULES AND REGULATIONS to safely effect such operations ~~and have the option to store same on board for the duration of Charter Party. Handling of such equipment on board the vessel shall be by owners' crew at Owners' cost.~~ All such equipment shall be removed from the vessel by Charterers upon completion of ~~Charter Party~~ LOADING OR DISCHARGING without delay.

Vessel's crew shall connect/disconnect cargo hoses, heave down/heave up fenders, take/throw connection lines, transfer to/transfer back cargo hoses and any other activities required for the completion and safe conduct of the ship to ship transfer operation for their account without any exclusion.

~~Owners warrant that the vessel is equipped with minimum 10-ton derricks port and starboard amidships to handle bunker lines/cargo hoses.~~ CHARTERERS HAVE NO LIABILITY FOR HULL OR OTHER DAMAGE, IF ANY, THAT MAY OCCUR DURING SUCH OPERATIONS

All extra insurance for above ship to ship literage operations shall be for Owners' account and Charterers have no liability for hull or other damage, if any, that may occur during such operations. Owners warrant that the vessel is equipped and capable of safely carrying out all procedures as set out in the latest revised edition of the ICS/OCIMF Ship to Ship Transfer Guide.

Ship to Ship Transfer may include Charterers very large crude barge (VLCB) of about 34,500 tdw chartered to perform such operations.

7) SUPER CARGO:

Charterers have the option to place on board one supercargo ~~at any time~~ during LOAD OR DISCHARGE this Charter Party. Owner is to provide such supercargo with good accommodation with private bath and food at Captain's table at a cost of US$7.00 per day at Charterers' expense. Supercargo will be allowed access, to investigate, ullage and sample all cargo, slop, bunker, ~~and ballast tanks~~, also any void spaces, ~~and assess to any other parts of vessel that may relate to carriage of cargo as he may require.~~ SUPERCARGO WILL REMAIN ON BOARD ONLY DURING LOADING AND DISCHARGING OPERATIONS. He shall also have the

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses – (ASBATANKVOY)
Dated: 07.08.2003 (1 – 39)

M.T. "PELAGOS " CP DATED: 28 MAY 2005

right to require selected valves on bunker and cargo systems to be sealed to preclude the possibility of cargo/product/bunker migration.

8) VESSEL DESCRIPTION:
Questionnaire'88 form duly completed before placing on subjects to form an integral part of this c/p.

9) PROTECTION & INDEMNITY INSURANCE:
Owner warrants that the vessel is a member of the..NORTH OF ENGLAND... P&I Club and also a member of the ITOPF and will remain throughout the charter period. Owner warrants that vessel holds a pollution cover of US$ 500 million, and additional US$ 200 million USD $ 1 BILLION during full time of Charter Party. Owners agreed to allow Charterers to have the benefit of Owners' P&I insurance to the extent the Rules of that Association permits. Owners to be responsible for all third party claims          which fall under Owner's responsibility.

10) INSURED VALUE:
The vessel insured value is US$ .......15 MILLION TOTAL VALUE.......................

11) COMMUNICATIONS:
The master is to allow Charterers supercargo the use of vessels communication equipment EXCEPT MOBILE AND SATELLITE PHONES for reasonable operational purposes without charge.

Master shall transmit to charterers, on owners account, daily noon positions giving required information regarding vessels position, distance to go, average speed, Eta next port, cargo temperature maintained and any other information requested. Vessel shall maintain twenty-four hours (24 Hrs) watch on VHF Channel 16/14.

12) TRADING HISTORY:
Owners guarantee TO THE BEST OF OWNERS KNOWLEDGE that the vessel is not boycotted by the Arab League and has never traded to Israel.

13) AGENCY:
Owners to appoint Charterers recommended agents at load and discharge ports PROVIED COMPETITIVE.

14) ACCESS:
The Master shall not allow any vessel or craft, other than those of port authorities or pilots, to secure alongside without the express authority of Charterers.

15) OVER AGE INSURANCE:
Any additional insurance payable on vessel and/or cargo due to vessel's age or class shall be for Owners' account.

16) QUANTITATIVE RESPONSIBILITY:
Although Charterers' surveyor may be monitoring any transfer operation, this does not relieve Master or Owners of responsibility for verifying the quantity involved in

3

## 1ST ORIGINAL

each oil movement nor for liability under the terms of this charter party for any oil losses.

### 17) BERTH OCCUPANCY:
Owners warrant vessel shall vacate the berth after completion of ballasting or within one and a half hours following completion of loading/discharging whichever is sooner. If ship not able to vacate berth after such time due to reasons attributed to ship, any extra berth occupancy charges by terminal and port shall be for owners account, all time lost for such occupancy shall not count as used laytime. **HOWEVER IF VSL IS WAITING FOR CARGO DOCUMENTS THEN SUCH TIME AND EXTRA COSTS AS ABOVE TO BE FOR CHARTERER'S ACCOUNT.**

### 18) CHARTER SIGNATURE:
Owners acknowledge Charterers' payment procedures require one original signed **BY OWNERS OR THEIR AGENTS** Charter Party.

### 19) INTRANSIT LOSS:
In addition to other guarantees herein provided with respect to the quality and quantity of vessel's cargo, Owners shall be accountable for product losses, all volumes corrected to 60 degrees Fahrenheit and **TOTAL CALCULATED VOLUMES** assessed by an independent cargo inspector, in excess of the following:

0.1 **0.3** percent for non-volatile products (Fuel Oil and crude Oil), 0.2 percent for gas oil motor oil gasoline, jet fuel and naphtha.

### 20) BLENDING:
**OWNERS NOT TO BE RESPONSIBLE FOR THE FINAL PRODUCT WHATSOEVER. CHRTS WILL PROVIDE OWNERS AS PER OWNERS P&I CLUB WORDING. LOI WORDING AGAINST BLENDING AND/OR COMMINGELING WITHOUT BANK GUARANTEE.** Charterers have the right to load on top of any cargo previously loaded by them, load into a tank containing an on board quantity at bottom, comingle cargo, and blend cargo on board by intertank cargo transfer.

### 21) DEMURRAGE TIME BAR:
Owners agree that Charterers shall be released from all liability for payment of demurrage, unless a telex invoice is received within 30 days upon completion of discharge thereby followed by the claim to be **IS** submitted to Charterers in writing with fully certified original supporting documents, such shall include but not be limited to original signed notice of readiness submitted and accepted and duly signed time sheets and statement of facts duly counter signed **IF POSSIBLE** by shippers and receivers respectively and original pumping logs duly counter signed by terminal representatives **IF POSSIBLE** within 60 **90** days of completion of discharge.

### 22) ADHERENCE TO VOYAGE INSTRUCTIONS:
In the event of Owners/master failing to comply fully with the voyage instructions of Charterers or any other subsequent instructions relayed by charterers, Owners

**1ST ORIGINAL**

~~shall be responsible for such failure and shall indemnify Charterers for any loss of time, costs and expenses directly suffered by Charterers arising therefrom and in particular due to underlift or overlift of cargo, whether or not owners are entitled to claim deadfreight.~~ OWNERS/MASTER WILL COMPLY WITH CHRTS VOYAGE INSTRUCTIONS PROVIDED IN ACCORDANCE WITH THIS C/P EXCEPT WHERE SAFETY OF LIFE, THE VESSEL OR CARGO IS AT RISK.

## 23) YORK/ANTWERP RULES:
York/Antwerp Rules, 1974, as amended 1990, apply to this charter party.

## 24) AVERAGE/ARBITRATION:
General Average and Arbitration shall take place in London and English Law applies to this charter party.

## 25) BILLS OF LADING:
In the event of a change in discharge port **AND/ OR CONSIGNEE** named in Bills of Lading or if the **DULY ENDORSED ORIGINAL** Bills of Lading are not available at discharge port(s), the cargo is to be released by Owners against a Letter of Indemnity signed by an authorized signatory of Charterers in Owners' P&I Club wording without bank guarantee or counter signature.

## 26) ROB'S:
In the event that any cargo remains on board upon completion of discharge, Charterers shall have the right to ~~deduct from freight~~ CLAIM an amount equal to the FOB port of loading value of such cargo plus freight due with respect thereto PROVIDED THE VOLUME OF CARGO REMAINING ON BOARD IS PUMPABLE, LIQUID AND REACHABLE BY VESSEL'S MEANS AS DETERMINED BY AN INDEPENDENT SURVEYOR.

## 27) WAR RISKS:
~~Any increase of hull and machinery war risk premia over and above those in effect on the date of this Charter Party will be for Charterers account, except for the first seven days, which shall be for Owners account. Any premia or increases thereto attributable to closure (i.e. blocking and trapping) insurance shall be for Owners account.~~

~~Surcharges which are in effect on the date of this Charter Party are for Owners account.~~

BP WAR RISK INSURANCE CLAUSE (AMENDED) -
OWNERS SHALL EFFECT WAR RISKS INSURANCE IN RESPECT OF THE HULL AND MACHINERY OF THE VESSEL AND THEIR OTHER INTERESTS (INCL BUT NOT LIMITED TO, LOSS OF EARNINGS AND DETENTION AND THEIR PROTECTION AND INDEMNITY RISKS), AND THE BASIC PREMIUMS AND/OR CALLS THEREFORE SHALL BE FOR OWNERSACCOUNT. WAR RISKS INSURANCE ADDITIONAL PREMIUMS IF ANY ARE FOR CHARTERERS ACCOUNT, NET OF ALL DISCOUNTS OR REBATES RECEIVED BY OWNERS, AND PROVIDED ALWAYS THAT CHARTERERS ARE GIVEN AN INDICATION OF THE EXPECTED AMOUNT OF ADDITIONAL PREMIUM AS SOON AS

POSSIBLE AFTER RECEIPT OF CHARTERERS VOYAGE ORDERS. THE BENEFIT OF DISCOUNTS OR REBATES ON ADDITIONAL PREMIUM RECEIVED BY OWNERS FROM THEIR WAR RISKS INSURERS, UNDERWRITERS OR BROKERS SHALL BE CREDITED TO CHARTERERS IN FULL. CHARTERERS SHALL REIMBURSE OWNERS ANY AMOUNTS DUE UNDER THIS CLAUSE UPON RECEIPT OF OWNERS' INVOICE TOGETHER WITH REASONABLE SUPPORTING DOCUMENTATION INCLUDING ALL ASSOCIATED DEBIT AND CREDIT NOTES (IFANY). FOR THE AVOIDANCE OF DOUBT ANY 'BLOCKING AND TRAPPING', 'LOSS OF PROFIT', 'LOSS OF HIRE', 'LOSS OF FREIGHT' OR 'LOSS OF BUNKERS' INSURANCE TAKE OUT BY OWNERS IN RESPECT OF THE VESSEL, AND ANY ADDITIONAL PREMIUM RELATING THERETO ARISING FROM CHARTERERS TRADING OF THE VESSEL SHALL BE FOR OWNERS'ACCOUNT. CREW WAR BONUS TO BE FOR OWNERS ACCOUNT.

28) ITOPF:
Owners/Operators to be a member of ITOPF and shall present C.L.C. Certificate covering the entire Charter Party period. This is required before payment is made by Charterers.

29) PRORATION:
~~Laytime and waiting time if any at load/discharge ports to be prorated amongst charterers/receivers according to respective cargo quantity.~~

30) NAMING LOAD AND DISCHARGE PORTS
~~Clause 4 of Asbatankvoy c/p to be replaced with this clause. Notwithstanding anything to the contrary in this charter party and notwithstanding what loading and/or discharging ports/ranges may have been nominated and bills of lading issued, charterer shall have the right to change its nomination of the loading and/or discharging ports/ranges. Any extra time and expense incurred by owner in complying with charterer's orders shall be for charterer's account. Freight is based on the voyage actually performed. Charterer shall have the right to make as many changes as it deems necessary.~~

31) POSITION AND BALLAST SPEED:
~~Owners warrant that the vessel's position at the time of fixture is ........... and vessel's ballast speed will be ...... Knots with an expected Eta basis ......... as ......~~

"OWNERS WARRANT THAT THE VSL'S POSITION AT THE TIME OF FIXTURE IS SINGAPORE AND VSL'S BALLAST SPEED WILL BE ABOUT 14 KNOTS WITH AN EXPECTED ETA BASIS FUJAIRAH 5-6/6/05 A.G.W.

32) SPEED:
~~Vessel will perform the laden voyage at ...... knots upto ws 5, weather and safe navigation permitting.~~VESSEL WILL PERFORM LADEN PASSAGE AT 14.0 KNOTS WSNP

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses – (ASBATANKVOY)
Dated: 07.08.2003 (1 – 39)

M.T. "PELAGOS " CP DATED: 28 MAY 2005

### 33) BALLASTING/SHIFTING:
Deballasting **UNLESS CONCURRENT WITH CARGO OPERATIONS** and time proceeding to **FIRST** berth shall not count as used laytime or time on demurrage, even if vessel on demurrage.

### 34) DOCUMENTATION:
Owners warrant and undertake that all loading documents shall be strictly private and confidential and shall not be handed over to any party other than charterer or charterers agent/representative **OR PORT AUTHORITIES**, only if instructed by charterers. Such confidentiality shall include copies and/or quotes of such documents to any party other than charterers.

Owners undertake to instruct master to strictly adhere to above and not to release any information under whatsoever circumstances neither in writing or in verbal unless agreed/instructed in writing by the charterers.

35)    Charterers' shall have the right to ask owners to reissue new Bill of Lading, as per requirements of charterers, upon delivery of **ALL OF** the signed B/L's to the owner/~~owners agent~~ **A REPRESENTATIVE APPOINTED BY OWNERS** or master. Owners shall comply with such request **PROVIDED THE CONTENTS OF NEW BILLS OF LADINGS ARE CORRECT.**

36)    ~~In case the vessel calling port Sudan master of vessel should obtain signature and stamp of receivers and agents/all concerned on following documents prior sailing from port Sudan. NOR, ullage report before discharge, ship ullage report after discharge, dry tank certificate, time sheet and LOP if any.~~

37)    Owners warrant that, a Safety Management System (SMS) in accordance with the ISM code is in operation both on shore and on board the vessels. Onwers further warrant that during the entire duration of c/p, owner (or the company as defined by the ISM code) shall have a valid document of compliance and the vessels shall have a safety management certificate, copies of which will be supplied to charterers **ON THEIR REQUEST.**

38)    This charter party shall be treated as an independent contract and neither party shall have the right of off-setting and/or claim any amounts due or not due from any other charter parties or dealings of whatsoever nature, whether or not same may be due or justified.

The owner warrants that the master and vessel will fully comply with c/p and will not lien cargo or delay or suspend operations due to any claim arising out of **PREVIOUS** c/p's/contracts between owner and charterers and/or any charterers affiliates and/or any of charterers subsidiary companies.

### 39) DISCHARGE / RELOAD CLAUSE:
Charterers may order the vessel to discharge and/or back load a part or full cargo at any nominated port within the loading/~~discharging~~ ranges specified within part 1 and within the rotation of the ports previously nominated, provided that any cargo loaded is of the description specified in part 1 and the Master in his reasonable

7

**1ST ORIGINAL**

M.T. "PELAGOS " CP DATED: 28 MAY 2005

discretion determines that the cargo can be loaded, segregated and discharged without risk of contamination by, or of any other cargo. Charterers shall pay in respect of loading, carrying and discharging such cargo as follows:

a) All time used including deviation if any to be for charterers account. Deviation and other port and anchorage time used at demurrage rate plus all bunkers FO and MDO consumed irrespective of vessel being idle or steaming, plus port cost.

b) Any additional expenses, including port charges and all bunkers FO and MDO consumed, incurred.

c) If the vessel is fixed on a world scale rate in part 1 then freight shall always be paid for the whole voyage at the rate(s) specified in part 1 on the largest cargo quantity carried on any ocean leg.

INTERNATIONAL OIL OVERSEAS INC
Additional Clauses – (ASBATANKVOY)
Dated: 07.08.2003 (1 – 39)

**1ST ORIGINAL**

M.T. "PELAGOS " CP DATED: 28 MAY 2005

## ADDENDUM

IF CHRTRS PERMITS VSL TO TENDER NOR AND BERTH PRIOR TO COMMENCEMENT OF LAYDAYS, ALL TIME FROM COMMENCEMENT OF LOADING UNTIL COMMENCEMENT OF LAYDAYS TO BE CREDITED TO CHRTRS AGAINST LAYTIME AND/OR TIME ON DEMURRAGE

FOR & ON BEHALF OF
THE OWNERS

BY AUTHORITY
MAR-ARA COMMUNICATION LTD.

AS NON - RESPONSIBLE AGENTS ONLY

9

EXHIBIT 3

----------[Maria Iordanidou]------------



"Capital Shipbrokers      To: <tankers.ops@marmaras-nav.gr>
Operations"              cc:
<ops@capital-shipbrok    Subject: DELTA SAILOR / IOOI / CP 25.04.05
ers.co.uk>               Distribution List: ● 1 ○ 2
Sent by: "Jeremy
Chamberlain"
<jchamberlain@capital-s
hipbrokers.co.uk>

05/05/2005 11:01
Please respond to
"Capital Shipbrokers
Operations"


From: Capital Shipbrokers Ltd.
Outgoing Message No: 10926249/JC   05/05/05 09:01


TO: MARMARAS NAVIGATION FOR CHRISTOS

DELTA SAILOR / IOOI / CP 25.04.05
=================================

FOLL FROM CHRTS BROKERS:

QUOTE.

Ref frt remittance following from chrtrs;

qte

Date    : 05-05-2005

To      : R. S. Platou (Asia) Pte Ltd
Attn    : Capt. Abdul Waheed

From    : International Oil Overseas Inc., Jeddah

Ref     : MT Delta Sailor C/P Dtd 25-04-2005.
          Freight Remittance Detail Of USD 282,750.00
................................................................
...
...

Ref above mentioned c/p, this is to inform the owners that charterers
have arranged remittance of freight amount of USD 282,750.00 (i.e. as
per owners freight invoice dtd 28/04) to owners nominated bank
account
being freight thru Riyad Bank, Jeddah.

B-Regard

IOOI / Ops Dept

unqte


UNQUOTE.

```
RGDS CAPITAL SHIPBROKERS
JEREMY CHAMBERLAIN
OFFICE TEL:        +44 (0) 207 300 8290
MOBILE TEL:        +44 (0) 776 893 0556
NEW HOME TEL:      +44 (0) 125 272 8656
```

This email and any attachment ("email") is confidential and contains
preferred information, which may also be legally privileged or otherwise
protected from disclosure and intended only for the addressee. Access to
this email by anyone else is unauthorised. If you are not the intended
recipient, please notify the sender by return and delete this email from
your system. Any disclosure, copying, distribution or any action taken in
reliance on this email is strictly prohibited and may be unlawful. Capital
Shipbrokers Ltd do not warrant that any email is free from viruses and
defects, do not guarantee the completeness or accuracy of the information
contained in it and further disclaim and do not accept any liability for
any loss, damage or expense whatsoever and howsoever caused, arising from
the sending, receipt, use or reliance placed upon the information contained
in the email. Any views expressed in this email may be those of the writer
and do not necessarily reflect those of Capital Shipbrokers Ltd.

This e-mail has been scanned for all viruses by Star Internet. The
service is powered by MessageLabs. For more information on a proactive
anti-virus service working around the clock, around the globe, visit:
http://www.star.net.uk

```
**********************************************************************
*  PRINT NUMBER MLQSPFQS6431 PRINTED BY MLQ OPR K59 ON 18JUL2005 AT 12:55:16  *
*                            PRINT CLASS RX RECEIVE                   *
*                                                                    *
*  IRN 126003683            SERVICE IN  SWF03    HASH 1111           *
*  SRN 06WIOLGRAAAXXX028163  SERVICE OUT MOS48I   OSN  028163        *
*                                                                    *
*  SENDER ADDRESS           MRMDUS33                                 *
*  ROUTE CODE (MMBINNY )    HSBC BANK USA NA                         *
*                           NEW YORK                                 *
*                           UNITED STATES .                          *
**********************************************************************
*  *** WARNING *** THIS PRINTOUT IS A REPRINT                        *
*  *** REMARK *** AUTHENTICATOR CORRECT                              *
**********************************************************************
                  AS RECEIVE HEADER WITH TRANSLATED TEXT
-----------------------------------------------------------------------
{1:F01MIOLGRAAAXXX7260028163}
{2:O1032113050505MRMDUS33DXXX07209789600505060413N}
{3:{108:126009559}
{119:STP}}
-----------------------------------------------------------------------

MT103 SINGLE CUSTOMER CREDIT TRANSFER
  20  TRN                          II MNY126009600
  23B BANK OPERATION CODE          CRED
  32A VAL DATE (CCY/AMT)
      VAL DATE                     06MAY2005
      CCY/AMT                      USD282,750.00
  50K ORDERING CUSTOMER
      FULL N/A                     MARINA WORLD SHIPPING CORP
  52A ORDERING BK
      SWIFT ADDRESS                CHASUS33
                                   JPMORGAN CHASE BANK NA
                                   NEW YORK
                                   UNITED STATES
  53A SENDER REIMB THRU
      SWIFT ADDRESS                MIOLGRAA
                                   HSBC BANK PLC
                                   PIRAEUS
                                   GREECE
  59  BENEF CUSTOMER
      A/C NO                       /GR0507100010000001050055071
      FULL N/A                     ROUTE HOLDING INC.
  70  REM INFO                     /RFB/SWF OF 050505
                                   FRTRHT PYMT REF.370
  71A DETAILS OF CHARGES           SHARE TRANSACTION CHARGES
  72  SENDER TO RECEIVER INFO      INSTRUCTIONS FOLLOWING ARE FOR THE
                                   'ACCOUNT WITH' BANK
                                   (OGB)RIYAD BANK RIYADH 11411,
                                   //SAUDI ARABIA

TRAILER
{5:
{MAC:7A7C6600}
{CHK:12C074A7145C}}        Att: Marina
-----------------------------------------------------------------------
PRINT NUMBER MLQSPFQS6431 PRINTED BY MLQ OPR K59 ON 18JUL2005 AT 12:55:16
>>>>>>>>>> POSSIBLE DUPLICATED PRINT <<<<<<<<<<
END OF MESSAGE
```

**EXHIBIT 4**

ATTN CAPT PEMMAS

SHIBUMI / IOOI  C/P 4-2-98

FYG, FLWG RECVD FROM CHARTERERS

RGDS

---

70991230U001 22FEB98 11:58 GMT

DATE : 22/02/98
REF  : DVA /7010

TO   : PETRIAN SHIPBROKERS, LONDON
       ATTN : SUE VAUGHAN
       FAX  : 44 171 2221346
FROM : I.O.O.I, JEDDAH


SUB  : MT SHIBUMI   C/P DTD 04/02/98

WE HAVE ARRANGED REMITTANCE OF USD 390,000 TO OWNERS.
NOMINATED BANK ACCOUNT BEING FREIGHT THRU RIYAD BANK
MAIN BRANCH , JEDDAH WITH VALU DATE 24/02/98.

WE INSTRUCTED OUR BANK TO SEND DIRECT TLX TO YOUR
CONFIRMING REMITTANCE.

PLS CNFS SAFE RECEIPT OF ABV AMT.


REGARDS
I.O.O.I / JEDDAH
ASHFAQ

# EXHIBIT 5



24-02-98   13:00

215979 CARD GR
407490/8 RDX SJ
YZYZ

WARNING - A COMPUTER GENERATED MESSAGE FOLLOWS.
          PLEASE DO NOT INTERRUPT TRANSMISSION


FROM:RIBLSARI
      RIYAD BANK
      RIYADH

TO   :SEATRADEINV
      SEATRADE INVESTEMENTS S A

DATE:980224
MT:NTX      : NON TESTED TELEX-FREE FORMAT
PR:N        : NORMAL

    :20 /TRANSACTION REFERENCE NO.    :401980540004027/1
    :79X/NARRATIVE                    :FOR YOUR INFORMATION ONLY.


AT THE REQEUST OF OUR CUSTOMER MARINA WORLD SHIPPING CORP. TODAY
WE HAVE TRANSFERED USD.389,986/- VALUE 24/02/1998 FVG YOUR
A/C NO.SEATRADE-USD1 WITH ROYAL BANK OF SCOTLAND PLC.
INTERNATIONAL PAYMENT LONDON, LONDON HRU THEIR CORRESPONDENT
STATE STREET BANK INTL., NEW YORK AND THRU OUR CORRESPONDENT
CHASE MANHATTAN BANK, NEW YORK UNDER OUR SNIFT REF. 101980540004027
STOP PLS FOLLOW UP THE MATTER.

REGARDS,
RIYAD BANK
JEDDAH OPERAITON CENTER.




NNNN
407490/8 RDX SJ
215979 CARD GR

```
4.6  ** Message printout ** Printed:25/02/98 11:46:32 by:gl

LT 07028-00 2402 1906 887571      RBS      X SHIB      OPS/ACC    7bp
================================================================
215976 CARD GR
887571 RBSINT G
XYZ

WARNING - A COMPUTER GENERATED MESSAGE FOLLOWS.
          PLEASE DO NOT INTERRUPT TRANSMISSION

FROM:RBOSGB2L
     ROYAL BANK OF SCOTLAND PLC
     INTERNATIONAL OPERATIONS
     LONDON N1 8XL
     ++N.B. OUR NEW TELEX NO. IS 72130++

TO  :SEATRA
     SEATRADE INVESTMENTS

DATE:980224
MT:NTX       : NON TESTED TELEX FREE FORMAT
PR:N         : NORMAL

     :20 /TRANSACTION REFERENCE NO.    :MSG NO 4621
     :79X/NARRATIVE                    :
WE HAVE RECEIVED AN INSTRUCTION TO CREDIT YOUR
A/C NO SEATRADE USD1
AMOUNT USD 389,968.50
VALUE 24/02/98
ORDER MARINA WORLD SHIPPING
REF M/T SHIBUMI HIRE / 1001 TCT DD 4/2/98

THIS PAYMENT IS REVOCABLE UNTIL 9AM ON THE VALUE DATE

BEST REGARDS
J NARBROUGH
ICP/REF YGY0BM


NNNN
887571 RBSINT G
215976 CARD GR


=== END OF TEXT ===
!================================================================
```

**EXHIBIT 6**

FROM:RBOSGB2L
    ROYAL BANK OF SCOTLAND PLC
    LONDON

TO  :SEATRADE
    SEATRADE INVESTMENTS SA

DATE:  215
MT:NTX    : NON TESTED TELEX FREE FORMAT
PR:N    : NORMAL

  :20:/TRANSACTION REFERENCE NUMBER  :MSG NO 772
  :79:/NARRATIVE
WE HAVE RECEIVED AN INSTRUCTION TO CREDIT YOUR
A/C NO SEATRADE (USD)
AMOUNT USD 633,497.77
VALUE 15/12/98
ORDER MARINA WORLD SHIPPING CORP
REF M/T SHIBUMI VCP 1001 CP DATED 12 NOV 98

THIS PAYMENT IS REVOCABLE UNTIL 9AM ON THE VALUE DATE

BEST REGARDS
M FLEMING
TCP/REF YLLK3K

NNNN
987521 RBSINT G&
215976 CARD GR

*** 15.12.98  19:45

    TELIX ID:  IT 287F1-00 1512 1956

EXHIBIT 7

MESSAGE 42362-GR

FROM: MERIDIAN BROKERAGE INC.
TIME: 10:17 HOURS LT
DATE: 14 DEC 1998

TO: CARDIFF MARINE
    ATT : MR PEMMAS

FOLL RCVD FROM CHRTRS :

RE  : MT SHIBUMI  / IOOI C/P DTD 12ND NOVEMBER, 1998.
      FREIGHT REMITTANCE DETAILS.
==================================================
WE HAVE ARRANGED REMITTANCE OF FREIGHT AMOUNT OF SUM USD
433.719.27, TO OWNERS NOMINATED BANK ACCOUNT BEING FREIGHT
THRU RIYADH BANK MAIN BRANCH, JEDDAH.  WITH VALUE DATE 14TH
DEC. 1998.

WE HAVE INSTRUCTED OUR BANKERS TO SEND DIRECT TLX TO YOU
CONFIRMING REMITTANCE.

PLS CNFM SAFE RECEIPT OF ABV AMT.

IOOI

END

REGARDS
DK/MERIDIAN OPS
*
215981 DRYB GR
212001 MRDN GR

14 12 98   10:05

# EXHIBIT 8



ADVICE OF PAYMENT RECEIVED FROM CHAPS          RBS REF: SJYC4C13D000T      13 MAR 01

A/C NUMBER 22072326 HAS BEEN CREDITED          TIME SENT 08:31:42     RECD 08:31:42

            SETTLEMENT BANK:                    LLOYDS BANK
            SETTLEMENT BANK REF:                FT00048938574261
            PAYMENT TYPE:                       10

            AMOUNT                              £7,104.00

            PAYEE BANK:            15-20-25     ROYAL BANK OF SCOTLAND
                                                5 10 GREAT TOWER ST
                                                LONDON EC3P 3HX

            PAYEE CUSTOMER:                     WATERSON HICKS


            PAYEE CUSTOMER A/C:                 22072326

            PAYER BANK:            30-96-34     LLOYDS BANK PLC
                                                MONUMENT INTNL OFFICE
            SWIFT SENDERS ADDRESS:              RIBLSARIXXX
            PAYER CUSTOMER:                     MARINA WORLD


            PAYER CUSTOMER REF:

            PAYMENT DETAILS:


            INFO TO PAYEE BANK:                 LLOYDS TSB CHG GBP   12.00 DED
                                                UCTED

```
ADVICE OF PAYMENT RECEIVED FROM CHAPS          RBS REF: SJYC8YTDM000T     26 MAR 01

A/C NUMBER 22072326 HAS BEEN CREDITED          TIME SENT 08:29:18    RECD 08:29:18

          SETTLEMENT BANK:               LLOYDS BANK
          SETTLEMENT BANK REF:           FT00049138006261
          PAYMENT TYPE:                  10

          AMOUNT                         £7,103.00

          PAYEE BANK:          15-20-25  ROYAL BANK OF SCOTLAND
                                         5 10 GREAT TOWER ST
                                         LONDON EC3P 3HX
                                         SORT CODE 15 20 25
          PAYEE CUSTOMER:                WATERSON HICKS


          PAYEE CUSTOMER A/C:            22072326

          PAYER BANK:          30-96-34  LLOYDS BANK PLC
                                         MONUMENT INTNL OFFICE
          SWIFT SENDERS ADDRESS:         RIBLSARIXXX
          PAYER CUSTOMER:                MARINA WORLD



          PAYER CUSTOMER REF:

          PAYMENT DETAILS:



          INFO TO PAYEE BANK:            LLOYDS TSB CHG GBP   12.00 DED
                                         UCTED
```



SHIBON

```
ADVICE OF PAYMENT RECEIVED FROM CHAPS          RBS REF: SJYCHXJW9000T     11 APR 01

A/C NUMBER 22072326 HAS BEEN CREDITED          TIME SENT 08:28:33    RECD 08:28:33

              SETTLEMENT BANK:               LLOYDS BANK
              SETTLEMENT BANK REF:           FT00049424681261
              PAYMENT TYPE:                  10

              AMOUNT                         £7,113.00

              PAYEE BANK:         15-20-25   ROYAL BANK OF SCOTLAND
                                             5 10 GREAT TOWER ST
                                             LONDON EC3P 3HX
                                             SORT CODE 152025
              PAYEE CUSTOMER:                WATERSON HICKS


             ,PAYEE CUSTOMER A/C:            22072326

              PAYER BANK:         30-96-34   LLOYDS BANK PLC
                                             MONUMENT INTNL OFFICE
              SWIFT SENDERS ADDRESS:         RIBLSARIXXX
              PAYER CUSTOMER:                MARINA WORLD


              PAYER CUSTOMER REF:

              PAYMENT DETAILS:


              INFO TO PAYEE BANK:            LLOYDS TSB CHG GBP   12.00 DED
                                             UCTED
```

ADVICE OF PAYMENT RECEIVED FROM CHAPS       RBS REF: SJYCXYRQQ000T     15 MAY 01

A/C NUMBER 22072326 HAS BEEN CREDITED        TIME SENT 10:08:31    RECD 10:08:31

SETTLEMENT BANK:                             LLOYDS BANK
SETTLEMENT BANK REF:                         FT00049945720261
PAYMENT TYPE:                                10

AMOUNT                                       £7,113.00

PAYEE BANK:                    15-20-25      ROYAL BANK OF SCOTLAND
                                             510GREAT TOWER STREET LONDON EC3P
                                             3HX,U.K.

PAYEE CUSTOMER:                              WATERSON HICKS


PAYEE CUSTOMER A/C:                          22072326

PAYER BANK:                    30-96-34      LLOYDS BANK PLC
                                             MONUMENT INTNL OFFICE
SWIFT SENDERS ADDRESS:                       RIBLSARIXXX
PAYER CUSTOMER:                              MARINA WORLD


PAYER CUSTOMER REF:

PAYMENT DETAILS:


INFO TO PAYEE BANK:                          LLOYDS TSB CHG GBP   12.00 DED
                                             UCTED

# EXHIBIT 9

----------[Konstantinos Fotinos]------------



**R.S. Platou (Asia) Pte Ltd** &lt;tankers@platou.com.sg&gt;

11/07/2005 10:25
Please respond to R.S. Platou (Asia) Pte Ltd

To: "Capt Christos vogiatzis" &lt;tankers.ops@marmaras-nav.gr&gt;
cc:
Subject: Fw: MT Pelegon - Freight Remittance Detail

```
Dear Capt Christos,

Ref M/T Pelagos frt remittance, following from chrtrs fyr;

qte


Date    : 11-07-2005

To      : R. S. Platou (Asia) Pte Ltd
Attn    : Capt. Abdul Waheed

From    : International Oil Overseas Inc., Jeddah

Ref     : MT Pelegon C/P Dtd 28-05-2005
          Freight Remittance Detail Of Total USD 1,329,824.29
...............................................................
...

Ref above mentioned c/p, this is to inform the owners that charterers
have arranged remittance of freight + time loss for slow down for total
amount of USD 1,329,824.29 (i.e. as per owners freight invoice dtd 23/06
& and per owners invoice for time loss to slow down to arrive Sing dtd
4/07) to owners nominated bank account being freight thru Riyad Bank,
main branch Jeddah.

Please confirm safe receipt of above amount.

B-Regard
IOOI / Ops Dept

unqte


Rgds
Capt. Waheed
```

```
*************************************************************************
* PRINT NUMBER MLQSPFQ56432 PRINTED BY MLQ OPR K59 ON 18JUL2005 AT 12:56:02
*                              PRINT CLASS RX RECEIVE                    *
*                                                                       *
* IRN 19300466/              SERVICE IN  SWF03     HASH 1111            *
* SRN 12MIDLGRAAAXXX084/59   SERVICE OUT MQS48I    OSN  084759          *
*                                                                       *
* SENDER ADDRESS        MRMDUS33                                        *
* ROUTE CODE (MRBIMNY )  HSBC BANK USA NA                               *
*                        NEW YORK                                       *
*                        UNITED STATES                                  *
*************************************************************************
* *** WARNING *** THIS PRINTOUT IS A REPRINT                            *
* *** REMARK *** AUTHENTICATOR CORRECT                                  *
*************************************************************************
              AS RECEIVE HEADER WITH TRANSLATED TEXT
-------------------------------------------------------------------------
{1:F01MIDLGRAAAXXX73760A4759}
{2:O1032205050711MRMDUS33BXXX0791880030050712050bN}
{3:{108:193003273}
{119:STP}}
-------------------------------------------------------------------------
MT103 SINGLE CUSTOMER CREDIT TRANSFER
  20  TRN                       TT MNY193010920
  23B BANK OPERATION CODE       CRED
  32A VAL DATE (CCY/AMT)
      VAL DATE                  12JUL2005
      CCY/AMT                   USD1,029,704.29
  50K ORDERING CUSTOMER
      FULL N/A                  MARINA WORLD SHIPPING CO
  52A ORDERING BK
      SWIFT ADDRESS             CHAGUS33
                                JPMORGAN CHASE BANK NA
                                NEW YORK
                                UNITED STATES
  53A SENDER REIMB THRU
      SWIFT ADDRESS             MIDLGRAA
                                HSBC BANK PLC
                                PIRAEUS
                                GREECE
  59  BENEF CUSTOMER
      A/C NO                    /001025139036
      FULL N/A                  BEAM COMPANY INC
  70  REM INFO                  /RFB/SWF OF 060/11
                                IBAN GR630/10001000001025139036 FR
                                EIGHT PYMT OUR REF.381
  71A DETAILS OF CHARGES        SHARE TRANSACTION CHARGES
  72  SENDER TO RECEIVER INFO   INSTRUCTIONS FOLLOWING ARE FOR THE
                                'ACCOUNT WITH' BANK
                                AT YR 93 AJTU NUAIYKU STR PIRA
                                // FUS ARFECF(OAR)RIYAD BANK RIYADH
                                // 11411, SAUDI ARABIA
                                //(SNDCHA)USD25,00
  TRAILER
  {5:
  {MAC:OEC6EA88}
  {CHK:86FCA9659A85}}
-------------------------------------------------------------------------
-------------------------------------------------------------------------
                   PRINT NUMBER MLQSPFQ56432 WILL CONTINUE ON PAGE 2
```

EXHIBIT 10

```
/*****************************************************************
RINTER:GRS01    24/08/04 SEQ NO:000009S GRPRTSI  SW CHASUS33XXXX
*****************************************************************
SWIFT MESSAGE
MT103 Single Customer Credit Transfer (All forms)
MAR       : 040824RBOSGRAAAXXX4045009015
Status    : R
********************** Message Text **********************
1:F01RBOSGRAAAXXX4045009015
2:O1030442040824CHASUS33DXXX1637831695040824142N
SENDER:                  CHASUS33XXXX
                         JPMORGAN CHASE BANK
                         NEW YORK,NY
MESSAGE TYPE:            103
SENDER'S INPUT TIME:     04:42
MIR:                     040824CHASUS33DXXX1637831695
RECEIVED:                24/08/2004 11:42
PRIORITY:                NORMAL
4:
:20: SENDER'S REFERENCE
     1201800237JS
:23B:BANK OPERATION CODE
     CRED
:32A:VALUE DATE:040824
     CURRENCY CODE:USD
     AMOUNT:360703,
:33B:CCY/ORIGINAL ORDERED AMT
     USD360733,
:50K:ORDERING CUSTOMER
     MARINE WORLS SHIPPING

:52A:ORDERING INSTITUTION
     RIBLSARI
     RIYAD BANK
     RIYADH
:57D:ACCOUNT WITH INSTITUTION
     THE ROYAL BANK OF SCOTLAND PLC
     PIRAEUS BRANCH 61 AKTI MIAOULI 1851
     JPMORGEN CASE BANK
     SWEFT CODE RBOSGRAA
:59: BENEFICIARY CUSTOMER
     /GR11064000100000000155454100
     BILKAR SHIPPING COMPANY LTD
:71A:DETAILS OF CHARGES
     BEN
:71F:SENDER'S CHARGES
     USD30,00
:72: SENDER TO RECEIVER INFO
     /BOOK/1201800237JS
5:
MAC:898CAA9B
CHK:0A21601E8156
********************* Message Audit Details *********************
24/08/2004  09:43:09  IDS                 SWIFT IN
AUTHENTICATION SUCCESSFUL - MAC
24/08/2004  09:43:09  934                 MESSAGE ROUTED
TO: GRPRTSI  RBOSGRAA *** RULE 100
************************** End of Message**************************
```

*(handwritten)* AH 9192
AH 9192
MT PP161P01

EXHIBIT 11

⑥

```
************************************************************************
PRINTER:GR501    24/05/04 SEQ NO:000103 GR501    SW CHASUS33XXXX  REPRINT
************************************************************************
SWIFT MESSAGE
MT103 Single Customer Credit transfer (All forms)
MAR      : 040524RBOSGRAAAXXX3976985808
Status   : R
******************************* Message Text *****************************
1:FO1RBOSGRAAAXXX3976985808
2:01030137040524CHASUS33CXXX71798553490405240837N
SENDER:           CHASUS33XXXX
                  JPMORGAN CHASE BANK
                  NEW YORK,NY
MESSAGE TYPE:     103
SENDER'S INPUT TIME: 01:37
MIR:              040524CHASUS33CXXX7179855349
RECEIVED:         24/05/2004 08:37
PRIORITY:         NORMAL
3:
:119:VALIDATION REQUEST FOR
     STP
4:
:20: SENDER'S REFERENCE
     8260100144JS
:23B:BANK OPERATION CODE
     CRED
:32A:VALUE DATE:040524
     CURRENCY CODE:USD
     AMOUNT:866524,02
:33B:CCY/ORIGINAL ORDERED AMT
     USD866554,02
:50K:ORDERING CUSTOMER
     MARINE WORLD SHIPPING

:52A:ORDERING INSTITUTION
     RIBLSARI
     RIYAD BANK
     RIYADH
:59: BENEFICIARY CUSTOMER
     /GR58 0640001000000042000310O USD
     NORD COMPANY LTD.(LIBERIA)
:70: REMITTANCE INFORMATION
     FREIGHT PAYMENT REF.317
:71A:DETAILS OF CHARGES
     BEN
:71F:SENDER'S CHARGES
     USD30,00
:72: SENDER TO RECEIVER INFO
     /ACC/AT YR PIRAEUS BRANCH,61 AKTI M
     //IAOULI 185 10 PIRAEUS GREECE
     ///BOOK/8260100144JS
5:
MAC:3B44D79F
CHK:D41DFEC40464
********************** Message Audit Details **********************
24/05/2004 08:37:25  IDS            SWIFT IN
AUTHENTICATION SUCCESSFUL - MAC
24/05/2004 08:37:25  935            MESSAGE ROUTED
TO: GRPRTSI   RBOSGRAA *** RULE 100
```

AH 7052

MT NORD SEA

EXHIBIT 12

```
*****************************************************************
PRINTER:GR501     15/09/04 SEQ NO:000201 GRPRTSI   SW RIBLSARIXXXX
*****************************************************************
SWIFT MESSAGE
MT103 Single Customer Credit transfer (All forms)
MAR      : 040915RBOSGRAAAXXX4061013657
Status   : R
************************************ Message Text ****************************
1:F01RBOSGRAAAXXX4061013657
2:O1031320040915RIBLSARIAXXX3150823856040915132ON
SENDER:              RIBLSARIXXXX
                     RIYAD BANK
                     RIYADH
MESSAGE TYPE:        103
SENDER'S INPUT TIME: 13:20
MIR:                 040915RIBLSARIAXXX3150823856
RECEIVED:            15/09/2004 13:20
PRIORITY:            NORMAL
3:
:108:MSG USER REF
     E103040915031921
4:
:20: SENDER'S REFERENCE
     101482590951340O
:23B:BANK OPERATION CODE
     CRED
:32A:VALUE DATE:040915
     CURRENCY CODE:USD
     AMOUNT:1133794,91
:50K:ORDERING CUSTOMER
     MARINE WORLD SHIPPING CORP
:53A:SENDER'S CORRESPONDENT
     CHASUS33XXX
     JPMORGAN CHASE BANK
     NEW YORK,NY
:54A:RECEIVER'S CORRESPONDENT
     CHASUS33XXX
     JPMORGAN CHASE BANK
     NEW YORK,NY
:57D:ACCOUNT WITH INSTITUTION
     THE ROYAL BANK OF SCOTLAND PLC
     PIRAEUS BRANCH 61AKTI MIAOULI 18510
     GRECCE SWEFT CODE RBOSGRAA
:59: BENEFICIARY CUSTOMER
     /GR5806400010000000420003100
     NORD COMPANY LTD LIBERIA
:70: REMITTANCE INFORMATION
     HIRE PAYMENT OUR REF.332
:71A:DETAILS OF CHARGES
     SHA
5:
MAC:OFF5925C
CHK:DOF617A3A621
*********************** Message Audit Details **********************
15/09/2004  11:20:29  IDS               SWIFT IN
AUTHENTICATION SUCCESSFUL - MAC
15/09/2004  11:20:29  934               MESSAGE ROUTED
TO: GRPRTSI   RBOSGRAA *** RULE 100
******************************** End of Message*************************
```

*A+|8]1 g* (handwritten)

*M·V· NORD SEA* (handwritten)

**The Royal Bank of Scotland plc**

Piraeus Branch
61 Akti Miaouli
GR-185 10 Piraeus

Date __

EXHIBIT 13

----------[Konstantinos Fotinos]----------



**"Jahre Dahl Bergesen AS - Trond Sending"**
**<ts@jdb.no>**

13/01/2005 13:48

To: "NORD COMPANY LTD (FREIGHT) - PIRAEUS"
    <tankers.ops@marmaras-nav.gr.>
cc:
Subject: MT Nord Sea/IOOI CP 1.1.05. - Freight Remittance Detail

FOLLOWING FROM CHARTERERS:

Please note following from the Charterers and acknowledge safe receipt of funds.

Subject: Fw: MT Nord Sea - Freight Remittance Detail

+++++ QTE +++

<----- Original Message ----->
From: Ashfaq Kadri <akadri@emailsrvc.com>
To: <amn_seawise@yahoo.com>; <tankers@platou.com.sg>;
Received: 1/13/2005 6:57:24 PM
Subject: [ABMN] MT Nord Sea - Freight Remittance Detail Of
Ref: 130105-ABMN011195 - R.S. Platou

Date     : 13-01-2005

To       : R. S. Platou (Asia) Pte Ltd
Attn     : Capt. Adnan

From     : International Oil Overseas Inc., Jeddah

Ref      : MT Nord Sea C/P Dtd 01-01-2005
           Freight Remittance Detail Of USD 302,250.00
................................................................
......

Ref above mentioned c/p, this is to inform the owners that charterers
have arranged remittance of freight amount of USD 302,250.00 (i.e. as
per owners revised freight invoice dtd 10/01/05) to owners nominated
bank account being freight thru Riyad Bank Jeddah.

B-Regard

IOOI / Ops Dept

+++ UNQTE +++

Best Regards
Simon Ledger
ACM Shipping Limited

Telephone 020 7930 7666
Fax 020 7930 0115
Telex 296406
E-mail ops@acmshipping.co.uk

Home 01322 615758
Mobile 07770 687793



```
:20: SENDER'S REFERENCE
     9223900016JS
:23B:BANK OPERATION CODE
     CRED
:32A:VALUE DATE:050118
     CURRENCY CODE:USD
     AMOUNT:302242,
:33B:CCY/ORIGINAL ORDERED AMT
     USD302250,
:50K:ORDERING CUSTOMER
     MARINA WORLD SHIPPING CORP

:52A:ORDERING INSTITUTION
     RIBLSARI
     RIYAD BANK
     RIYADH
:59: BENEFICIARY CUSTOMER
     /GR5806400010000000420003100 USD
     NORD COMPANY LTD LIBERLA
.70: REMITTANCE INFORMATION
     FREIGHT PAYMENT REF.359
:71A:DETAILS OF CHARGES
     BEN
:71F:SENDER'S CHARGES
     USD8.00
:72: SENDER TO RECEIVER INFO
     /ACC/AT YR PIRAEUS BR. 61 AKTI MISO
     //ULI 185 10 PIRAEUS GREECE
     ///BOOK/9223900016JS
5:
MAC:A9F47CC6
CHK:1A192F14572B
DLM:
```

A12920

M.1. NORD SEA

```
*************************** Message Audit Details ***************************
18/01/2005  05:32:26  IDS              SWIFT IN
AUTHENTICATION SUCCESSFUL  MAC
18/01/2005  05:32:26  933              MESSAGE ROUTED
```

## The Royal Bank of Scotland plc

Piraeus Branch
61 Akti Miaouli
GR-185 10 Piraeus

Date 1

NORD COMPANY LTD

We have debited your account with the amounts shown below according to your instructions.

We have credited your account with the amounts shown below in relation to the payment printed above.

420003

| | Amount |
|---|---|
| 741 | 302,242.00 |

| | |
|---|---|
| Payment | |
| Commission | |
| Transfer charges | |
| Total | |
| Our ref. | |

Είναι απόλυτα κατανοητό ότι το έμβασμα εκτελείται με την ευθύνη του αποστολέα και ότι η The Royal Bank of Scotland plc και / ή οι ανταποκριτές της δεν αναλαμβάνουν καμμιά απολύτως ευθύνη για τυχόν καθυστέρηση κατά τη μεταφορά ή για παράλειψη εντοπισμού του δικαιούχου. Είναι επίσης κατανοητό ότι η εφαρμοζόμενη ισοτιμία μετατροπής (σε περίπτωση ξένου νομίσματος) θα είναι η ισχύουσα στο κεντρικό μας κατάστημα του Λονδίνου κατά την ημέρα της επεξεργασίας του εμβάσματος εκτός εάν έχει προηγηθεί διαφορετική συμφωνία.

It is clearly understood that the payment is undertaken at the sender's risk and that The Royal Bank of Scotland plc and / or their agents accept no liability whatsoever for any delay in transit or from failure to identify the beneficiary. It is also understood that the applicable rate of exchange (in the case of foreign currency) will be that ruling on the date of processing in our Head Office unless otherwise previously agreed.

EXHIBIT 14

# Graham Pilkington

| | |
|---|---|
| From: | Michael Hope |
| Sent: | 22 November 2005 15:45 |
| To: | Graham Pilkington |
| Subject: | "PRIGIPOS" - OUTSTANDING MARMARAS CLAIMS |

To:   Graham Pilkington
      NEPIA

From:  Michael Hope
Ref:   04/FDD/A/MKH/RH

**WITHOUT PREJUDICE**

Graham,

I have been authorised by IOOI to pass on the following settlement proposal. They are willing to settle the four outstanding claims with Marmaras for the total sum of US$195,000.00, inclusive of interest and costs, with payment to be effected within 10 days upon presentation of an invoice. IOOI will pay against a copy of the invoice, but require the original invoice to be forwarded to them in the post. For the sake of good order, the four claims are the following:

MT "NORD SEA" - C/P 01/01/05
MT "NORD SEA" - C/P 22/04/04
MT "NORD SEA" - C/P 12/08/04
MT "PRIGIPOSE" - C/P 12/08/04

Please let me know if your Members agree to the above proposal.

Kind regards

Michael Hope
Manager - North Insurance Management Ltd
As Managers on behalf of the North of England P&I Association Limited
michael.hope@nepia.com

This message, and any associated files, is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this message in error, please notify us immediately.

The North of England Protecting and Indemnity Association Limited. Registered in England No.505456. Registered Office: The Quayside Newcastle Upon Tyne NE1 3DU UK. Telephone: +44 191 2325221, Fax: +44 191 2610540, Telex: 53634 / 537316



## INVOICE.

To      : Messrs. International Oil Overseas Inc. – Jeddah.
          c/o The North of England P&I Assosciation Ltd
          The Quayside,
          Newcastle upon Tyne

          United Kingdom.

**M/T Nord Sea cp 22/4-04 - 12/8-04 and 1/1-05. M/T Prigipos cp 12/8-04.**

Agreed amount, included interest and costs, as full and final
settlement under above charter parties:                    **Usd. 195.000.-**

Above amount payable to:

The Royal Bank of Scotland Plc. – Piraeus Branch
61, Akti Miaouli
185 10 Piraeus, Greece.
swift: rbosgraa
a/c no: 420003 – 100 usd
Iban no: gr58 0640 0010 0000 0042 0003 100
favour: Nord Company Ltd.
corresponding bank of RBS in New York:
J.P.Morgan Chase Bank N.York
aba no: 021000021

on behalf of Nord Company Ltd and Bilkar Shipping Company Ltd.

Trond Sending

**Jahre Dahl Bergesen AS**
P.O.Box 2263, N-3203 Sandefjord, Norway
Telephone: 47 33 48 47 00, Telefax: 47 33 46 72 00
E-mail: jdb@jdb.no
Telex: 21777 Thorl N
www.jdb.no
Visiting address: Strandpromenaden 9, Sandefjord
Enterprise number: NO 976 932 722 MVA

:20: SENDER'S REFERENCE
    7993000351FS
:23B:BANK OPERATION CODE
    CRED
:32A:VALUE DATE:051221
    CURRENCY CODE:USD
    AMOUNT:194952,
:33B:CCY/ORIGINAL ORDERED AMT
    USD194983,
:50K:ORDERING CUSTOMER
    MARINA WORLD SHIPPING CORP

:52A:ORDERING INSTITUTION
    RIBLSARI
    RIYAD BANK
    RIYADH
:59: BENEFICIARY CUSTOMER
    /421605 100 USD
    NOSTOS HOLIDING INC.
:70: REMITTANCE INFORMATION
    SETTLEMENT OF DEMURRAGE PAYMENT
    REF. 422 IBAN
    GR070640001000000421605100
:71A:DETAILS OF CHARGES
    BEN
:71F:SENDER'S CHARGES
    USD31,00
:72: SENDER TO RECEIVER INFO
    /BOOK/7993000351FS
5:
MAC:A8964DEF
CHK:08F143AEBEA5
DLM:

*A K 1 8 8 3*

*M·V· NORD SEA*

*************************** Message Audit Details ********************:
21/12/2005  05:32:29  IDS              SWIFT IN
AUTHENTICATION SUCCESSFUL - MAC
21/12/2005  05:32:30  930              MESSAGE ROUTED

---

### The Royal Bank of Scotland plc

Piraeus Branch
45 Akti Miaouli
GR-185 10 Piraeus

Date

| To NOSTOS HOLDING INC | We have debited your account with the amounts shown below according to your instructions. | |
|---|---|---|
| c/o Marmaras Nav | We have credited your account with the amounts shown below in relation to the payment printed above. | 421605 |

| | Amount | | Payment |
|---|---|---|---|
| H C | 741 | 194,952.00 | Commission |
| | | | Transfer charges |
| | | | Total |
| | | | Our ref. |

Είναι απόλυτα κατανοητό ότι το έμβασμα εκτελείται με την ευθύνη του αποστολέα και ότι η The Royal Bank of Scotland plc και / ή οι ανταποκριτές της δεν αναλαμβάνουν καμμιά απολύτως ευθύνη για τυχόν καθυστέρηση κατά τη μεταφορά ή για παράλειψη εντοπισμού του δικαιούχου. Είναι επίσης κατανοητό ότι η εφαρμοζόμενη ισοτιμία μετατροπής (σε περίπτωση ξένου νομίσματος) θα είναι η ισχύουσα στο κεντρικό μας κατάστημα του Λονδίνου κατά την ημέρα της επεξεργασίας του εμβάσματος εκτός εάν έχει προηγηθεί διαφορετική συμφωνία.

It is clearly understood that the payment is undertaken at the sender's risk and that The Royal Bank of Scotland plc and / or their agents accept no liability whatsoever for any delay in transit or from failure to identify the beneficiary. It is also understood that the applicable rate of exchange (in the case of foreign currency) will be that ruling on the date of processing in our Head Office unless otherwise previously agreed.

EXHIBIT 15

wrELiX 5.69 Case 1:16-cv-03923-JMC Document 134-16 Filed 07/25/16 Page 92 of 107
I IF 121FB-00*1504 1905 020 7929 3748>HICKS   P SHIB   CLAIMS   2mv



**MRC** INVESTIGATIONS

The Bakri Group / International Oil Overseas Inc

---

**Prepared for:**
**Waterson Hicks**


**Attention:**
**John Hicks**


**MRC Investigations Report on:**


**The Bakri Group**
**&**
**International Oil Overseas Inc.**

Report supplied under MRC's published Terms and Conditions of Sale.
Note in particular that MRC reports are for the client's business use only
and the contents are not to be passed in whole or part to any third party
without prior written agreement from MRC.

---

wTELiX 5. Case Message Printed Re Printed:16/04/2002 10:37 by:mv Page 4/25 Document 384 316 Filed 07/25/06 Page 80 of 107
I IF 121F8-00*1504 1905 020 7929 3748>HICKS    P SHIB    CLAIMS    2mv

15-APR-2002  17:05   FROM  WATERSON HICKS              TO  0030100090105           P.04/25

**MRC** INVESTIGATIONS

The Bakri Group / International Oil Overseas Inc

### INSTRUCTION

On the 19th March 2002, instruction was received from Messrs Waterson Hicks to investigate the ownership and structure of the Bakri Group of companies, Saudi Arabia - including relations to International Oil Overseas Inc. (IOOI) of Panama. The primary aim of the investigation is to connect IOOI to the Bakri Group of companies and hence from there to assets which may be attached as security to a claim. Additionally the question of Sheikh Abdul Kader Bakri Mohamed Saleh Al Smakari's (Bakri) involvement as the controlling force behind IOOI between February and May 1998 is also to be addressed, and his role in control of the Bakri companies referred to within Lloyds Registry of International Shipowning Groups.

As we understand it, this investigation surrounds your wish to enforce an arbitration award in favour of your clients against IOOI as the debtor against which this claim arose. As IOOI is considered assetless, the enforcement of the award is sought through the attachment of assets that are in common ownership/control of IOOI and the Bakri Group.

The ideal method by which this might be achieved was considered to be the arrest of a vessel within the common ownership of IOOI / The Bakri Group which may call at South Africa, or another suitable jurisdiction. In this light, the vessels *Quds* and *Taibah I* were identified as potential targets prior to our investigation and details were sought of their ownership and operations to tie them to Bakri and IOOI.

In addition to these two vessels, we also included enquiries against the *Sea Wind*, *Yasmeen* and *Al Marwah*. The reason for this was to provide a

**MRC** INVESTIGATIONS

The Bakri Group / International Oil Overseas Inc

broader, and therefore greater, chance of providing evidence of common
control against all of the vessels through the selection of vessel flagged in
different jurisdictions - in this case Panama as well as Saudi Arabia.

Our enquires on this matter have been based upon research of our
internal records and multi-media resources, via third party market sources
and through corporate and flag registry searches.

### BACKGROUND INFORMATION - THE BAKRI GROUP

The Bakri group is headed by Abdul Kader Bakri, with a number of other
family members also involved in management of various companies within
the overall group. The group's structure is not transparent, since Saudi
trading groups rarely have any conventional corporate organisation, but is
represented by separate companies, established by the principals for
particular businesses. In the case of the Bakri group, this is a series of
companies, active in shipping, trading, bunkering and, latterly, port
operations, but with no formal holding structure. As such, the term Bakri
Group is used loosely to describe all of the companies there n, rather than
it being a formally incorporated company.

Central to the Bakri Group is Bakri Trading Co. Inc. The core activity of
this company is as a trader, charterer and supplier in the Asian oil market,
particularly in relation to refined oil products, such as fuel oil, gas oil,
diesel oil, naptha, kerosene and jet oil. The company regularly participates
in government-sponsored tenders issued by the national oil companies of
Pakistan, Sri Lanka, and India, and to a lesser extent, Vietnam, Egypt,

Case 1:06-cv-03622-PKC Document 316 Filed 07/25/06 Page 82 of 107

**MRC** INVESTIGATIONS

The Bakri Group / International Oil Overseas Inc

and Nepal. Bakri Trading sources its crude oil and refined oil products from Saudi Arabia and the Gulf States.

A Panamanian-registered affiliate, **International Oil Overseas Inc.** (IOOI), frequently acts as Bakri's chartering arm and is registered in tanker charter parties as the nominated counterparty, mainly for crude oil shipments supporting the trades conducted by Bakri Trading.

The other main operating company of the Bakri group, acting in close liaison with **Bakri Trading,** is **Bakri Navigation Co Ltd,** which currently operates a fleet of 39 tankers of various types. 17 of these are employed in the distribution of refined products within the Arabian Gulf-Red Sea region, 22 are operated internationally, mainly transporting oil to ports in the Indian sub-continent and the Far East.

The majority of the vessels are 1970s-built. However, in recent years Bakri Navigation has invested in newbuilding tonnage, taking delivery of two 45,000 dwt chemical carriers from the South Korean shipyard Hanjin in 2000, these being the vessels "Quds" and "Taibah I". Both these vessels are presently understood to be trading in the Far East.

The company's vessels are mainly chartered out to Saudi operators, which include the state-owned companies, Vela, SABIC and Petromin, or are employed in Bakri group business, which includes bunkering operations.

In Yanbu, Bakri Navigation leases the only bunker station (berth 21) which has a capacity of 16,000 tonnes of fuel oil and 12,000 tonnes of gas oil.

wTELiX 5. Gase 1:05-cv-03825-PKC Document 31-316 Filed 07/25/06 Page 83 of 107
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS    Printed:16/04/2002 10:37 by:mv   Page 7/25
P SHIB                                   CLAIMS      2mv

**MRC** INVESTIGATIONS

The Bakri Group / International Oil Overseas Inc

The monthly physical sales here are placed at 15,000 tonnes of fuel oil and 2,000 tonnes of gas oil.

Bakri Navigation also leases maritime facilities at the King Fahed Industrial Seaport in Jubail and the Jubail Commercial Seaport, both in The Eastern Province. It also operates Jeddah Drydock.

The other significant components of the Bakri Group of companies, but which are less significant in role, include **Bakri International Energy Corporation** (formerly known as Bakri Bunker Trading Co or Bakri Bunkering) which is the principal bunkering arm of the group. The UK-based Arabian Bunkering Ltd was rumoured to act as its agent and handling Bakri's sales in Europe as its agent. Leastways this later company has had strong ties to Bakri in the past.

Market sources suggest that the Bakri family controls other regional bunkering/oil trading companies, most notably Transgulf Oil and Shipping Inc and East Africa Maritime Inc, both of which are registered in Liberia.

**Red Sea Marine Services** acts as the Bakri Navigation fleet manager. Supplies of fuels for the fleet, where sourced external to the group, are ordered by another company, **Ocean Marine Services.**

Other non-shipping and energy companies are believed to include **Khomasia Establishment, Bakri Real Estate, Bakri National Commercial Co, Bakri Trading and Contracting.**

wTELiX 5.65 ** Message printout ** Printed:16/04/2002 10:37 by:mv    Page 8/25
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS      P SHIB        CLAIMS    2mv

15-APR-2002  17:07   FROM   WATERSON HICKS            TO  0030108090105           P.08/25

**M R C** INVESTIGATIONS

The Bakri Group / International Oil Overseas Inc

---

### COMPANY FINDINGS

In light of the above, corporate registry searches were conducted against a variety of Bakri Group companies associated to the ownership and operation of the vessels *Quds*, *Taibah 1*, *Yasmeen* and *Al Marwah*. The results of these searches and enquiries are described below, company by company.

- **International Oil Overseas Inc**

IOOI was confirmed as registered as a private limited company in the offshore jurisdiction of Panama on the 1st August 1990.

IOOI was officially registered in Panama under Public Deed No. 8247, dated the 30th July 1990, of the First Notary Public. This is recorded under Microjacket 236054, Roll 30116, Frame 0116 of the Microfilm (Commercial Section) of the Panamanian Public Register.

There is no specific classification of the activities of IOOI on public record in Panama. The activities of the company are merely registered as 'general'. The company has a registered share capital of US$10,000 divided into 10,000 shares of US$1 par value.

Unfortunately, there are no shareholders listed on file in Panama. However, even if the shareholders were listed, we would expect them to be nominees. In this case, the direct shareholders may well be members of the local law firm which registered IOOI and acts as it's legal representative in Panama. This law firm is Patton Moreno & Asvat.

---

Case 1:06-cv-03628-PKC   Document 31-316   Filed 07/25/06   Page 85 of 107
wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:38 by:mv    Page 10/25
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS      P SHIB          CLAIMS    2mv

15-APR-2002  17:08  FROM  WATERSON HICKS          TO  0030108090105        P.10/25



The Bakri Group / International Oil Overseas Inc

We do not presently know if this address has been used as a contact for IOOI.

The significance of ABL and ABS (as previously mentioned) is the working relationship between these companies and the Bakri Group. Such involvement is understood to have included acting as agents for Bakri Bunker Trading. We do not know if ABS have continued this commercial relationship with Bakri Bunker Trading or any other components of the Bakri Group. However, we understand from third party market sources that Bakri have stressed that ABL/ABS have only ever acted in a brokerage role for the company and never as agents.

As far as we have been able to ascertain, there has never been any direct ownership interest between any of the Bakri companies and ABL, or ABS. Companies House records in the UK have never shown such a connection. From market enquiries conducted in the past, we have no reason to doubt a very close relationship between ABL (specifically John Noyon) and members of the Bakri Group. The relationship, as stated, is in a commercial capacity only.

However, by means of Public Deed No. 10400, dated the 10th December 1997, the corporate officers for IOOI were changed to (i.e. replacing John Noyon, David Noyon and Patrick Feely):

| Director/President: | Abdel Kader Mohamed El Amin |
|---|---|
| Director/Treasurer: | Saber Abu Ammara |
| Director/Secretary: | M. Othaman Mahamed |

The above individuals were listed as domiciled at:

MRC Ref: S259 00888 / 10158786   11 April 2002          Page 8

wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:38 by:mv   Page 11/25
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS      P SHIB        CLAIMS    2mv

15-APR-2002  17:08  FROM  WATERSON HICKS                  TO  0030108090105        P.11/25



The Bakri Group / International Oil Overseas Inc

                P.O. Pox 1086
                Fujairan
                United Arab Emirates

When considering Abdel Kader Mohamed El Amin, Saber Abu Ammara
and M. Othaman Mahamed, none of these names immediately tally with
those known for either of Arabian Bunkering Ltd or Bakri Navigation Co.
Ltd, nor other companies which are members of the Bakri Group.

However, the above address is known to belong to a company named as
**Al Badia Bunkering Ltd.** Al Badia Bunkering Ltd, although of no direct
connection in itself to the subjects of this report, does have a close working
relationship (and believed common ownership) with another company
named **Transgulf Oil & Shipping Ltd (TOS).**

TOS is a Liberian registered company, previously active as a bunker
supplier in the Persian Gulf. The company is in turn very strongly believed
to be a vehicle controlled by the Bakri family and John Noyon. Although
we do not have documentary evidence to support this, the aforementioned
ABL (John Noyon) has acted as the world-wide agents for TOS and the
company is understood to have utilised Bakri controlled tonnage for its
local operations. As far as we understand the position at present,
Transgulf Oil & Shipping Ltd has now ceased operating.

Although the direct shareholders of IOOI have not been disclosed on
public file, there is some evidence to show a connection between the
former, and current, corporate officers of IOOI with the Bakri Group. One
source, an internationally recognised maritime exchange, has advised us
that they were aware of a 'number' of arbitration awards against IOOI. This

Case 1:02-cv-03626-PKK   Document 33-36   Filed 07/25/06   Page 87 of 107
wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:38 by:mv    Page 12/25
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS      P SHIB        CLAIMS      2mv

15-APR-2002  17:09   FROM  WATERSON HICKS            TO  0030108090105          P.12/25



The Bakri Group / International Oil Overseas Inc

source also stated that, as far as they were aware, these had not yet been honoured. This source did not identify the number of these awards or their value, but it would appear to be more than one. We do not have documentary evidence of these awards and so therefore cannot substantiate them. However, the awards were addressed to IOOI c/o Bakri in Jeddah.

Another source, an internationally recognised body representing shipowners, has advised us that the address listed against IOOI of Panama on one award they were aware of was:

Al Andulas Street
P.O. Box 3757
Jeddah 21481
Saudi Arabia

Fax: + 966 2 651 2908

The above address and fax number are both, from our internal records, those that have been used for Bakri Bunker Trading, Schiff Holdings Inc (the owner of the m/v *Seawind*) and Red Sea Marine Services Ltd. We understand that the office at this address is named the "Al Bakri Building" and that it houses a number of current Bakri Group companies, including Bakri Trading and Bakri Navigation.

- **Bakri Navigation Company Limited.**

The investigation was to also focus on whether the Bakri Navigation Company, hereafter BNC, is presently under the control of Abdul Kadar Bakri.

Case 1:08-cv-03626-PKC Document 33-36 Filed 07/25/06 Page 88 of 107

wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:38 by:mv    Page 13/25
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS      P SHIB       CLAIMS      2mv

15-APR-2002  17:09   FROM  WATERSON HICKS                     TO  00301080090105 ·        P.13/25



**MRC** INVESTIGATIONS

The Bakri Group ,' International Oil Overseas Inc

A corporate registry search was conducted into the company with the
following results:

BNC was registered in Saudi Arabia on the 01st September 1978. It is a
sharikat tadhamun bill asshum (limited liability partnership) registered
under commercial registration number (C.R.No.) 4030012898, Jeddah.

The BNC's activities are given as ship owners, oil traders and oil tanker
operators. BNC transports oil, petroleum products and petrochemicals at
local, regional and international levels. Locally, it transports light Arab
crude oil between the Kingdom of Saudi Arabia and Red Sea and Gulf
Ports.

Regionally, the company transports products to East Africa, Gulf of Oman
and the Indian Sub-continent. Internationally, it transports products to
Europe and the Far East.

The company operates from a large suite of offices (reportedly owned), in
the central business district of Jeddah, at the following address:

Al Bakri Building
Al Andulas Street
Al Hamra
Jeddah 21481
Saudi Arabia

(BNC also have offices in Dammam, Riyadh and Ras Tanura.)

The partners and management are listed as:

| Managing Partner: | Abdul Kader Bakri |
|---|---|

wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:38 by:mv    Page 14/25
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS      P SHIB      CLAIMS    2mv

15-APR-2002  17:09   FROM  WATERSON HICKS              TO  00301080901.05          P. 14/25



The Bakri Group / International Oil Overseas Inc

| Partner: | Raad Abdul Kader Bakri |
|---|---|
| Partner: | Waleed Abdul Kader Bakri |
| Partner: | Mohamed Hani Abdul Kader Bakri |
| Partner: | Zohair Abdulkader Bakri |
| Partner: | Ghassan Abdulkader Bakri |

Management:

| General Manager: | Mohamed Hani Abdul Kader Bakri |
|---|---|
| Assistant G.M.: | Captain F.N. Siddiquie |
| Operations Manager: | Mr. Jehanzev Khan |
| Contracts Manager: | Captain Ahmed Massoud |

Shareholders:

The company's authorised capital is Saudi Riyal 500,000. Of this, 100% is paid up and the shareholders are:

| Name | Value | Percentage |
|---|---|---|
| Abdul Kader Bakri | SR 275,000 | 55% |
| Zuhair Abdul Kader Bakri | SR 45,000 | 09% |
| Ghassan Abdul Kader Bakri | SR 45,000 | 09% |
| M. Hani Abdul Kader Bakri | SR 45,000 | 09% |
| Waleed Abdul Kader Bakri | SR 45,000 | 09% |
| Raad Abdul Kader Bakri | SR 45,000 | 09% |

According our enquiries with local agents in Saudi Arabia, the following are listed as "sister concerns", we understand by reason of common shareholders and/or corporate officers:

MRC Ref: S259 00888 / 10158786   11 April 2002       Page 12

wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:38 by:mv   Page 15/25
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS    P SHIB       CLAIMS    2mv

15-APR-2002  17:10   FROM  WATERSON HICKS        TO  0030100090105         P.15/25



**MRC** INVESTIGATIONS

The Bakri Group / International Oil Overseas Inc

---

*Bakri International Energy Company Ltd*
Bakri Building
Al Maadi Street
Al Ruwais District
Jeddah
Saudi Arabia

*Penta Commercial Agencies*
Shemaisi
Riyadh
Saudi Arabia

*Al Khomasiah Est*
Al Bakri Building
Al Andulas Street
Al Hamra
Jeddah
Saudi Arabia

*Red Sea Marine Services*
Al Bakri Building
Al Andulas Street
Al Hamra
Jeddah
Saudi Arabia

*Bakri Trading Company Ltd*
Al Maadi Street
Jeddah
Saudi Arabia

*Marketing Integrated Services Centre*
Al Andulas Street
Jeddah
Saudi Arabia

We further understand from our enquiries that BNC has relations with the
following banks:

Riyadh Bank
Prince Fahad Street
Jeddah
Saudi Arabia

---

MRC Ref: S259 00888 / 10158786   11 April 2002         Page 13

wTELiX 5.6 Case 1:08-cv-03626-PKC Document 33-36 Filed 07/25/06 Page 91 of 107
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS   P SHIB   CLAIMS   2mv

15-APR-2002  17:10   FROM  WATERSON HICKS                  TO  0030108090105           P.16/25



The Bakri Group / International Oil Overseas Inc

**MRC** INVESTIGATIONS

Saudi American Bank
Andulas Street
Jeddah
Saudi Arabia

These banks also have linked to other arms of the Bakri group and are
also listed as being the bankers of RSMS (see below).

- **Red Sea Marine Services Ltd:**

A corporate registry search was conducted into the company with the
following results:

RSMS was registered in Saudi Arabia on the 01st January 1989. It is a
sharikat tadhamun bill asshum (limited liability partnership) entity acting as
shipping agents and marine services contractors. The company is listed
as having 20 employees. The company works in conjunction with Bakri
Navigation (BNC) in providing management and agency services to
vessels operated within the Bakri Group. We understand that this largely
involves those vessel operated in coastal waters of Saudi Arabia.

The company operates from a leased small suite of offices at the following
address:

Al Bakri Building
Al Andulas Street
Al Hamra
Jeddah 21481
Saudi Arabia

The company's postal address is listed as:

P.O. Box 3757
Jeddah 21481
Saudi Arabia

Case 1:08-cv-03628-PKC  Document 33-16  Filed 07/13/06  Page 92 of 107

wTELiX 5.69 Message Printed - Printed:15/04/2002 10:38 by:mv  Page 17/25
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS    P SHIB      CLAIMS    2mv



**MRC INVESTIGATIONS**

The Bakri Group / International Oil Overseas Inc

The partners and management are listed as:

| Managing partner: | Abdul Kader Bakri |
|---|---|
| Partner: | Zohair Abdul Kader Bakri |
| Partner: | Ghassan Abdul Kader Bakri |

The company's authorised capital is Saudi Riyal 3,500,00. Of this, 100% is paid up. Unfortunately, for reasons unknown, our agents in Saudi Arabia were unable to obtain any information on the identities of the shareholders of this capital.

As with Bakri Navigation (BNC) information from our local agents in Saudi Arabia described the following as "sister concerns" of RSMS:

*Bakri International Energy Company Ltd*
Bakri Building
Al Maadi Street
Al Ruwais District
Jeddah
Saudi Arabia

*Penta Commercial Agencies*
Shemaisi
Riyadh
Saudi Arabia

*Al Khomasiah Est*
Al Bakri Building
Al Andulas Street
Al Hamra
Jeddah
Saudi Arabia

*Bakri Navigation Company Ltd*
Al Bakri Building
Al Andulas Street

Case 1:08-cv-03625-PKC   Document 33-36   Filed 07/23/26   Page 93 of 107

wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:38 by:mv   Page 18/25
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS   P SHIB   CLAIMS   2mv

15-APR-2002  17:11   FROM  WATERSON HICKS                    TO  0030108090105        P. 18/25



**MRC** INVESTIGATIONS

The Bakri Group / International Oil Overseas Inc

Al Hamra
Jeddah
Saudi Arabia

*Bakri Trading Company Ltd*
Al Maadi Street
Jeddah
Saudi Arabia

*Marketing Integrated Services Centre*
Al Andulas Street
Jeddah
Saudi Arabia

## VESSEL ENQUIRIES

The following section describes the information obtained in respect of the vessels *Quds*, *Taibah I*, Seawind, Yasmeen and Al Marwah – whether through corporate and flag enquiries or market sources.

- *Quds & Taibah I*

Our attempts to source flag registration documents on both the Quds and Taibah I have met without success, and no prospect thereof. As both of these vessels are registered in Saudi Arabia, as are the majority of the Bakri fleet, we have been prevented from obtaining the relevant documents to identify registered owners and mortgage details. The Saudi shipping register will only release information at the behest of the owners. We have therefore been unable to pursue this line of enquiry. Given that Bakri would not release such information without disclosure of our client and purpose of the enquiry, we are unable to pursue this specific aspect.

wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:38 by:mv   Page 15/25
I IF 121FB-00*1504 1905 020 7929 3748>HICKS     P SHIB       CLAIMS       2mv

15-APR-2002  17:11   FROM  WATERSON HICKS                 TO  0030100090105        P.19/25



The Bakri Group / International Oil Overseas Inc

**MRC INVESTIGATIONS**

However, market sources have informed us that the vessels are presently
on time charter to Saudi Arabia Basic Industrial Corp (SABIC) for 10
years. Every available source of public domain information, including all
recognised shipping directories, list Bakri Navigation Co. Ltd as the
owners of the vessels. It is further understood that the purchase of these
vessels was financed on the back of a syndicated loan from the ANZ
Investment Bank to the 'Bakri Group'. Sources further corroborated Bakri's
purchase of the vessels by stating that the loan, in 1999, was for the
purchase of 2 x 45,000 dwt chemical tankers - this obviously tallies with
the base characteristics of both the *Quds* and *Taibah I*.

For information on Bakri Navigation Co. Ltd, as understood and believed
to be the registered owners of the *Quds* and *Taibah I*, please refer to the
section above.

### ● *Sea Wind*

Due to the registration issue faced above, we sought to identify alternative
vessels not registered in Saudi Arabia. The first such vessel investigated
is:

Name: *Sea Wind*
Call Sign: 3EJD9,
Navigation License No. (Last): 2070493B
Legal Representative (Last): Patton, Moreno & Asvat
Registered Owners (Last): Schiff Holding Inc.
Address: Saudi Arabia

Case 1:02-cv-03625-PKC    Document 33-36    Filed 07/25/06    Page 95 of 107
wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:38 by:mv    Page 20/25
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS    P SHIB    CLAIMS    2mv

15-APR-2002  17:12   FROM  WATERSON HICKS                    TO  0030108090105                P.20/25



The Bakri Group / International Oil Overseas Inc

**MRC** INVESTIGATIONS

The information above obtained from the Panamanian Flag Registry, the
vessel was cancelled from the register under Resolution 608 dated 25th
February 2002.

The reasons for the cancellation from the register are unknown and we do
not have any information which identifies the new flag register to which the
vessel is assigned. As such, we contacted various market sources who
deal with the Bakri Group who advised that the vessel was still actively
trading, though none could embellish this information any further in respect
of whether this was under the Bakri banner or not. According to additional
searches through Lloyds Seasearcher vessel movements database, there
have been no reports of the vessel's location since December 2001.

The vessel's reported P&I Club and Classification Society were contacted
as part of our enquires. According to the North of England P&I Club, the
vessel is no longer covered by them although they do still cover other
vessels within the Bakri fleet. The Hellenic Registry stated that the vessel
was still in class, though they were unaware of the removal of the vessel
from the Panamanian register, they informed us that the vessel is due for
its annual survey in the very near future.

As noted above, the registered owner of the *Sea Wind*, at least until
22nd February 2002, is the company Schiff Holding Inc, Panama.
Searches conducted in Panama retrieved the following information.

Schiff Holding Inc was registered in Panama on 16th September 1987 by
means of Public Deed No.11769, dated 27/August/1987 of the First
Notary Public, under Microjacket, 199174, Roll 22251, Frame 74 in the
Microfilm (Commercial) Section.

MRC Ref: S259 00888 / 10158786   11 April 2002        Page 18

Case 1:02-cv-03625-PKC   Document 33-36   Filed 07/25/06   Page 96 of 107

wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:38 by:mv    Page 21/25
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS      P SHIB      CLAIMS    2mv

15-APR-2002  17:12   FROM  WATERSON HICKS                    TO  0030103090105          P. 21/25



**MRC** INVESTIGATIONS

The Bakri Group / International Oil Overseas Inc

The company does not have a listed share capital on file nor any information as to the nominal value or number of shares. However, the Directors/Officers of the company are:

| President/Director: Abdul Kader Bakri |
| --- |
| Treasurer/Director: Mohammed Hani Abdul Kader Bakri |
| Secretary/Director: Zohair Abdul Kader Bakri |

The address given on record is:

Al Maadi street,
P.O. Box 3757,
Jeddah 21481,
Saudi Arabia

The local Panamanian legal representative for Schiff Holding Inc is the law firm Arias, Fabrega & Fabrega, with the 'Legal Representative nominally described as 'The President'.

Obviously the above provides good evidence of connection between Schiff Holding Inc and the Bakri Group, it is not yet clear whether the Sea Wind remains owned by Schiff Holding Inc. No other market information at this time was able to establish if it has genuinely been sold, or simply transferred flag.

- **Yasmeen & Al Marwah**

The above results also led us to initial analysis of other ocean-going vessels understood to be operated under the banner of the general Bakri operated fleet.

MRC Ref: S259 00888 / 10158786   11 April 2002        Page 19

wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:38 by:mv    Page 22/25
I  IF 121FB-00*1504 1905 020 7929 3748>HICKS    P SHIB        CLAIMS    2mv

15-APR-2002  17:12   FROM  WATERSON HICKS                    TO  0030108090105        P.22/25



**MRC** INVESTIGATIONS

The Bakri Group / International Oil Overseas Inc

The *Yasmeen* is a Liberian flagged products tanker of 37,009 dwt and built in 1976. According to our databases, the Yasmeen is directly owned by the Liberian domiciled plate company Seafoam Maritime Inc, itself registered in 1987.

However, enquiries through historical movements databases did not identify any international movements records since September 1999 - hence a very low likelihood of the vessel calling to South Africa or other convenient jurisdictions. So far as we can tell from onward enquiries, the vessel currently trades locally within Saudi waters. As such, in order to not unnecessarily expend cost budget, we did not undertake further corporate or flag investigations in Liberia. However, should this be required, the relevant searches and investigations can be made.

The *Al Marwah* is a 1975 built tanker of 87,452 dwt flagged in Panama. Records show that the registered owner of the vessel is the Liberian company Sea King Maritime Inc, itself founded in 1994. As with the *Yasmeen*, subsequent enquiries on the activities of this vessel prior to conducting searches identified that it had been scrapped at Gadani Beach, Pakistan on or about the 7th February 2002. As a result, no registration enquiries were undertaken.

## CONCLUSION

The Bakri group is a large corporate organisation based upon the un-conventional structure often associated with Saudi Arabian corporations. The group is represented by separate companies, established by the principals for particular businesses. The group is headed by Abdul Kader

Case 1:08-cv-03626-PKC Document 33-36 Filed 07/03/26 Page 98 of 107
wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:38 by:mv Page 23/25
I IF 121FB-00*1504 1905 020 7929 3748>HICKS P SHIB CLAIMS 2mv

15-APR-2002  17:13  FROM  WATERSON HICKS            TO  0030108090105          P.23/25



The Bakri Group / International Oil Overseas Inc

Bakri, with a number of other family members also involved in
management. The group is made up of numerous and varied concerns.

Our investigation took in the Panamanian-registered affiliate,
**International Oil Overseas Inc.** (IOOI), who frequently act as Bakri
Trading's chartering arm and is identified in tanker charter parties as the
nominated counterparty, mainly for crude oil shipments. Also **Red Sea
Marine Services** (RSMS) who acts as the Bakri Navigation fleet manager.

As part of our enquiries corporate registry searches were conducted into
IOOI. No shareholders were listed on file in Panama and no direct
evidence of Bakri ownership was obtained from this source, despite the
appearance of Saudi corporate officers in 1997 addressed in Jeddah,
Saudi Arabia. However, from market contacts, one source has advised us
that one arbitration award given against IOOI in the past have addressed
the latter as:

Al Andulas Street
P.O. Box 3757
Jeddah 21481
Saudi Arabia

Fax: + 966 2 651 2908

The above address and fax number are both, from our internal records,
those that have been used for a variety of Bakri prefixed companies,
including Bakri Trading, Bakri Navigation and Red Sea Marine Services,
Bunker Trading, Schiff Holdings Inc and Red Sea Marine Services Ltd.
The office at this address is also named the "Al Bakri Building" and is
unlikely therefore to be a coincidence.

MRC Ref: 5259 00888 / 10158786  11 April 2002          Page 21

Case 1:08-cv-03626-PKC   Document 33-36   Filed 07/13/26   Page 99 of 107
wTELiX 5.69 ** Message printout ** Printed:16/04/2002 10:39 by:mv   Page 24/25
I  IF 121FB-00+1504 1905 020 7929 3748>HICKS     F SHIB        CLAIMS    2mv

15-APR-2002  17:13   FROM  WATERSON HICKS          TO  0030108090105          P.24/25



The Bakri Group / International Oil Overseas Inc

There is good evidence to connect the primary Bakri vessel operating companies - Bakri Navigation Co and Red Sea Marine Services - through common ownership and/or domicile and corporate officers. Principally, the results of the corporate registry searches detailed the partners and management as Abdul Kader Bakri, Zohair Abdul Kader Bakri and Ghassan Abdul Kader Bakri as common to both. Information on the registered owners of the Bakri controlled vessel *Sea Wind* - Schiff Holding Inc - identified Abdul Kader Bakri, Mohammed Hani Abdul Kader Bakri and Zohair Abdul Kader Bakri as being Directors and Officers of the latter

In addition to the above, Bakri Navigation (BNC) is understood to have relations with Riyadh Bank and Saudi American Bank. These banks are linked to other arms of the Bakri group and are also understood to be the bankers of Red Sea Marine Services (RSMS).

Whilst we were unable to obtain flag registration documents for the vessels *Quds* and *Taibah I*, due to the fact that the Saudi authorities will not release such information as public record, the vessels are nonetheless listed in all recognised shipping directories as owned by Bakri Navigation Co (BNC).

Obviously the weakest link in the chain of evidence is the connection between IOOI itself and Bakri Navigation Co (BNC) or others. However, there is sufficient information of a circumstantial nature which gives good reason to consider the two companies, and Bakri Trading, to be associated.

This concludes our preliminary investigations within the original budget. There are obviously various avenues which can be pursued in more detail,

MRC Ref: S259 00888 / 10158786   11 April 2002       Page 22

wTELiX 5.69 Case 1:05-cv-03924-RMC Document 381-16 Filed 07/17/2006 Page 123 of 107
I IF 121FB-00*1504 1905 020 7929 3748>HICKS    P SHIB       CLAIMS     2mv

15-APR-2002  17:14   FROM  WATERSON HICKS                TO  0030100090105         P.25/25

**MRC** INVESTIGATIONS

The Bakri Group / International Oil Overseas Inc

including investigations against other vessels within the Bakri controlled

fleet. Please advise if you require the investigation to be extended on any

aspect.

**Bakri Trading Co Inc**

SAUDI ARABIA

Page 2          Corporate Details
Page 3          Business Development
Page 4          Financial
Page 5          Reputation
Page 5          Appraisal
Page 7          Fleet List
Page

2Bakri Trading Co Inc S109 385 [[fax=0171 2042727]] [[name=DC / TMS06 / 10023099]] [[append=     ]] [[message=Please find attached your report on Bakri Trading Co Inc. If you would like to discuss it further, please contact David Culverwell at MRC in Oxford.]][[recipient=Andrew Kemp]][[subject=Through Transport Mutual Services, (Europe)]][[cover=coverbus]]

Report supplied under MRC's published Terms and Conditions of Sale. Note in particular that MRC reports are for the client's business use only and the contents are not to be passed in whole or part to any third party without prior written agreement from MRC.

**CORPORATE DETAILS**

**NRC Report on: Bakri Trading Co Inc.**

**Address:**

Al Bakri Building, Suez Street, Al Andulas District, PO Box 3757, Jeddah 21481, Saudi Arabia.
Phone: +966 2 651 9995    Fax:  +966 2 651 2908    Telex:  401557 BAKRI

**Legal Form:**

Limited liability company, registered in Saudi Arabia. Commenced operations in 1995.

**Ownership:**

Al-Bakri family.

**Management:**

Dr Zohair A.K. Al-Bakri  -  President

**Affiliate Offices:**

Bakri Bunker & Trading Co, Saudi Arabia; Bakri Navigation Co Ltd, Saudi Arabia; Bakri Trading Co Inc, Saudi Arabia; International Oil Overseas Inc., Panama; Red Sea Marine Services, Saudi Arabia etc.

**Main Activities:**

Shipowning, crude oil and products trading, bunker supply, port operations.

**Date of Last Accounts:**

N/A.

**Bankers:**

Riyadh Bank, Jeddah; Chase Manhattan Bank, Bahrain.

## BUSINESS DEVELOPMENT

**Bakri Trading Co Inc** is one of the key operating entities of the well established Bakri group of companies of shipping, oil trading and bunkering companies controlled by the Al-Bakri family. It was formed as a limited liability company in Saudi Arabia and commenced operations in 1995.

The group is controlled by Sheikh Abdul Kader Al-Bakri. A number of other family members are involved in management. The groups structure is not confirmed, since Saudi trading groups rarely have any traditional corporate organisation. They are likely to be separate companies, established by the principals for particular businesses. In the case of the Bakri group, this is a series of companies, active in shipping, trading, bunkering and, latterly, port operations, but with no formal holding structure.

Bakri Trading Co Inc is recognized as the primary oil trading entity of the group.

The other key companies are Bakri Navigation Co Ltd Inc, which operates a fleet of 15 owned tankers, ranging in size from the 4,030 dwt bunker supply vessel *Shamms* to the 87,452 dwt aframax tanker *Al Marwah*. It includes five chemical tankers of between 7,500 dwt and 12,000 dwt. In addition, Bakri has four floating storage barges and seven tugs. The core business, however, is the movement of oil between Saudi Arabia/Arabian Gulf, the Indian subcontinent and the Far East. Red Sea Marine Services functions as the Groups in-house technical ship management company, serving the Bakri fleets operational requirements.

International Oil Overseas Inc, Panama, is the Groups offshore-registered ship charterer and operator, while Supreme Global Inc, Panama, functions as the Groups offshore-registered cargo trading arm.

Bakri Bunker Trading Co provides bunker supplies in Saudi Arabian ports. Other Group affiliates active in shipping and trading are known to include Transgulf Oil & Shipping Inc, East Africa Maritime Inc, and International Supplies Ltd. Al Khomasia Establishment, Al Bakri Real Estate and Al Bakri Trading & Contracting Co are involved in real estate developments.

In April 1997, the Saudi Arabian Government, endorsed by King Fahd, announced a phased programme to hand over the management, operation and maintenance of ports controlled by the Saudi Ports Authority to the private sector. Under the first phase of the programme, the ro-ro goods terminal at Jeddah, the management of the King Fahd

ship repair complex at Dammam and the terminals for cargo and bulk wheat imports at Dammam and Jubail were offered as private concessions for leasing period of ten years. Forty-three companies were short-listed to acquire the concessions and their bids were evaluated during the period April-July 1997. The Bakri Group was awarded the concession to operate the Jubail terminal. Despite extensive enquiries, minimal information is available at the present time on the structure of this new arrangement since the project is still in its start-up phase.

## FINANCIAL

Bakri Trading Co Ltd is part of a group of companies domiciled in Saudi Arabia, where there is no obligation for companies to file any accounts. No financial information has been provided to us by the Bakri groups management.

The extent of the Al-Bakri familys worth, while believed to be considerable, has not been confirmed. Its known interests are concentrated in shipping, oil trading, bunker supplies .

Bakri Trading Cos trading activity is occasionally reported in the form of market fixtures. Estimates of its income from this source are difficult to quantify but are likely to fall in the US$20-30m range. On the basis of its own estimated supply volumes, Bakri Bunker & Trading is likely to be achieving an annual turnover in the region of US$60m through its operations at Jeddah and Yanbu. While margins in the bunker sector are never particularly good, this business should be profitable. The scale of the familys ownership interests in other bunkering operations - for example, at Fujairah - has not been quantified.

The shipping side of the group, Bakri Navigation, controls an owned fleet of 15 tankers. Turnover from this side of the business is estimated to be at least US$45m. International Oil Overseas and, possibly, other chartering companies, will have further boosted the groups revenues. The second hand value of Bakri Navigations fleet of mainly 1960/70s-built tankers is estimated at about US$35m.

Total Group turnover is therefore likely to be in the region of US$150m. However, without any hard financial data, this figure must remain no more than a rough estimate.

## REPUTATION

☑007/010

The Bakri Group is reasonably well known in the international oil and shipping markets. Although the groups commercial reputation is viewed as generally sound, there have been indications that its constituent companies are occasionally uncooperative in their dealings with overseas counterparties - an impression reinforced by its managements unwillingness to provide detailed information on its activities.

When, for example, Bakri Bunker Trading or Bakri Navigation appear on the international market as a purchaser of fuel or other supplies, delays in payment are to be expected. Purchasers have indicated that while quality/quantity problems are inherent in the bunker industry, Bakri Bunker has a higher proportion than many suppliers.

The owned fleets age profile is relatively elderly, and this has been reflected in its operating record over the years, with a number of casualties and accidents reported.

Chartering references for the group company International Oil Overseas have indicated a similar pattern. For example, two Greek owners who have dealt with the Group on a regular basis have reported that in the event of a charter party dispute, International Oil Overseas prefers to take matters all the way to arbitration rather than settling them by reasonable negotiation.

A Scandinavian owner has indicated that it would be unwilling to deal with the group again, in view of its allegedly difficult and uncommunicative attitude. However, this owner was confident that Bakri would remain a long term player in the market.


## APPRAISAL

Bakri Trading Co Ltd is part of the well-established Saudi shipping, oil trading and bunkering group. The group has been most widely known for its bunkering operations, but has also expanded its involvement in shipping and oil trading and, most recently, port operations, following its successful bid to operate the Port of Jubail under a ten year lease.

The financial standing of individual group members and of the overall Bakri operation, cannot be established, since no financial information is available and the full extent of their interests has not been disclosed. However, the Bakri groups recent pattern of investment in the expansion of its various activities support the view that the Group has substantial financial resources.

Reports have been received from market sources that problems may occur when dealing with Bakri group companies in the form of disputes and claims, and it is recommended that contracts are scrupulously

worded to avoid potential pitfalls. However, overall the Groups commercial performance is viewed as reliable.

With this proviso, Bakri Trading Co Ltd may be regarded as a suitable counterparty in any proposed business undertaking.

MRC RATING

| MRC Marine Rating | Rating | Additional Factors |
|-------------------|--------|--------------------|
| Sales level (1-6) | ID | |
| Condition (1-6) | 3 | |
| Performance (1-6) | 4 | MLG |

*Refer to MRC Rating Sheet for the explanation of Ratings*

FLEET LIST

| Name | Type | Dwt | Bit |
|------|------|-----|-----|
| Al Marwah | tanker | 87,452 | 75 |
| Al Haijra | tanker | 10,200 | 77 |
| Bador | tanker | 8,647 | 80 |
| Bakri Orbotor | tanker | 12,010 | 82 |
| Nadia | tanker | 3,445 | 54 |
| Naseem Al Bahr | tanker | 3,196 | 73 |
| Shamms | tanker | 4,095 | 76 |
| Yasmeen | tanker | 37,009 | 76 |
| Sea Wind | tanker | 21,093 | 64 |
| Good Carrier | tanker | 6,174 | 67 |
| Radwah | LPG | 5,131 | 66 |
| Gulf Navigator | tanker | 10,895 | 82 |
| Bakri Voyager | chemical | 7,749 | 74 |
| Miraj | tanker | 87,151 | 75 |
| Hatan | chemical | 8,176 | 74 |